# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

TONIA L. JONES, *et al.*

      Plaintiffs,

  v.

DISTRICT OF COLUMBIA,　　　　　　　Civil Action No. 11-00215 (RMC)

      Defendant.

## PLAINTIFFS' OPPOSITION TO DEFENDANT'S PARTIAL MOTION TO DISMISS

Plaintiffs oppose Defendant's partial motion to dismiss counts 2, 3, 4, 11, 12, and 13 of their Amended Complaint.[1]  Plaintiffs properly and timely gave notice to the District of Columbia under D.C. Code §12-309 of their claims of discrimination, harassment, and reprisal by filing multiple police reports in the regular course of duty.  In addition, Plaintiffs' claims for unliquidated damages are not subject to §12-309.  Finally, Plaintiffs timely filed their Section 1983 claims (counts 11, 12, and 13) and plainly stated causes of action under that statute. For these reasons, the Court must deny Defendant's partial motion to dismiss in its entirety.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

### A.      FACTS

Plaintiffs are police officers in the District of Columbia's Metropolitan Police Department ("MPD"), Seventh District.  Amended Complaint ["AC"] at ¶ 3-4.  Plaintiffs were

---

[1] Defendant refers to the "Second Amended Complaint" in its partial motion to dismiss, however, there is no Second Amended Complaint, as the Complaint was only amended one time, before service upon Defendant. As a result, all references herein are to the Amended Complaint.

squad car partners beginning in early 2006. In July 2006, Plaintiffs began a lesbian relationship.

In September 2006, Plaintiffs informed their supervisor, Sgt. Podorski, of their relationship.  AC ¶ 10. Almost immediately thereafter, the Sergeants of 7D began harassing Plaintiffs and subjecting Plaintiffs to a hostile working environment on a frequent and continuing basis.  Plaintiffs experienced harassment and disparate treatment due to their sexual orientation and gender. *See e.g.,* AC ¶¶ 15-32.  Sgt. Podorski also exhibited his animus towards lesbians in other work-related incidents, including toward gay victims of domestic violence.  AC ¶¶ 29-30. Sgt. Washington also frequently referred to Plaintiff Jones as "the butch one" and Plaintiff Weeks as "the femme one." AC ¶ 21.  The Sergeants also frequently commented that it was their intention to split Plaintiffs up by not allowing them to ride together in the same patrol car.  AC ¶ 46.  Beginning in September 2006, Sgts. Podorski and Washington refused to allow Plaintiffs to ride in the same vehicle. AC ¶ 47.

Plaintiffs first complained about the discrimination to MPD in January 2007.  AC ¶ 12. Plaintiffs also reported Sgt. Podorski's harassment to other managers. AC ¶¶ 80, 81. However, this had the effect of continuing and increasing the harassment and hostile work environment. For example, two sergeants told Plaintiff Weeks in January 2007 in the cafeteria that if she filed an EEO complaint, Sgt. Podorski might claim that Plaintiff Weeks had slept with him. AC ¶ 24. Sgt. Podorski and other sergeants also made unwarranted and public accusations that Plaintiffs were "unsafe" to work with. AC ¶ 50.  Sgt. Podorski also harassed Plaintiffs about their attendance and treated them differently than heterosexual and male officers.  AC ¶¶ 55-57.

Upon learning of Plaintiffs' same-sex relationship, the Sergeants in 7D also repeatedly and persistently acted in ways to separate the Plaintiffs from one another during their work shifts

and to deny their requests for shift changes.  AC ¶ 34.  For example, in March 2007, Sgt. Podorski refused to have both Officers Jones and Weeks in the same Patrol Service Area ("PSA").  AC ¶ 35.  Around April 2007, Plaintiffs requested transfer to the midnight shift in order to get away from Sgt. Podorski's harassment.  AC ¶ 36.  However, Commander Joel Maupin issued a "policy" that officers cannot switch shifts without "a body for a body."  Males and heterosexuals were nevertheless allowed to switch shifts without replacements.  *Id.*

Plaintiffs' supervisors also made frequent sex-based comments that harassed the Plaintiffs based on gendered stereotypes of how women should act and look.  AC ¶ 19.   The frequent comments also included direct sexual comments to and solicitations of the Plaintiffs. AC ¶ 23.  In May 2007, Plaintiffs attended a party at which many MPD officers from 7D were in attendance. AC ¶ 25. At the party, Sgt. Podorski loudly yelled at Plaintiffs, "do you wanna fuck?" So, too, in September 2007, Officer Stephen Prestoop told Plaintiffs that he "want[ed] to watch" Plaintiffs have sex, and that he would pay them $5000 for the opportunity to do so.  AC ¶ 26. Officers of 7D also harassed Plaintiff Weeks, who had previously been in heterosexual relationships, for becoming involved in a lesbian relationship.  AC ¶ 17.  For example, on May 26, 2007, Sgt. Washington asked Plaintiff Weeks why she "switched to being with a woman." AC ¶ 16.  Officer William Chapman also told Plaintiff Weeks that she should "go back" to men. AC ¶ 18.

Plaintiffs requested reassignments away from day-work to midnights to get away from Sgt. Podorski.  AC ¶ 36.  However, their new supervisor, Sgt. Washington, began to harass them when they switched shifts in the fall of 2007.  Plaintiffs were informed that Sgt. Washington said that "he was going to get them" and that "he had something for them."  AC ¶ 104. Sgt.

Washington began putting Plaintiffs on fixed-duty, isolated details outside of their assigned PSAs in an attempt to separate them. AC ¶40, 42.  On September 19, 2007, Sgt. Washington assigned Plaintiff Weeks to the Marjorie Court detail. AC ¶ 41.  When other officers asked for this detail, Sgt. Washington said, "I'm saving this for my girl," meaning Plaintiff Weeks.  On October 5, 2007, Sgt. Washington assigned Plaintiff Weeks to the Marjorie Court detail again. AC ¶ 43.  Officers told Plaintiffs that Sgt. Washington was upset that Plaintiffs were always put together and intended to prevent them from taking leave at the same time.  *Id;* AC ¶ 53.

Sgt. Washington also created a hostile work environment for Plaintiffs by repeatedly subjecting them to unwarranted disciplinary actions and harassing them about leave usage.  AC ¶ 73.  For example, on September 26, 2007, Sgt. Washington charged Plaintiff Weeks with "Neglect of Duty."  On October 3, 2007, Plaintiff Weeks called in sick as a result of the stress she was experiencing relating to the ongoing harassment. AC ¶ 59.  Sgt. Washington repeatedly called the medical clinic to see whether Plaintiff Weeks had appeared, AC ¶ 61, and then charged her with 2 days of AWOL.  AC ¶ 63.  However, Sgt. Washington never informed Plaintiff Weeks of these charges.  AC ¶ 64.  While the discipline was not imposed due to a procedural error, the sustained AWOL documentation remains in her personnel file.  AC ¶ 66.

On October 7, 2007, along with other officers from 7D, Plaintiffs attended the wedding ceremony of two heterosexual officers and timely requested leave for the first hour of their shift.  AC ¶ 67.   Upon arriving for duty, Plaintiffs were informed that Sgt. Washington again said that "he was going to get them" and that "he had something for them." AC ¶ 68.  Plaintiffs learned that Sgt. Washington had docked two hours of leave for each of them.  Sgt. Washington did not dock the leave of male or heterosexual officers who attended the wedding and arrived later to

their shifts than Plaintiffs.  AC ¶ 69.

In October 2007, Plaintiffs complained again to Lt. Larson about the harassment. AC ¶ 82.  On October 7 and 9, 2007, Plaintiff Weeks and Plaintiff Jones filed PD Form 42 police reports detailing the ongoing hostile work environment and harassment.  AC ¶¶ 83 - 88.   These reports were openly circulated in 7D.  AC ¶ 84.  Plaintiffs also met with Commander Maupin to discuss their police reports of harassment.  AC ¶ 89.  As a result of this continued harassment by Sgt. Washington, Plaintiffs eventually took stress leave from October through November 2007 and requested Performance of Duty (POD) leave.  AC ¶ 70.  In October 2007, Plaintiffs initiated an internal MPD EEO complaint. AC ¶ 90. On October 15, 2007, an IAD investigator took Plaintiffs' statements of their complaints of harassment and hostile work environment on the basis of sex and sexual orientation.  *Id.*

After Plaintiffs returned from stress leave in late November or December of 2007, Plaintiffs were given their performance evaluations for the period October 2006 to September 2007.  AC ¶ 95.  Sgt. Podorski was still their rating official, and rated them as only "meeting" expectations.  AC ¶ 96.  Plaintiff Jones asked for a copy of her evaluation but was unable to get a copy until February 2008, because Sgt. Podorski refused to give it to her.  AC ¶ 97.  This delay prevented Plaintiff Jones from meeting the deadline in which to grieve her evaluation, and thus to become eligible to apply for the Detectives Class, or for other promotional opportunities.  *Id.*

Sgt. Washington also retaliated against Plaintiffs upon learning of their reports of discrimination.  On November 26, 2007, Sgt. Washington told Plaintiff Jones "you can feed the dogs but they will bite you." AC ¶ 102.  On January 22, 2008, Sgt. Washington said to her, "Ya'll pulled that shit. You jumped on the bandwagon with Weeks. I always been straight with

you. That shit is fucked up. You and your girl fucked up."  Plaintiff Jones filed another police report regarding this incident. *Id*.

Commander Maupin also retaliated against Plaintiffs once he learned of their EEO activity.  Commander Maupin sustained Plaintiff Weeks' AWOL in December 2007. AC ¶ 65. In May 2008, Commander Maupin placed Plaintiff Weeks on the midnight shift but kept Plaintiff Jones on the day shift. AC ¶ 31. When Plaintiffs complained to Maupin about the switch, he retorted, "why do you two have to follow each other around?"  Similarly, in July 2008, Plaintiff Weeks returned to full duty after an on-duty car accident.  Commander Maupin ordered Plaintiff Weeks to report to midnights again, while Plaintiff Jones was kept on the day shift.  AC ¶ 31.

Plaintiff Weeks continued to experience harassment and retaliatory actions even after her promotion to the 7D Detectives' Office in October 2008.  AC ¶ 106.  She was counseled for issues about which while males, heterosexuals, and those who had not engaged in protected EEO activity were not counseled.  AC ¶ 108.  During one counseling session, Plaintiff Weeks was also asked by Sgt. King about her EEO complaint, and was told not to be so "timid." AC ¶ 107. Plaintiff Weeks was also treated differently with respect to assignments in the Detectives' Office. AC ¶ 109.  Her cases, search warrants, and other job duties were routinely taken away from her and then given to male officers with less experience.  AC ¶ 110.  For example, on December 9, 2008, Plaintiff Weeks' case was taken away from her and given to a male officer.  *Id*.  Plaintiff was also targeted by officers in the Detectives' Office.  On February 17, 2009, someone put an open tampon and wrapper on Plaintiff Weeks' desk.  AC ¶ 22.  Plaintiff Weeks reported the matter, but, Defendant never initiated an investigation of this incident. *Id.*

Plaintiff Jones has also continued to suffer harassment and reprisal in 7D.  The

Commander and other supervisors have continued to treat Jones differently with respect to shift

bids and other assignments, while they gave better shift assignments to male and heterosexual

officers who had less seniority than Plaintiff Jones. AC ¶ 45. They have also treated her

differently with respect to car assignments, trainings, and detail opportunities. AC ¶¶ 45, 51, 112.

When she finally received a car assignment, a male officer stated "they gave every fuck-up a car

so I guess they had to give you one." AC ¶ 51.

In all, Defendant's workplace culture countenances harassment of gay and lesbian

employees.  This was recently evidenced by a flyer, created by certain detectives, that was

distributed in the Detective's Office in July 2010.  AC ¶ 32. The flyer described "naked sweaty

man love" and made fun of gay marriage.

B.    *Procedural Background*

On November 19, 2007, MPD's Assistant Chief, Peter Newsham, issued a decision not to

investigate Plaintiffs' internal EEO complaints.  AC ¶ 120.  By late March 2008, Plaintiffs both

received exit letters from MPD notifying them of their rights to proceed to OHR. AC ¶ 121.

Plaintiffs timely filed charges of discrimination based on sexual orientation with the D.C. Office

of Human Rights ["OHR"] on March 31, 2008.  *Id.*  In December 2008, Plaintiffs amended their

complaints to include additional bases of claims of gender discrimination, sexual harassment and

reprisal.  AC ¶ 122.  Plaintiffs' complaints were cross-filed with the U.S. Equal Employment

Opportunity Commission. *Id.*

On July 16, 2010, OHR issued a Probable Cause Finding in Plaintiffs' favor on both of

Plaintiffs' complaints of sex discrimination, sexual orientation discrimination, and reprisal.  AC

¶ 123.  OHR found probable cause that both Plaintiffs had established prima facie claims of

sexual harassment, hostile work environment based on sexual orientation (lesbian), and reprisal. Id. Plaintiffs later requested that OHR dismiss their pending case for "administrative convenience" and Defendant did not oppose the request. AC ¶ 125.  The Director of the Office of Human Rights granted Plaintiffs' request and administratively dismissed Plaintiffs' complaints without prejudice on January 24, 2011.  AC ¶ 126. Plaintiffs received their right to sue letters from the EEOC in April 2011.[2]

## II.   STANDARD OF REVIEW

To survive a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the complaint need only set forth "a short and plain statement" of the claim, giving the defendant "fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  The stated claim must be "plausible on its face." *Id.* at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Atherton v. D.C. Office of the Mayor*, 567 F.3d 672, 681 (D.C. Cir. 2009) (*citing Ashcroft v. Iqbal,* __U.S.__, 129 S. Ct. 1937 (2009)).

In evaluating a Rule 12(b)(6) motion, the court must accept as true all the factual allegations contained in the complaint and grant the plaintiff the benefit of all inferences that can be derived from the facts alleged.  *Id.*  A complaint must give defendant notice of the claims and the grounds upon which they rest, but "specific facts are not necessary." *Id.*  A plaintiff need not

---

[2] At the time of the filing of their Complaint and Amended Complaint, Plaintiffs had requested but not yet received their right to sue letters yet. Plaintiffs have recently received their right to sue letters from the U.S. Department of Justice, *via* the EEOC, and will seek leave to amend the Amended Complaint for the purpose of noting this procedural change.

"plead law or match facts to every element of a legal theory." *Krieger v. Fadely*, 211 F.3d 134, 136 (D.C. Cir. 2000); *Dave*, 606 F. Supp. 2d at 49; *see also Skinner v. Switzer,* 562 U.S. __, 09-9000, 2011 WL 767703, at *6 (Slip Op. Mar. 7, 2011).  Further, a plaintiff need not set forth the elements of "a prima facie case of discrimination in his complaint."  *Ali v. D.C. Gov't*, 697 F. Supp. 2d 88, 91-92 (D.D.C. 2010) (confirming *that Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111 (D.C. Cir. 2000), remains "good law").

## III.   ARGUMENT

### A.  PLAINTIFFS PROVIDED SUFFICIENT NOTICE OF THEIR DCHRA CLAIMS BY FILING MULTIPLE MPD POLICE REPORTS

Defendant moved to dismiss Plaintiffs' claims for disparate treatment based on sexual orientation and sex (Counts 2 and 4) and Plaintiffs' claim for hostile work environment based on sex and sexual harassment (Count 3), arguing that Plaintiffs failed to provide the statutory pre-litigation notice under D.C. Code §12-309.  Yet, the Defendant has nonetheless conceded that the police reports filed by Plaintiffs satisfied notice for the remainder of Plaintiffs' DCHRA claims for sexual orientation harassment and reprisal (Counts 1, 7, and 9).  Defendant fails to explain why the police reports constituted adequate notice for some counts but not others.  Regardless, Plaintiffs provided the statutory notice for Counts 2, 3 and 4 and Defendant's motion must therefore be denied.  In addition, Counts 2,3 and 4 cannot be dismissed in their entirety as § 12-309 notice only applies to unliquidated damages and Plaintiffs have claimed other damages that are not subject to § 12-309.

### 1.   Plaintiff's DCHRA Claims Cannot Be Dismissed Because the Police Reports They Filed Complied with the Notice Provisions of § 12-309.

Section 12-309 provides:

> *An action may not be maintained against the District of Columbia for unliquidated damages to person or property unless, within six months after the injury or damage was sustained, the claimant, his agent, or attorney has given notice in writing to the Mayor of the District of Columbia of the approximate time, place, cause, and circumstances of the injury or damage.* ***A report in writing by the Metropolitan Police Department, in regular course of duty, is a sufficient notice under this section.***

(Emphasis added).

In accordance with the statute, Plaintiffs filed a series of official MPD police reports which detailed a work environment that had become so hostile that they became physically ill on the job. A written MPD report taken by MPD or an MPD employee in the "regular course of duty" is the only statutory exception to the requirement of written notice to the Mayor. *Doe v. District of Columbia*, App. D.C., 697 A.2d 23, 28 (1997). To satisfy notice under the statute, the police report must include "the approximate time, place, cause, and circumstances of the injury or damage." *Doe*, 697 A.2d at 27. In *Snowder v. District of Columbia*, 949 A.2d 590 (D.C. 2008), the court held that police reports suffice as notice of a potential future lawsuit if the report states both the cause and the circumstances of the injury with enough particularity to inform the District of Columbia of a reasonable basis for anticipating legal action. *See also Washington v. District of Columbia*, 429 A.2d 1362, 1366 (D.C. 1981) (a police report will suffice if it "describe[s] the injuring event with sufficient detail to reveal, in itself, a basis for the District's potential liability"); *Feirson v. District of Columbia*, 315 F. Supp. 2d 52, 55-56 (D.D.C. 2004)(District did not dispute that a PD Form 42 report filed by an MPD officer was a "report in writing by [MPD] in the regular course of duty").

The Amended Complaint plainly identifies not one but five separate police reports filed by plaintiffs between October 2007 and January 2008, which provided clear and unambiguous

notice to the District of potential future lawsuits.  *See* AC at ¶¶ 83-88; Exs. 1,2,4.  In addition,

Plaintiffs also rely on a series of related internal MPD medical and investigative reports which

were generated as a direct result of Plaintiff's original police reports, and which also satisfy

notice under 12-309.  *See e.g.*, Exs. 5-8.

     As an initial matter, the Court should strike the exhibits that Defendant has attached to its

motion.  Defendant's motion arises under relies upon Fed. R. Civ. 12(b)(6), and matters outside

the pleadings should not be considered.  *See e.g., Richmond v. Nationwide Cassel L.P.*, 847

F.Supp. 88, 90 (N.D. Ill., 1994), )("w]here as here a Fed. R. Civ. P. ("Rule") 12(b)(6) motion is

at issue, the Complaint itself is the only grist for the Court's mill. . . ").  Defendant erroneously

relies upon Fed. R. Civ. P. 10 to justify "incorporating" the PD reports attached to its motion to

dismiss into the complaint itself.  However, Plaintiffs did not attach the PD reports as exhibits to

the Amended Complaint. Thus the reports themselves are not "incorporated" into the Amended

Complaint.  complaint merely because they were referenced therein.  Therefore, Plaintiffs request

that the Court strike Defendant's exhibits as the documents outside the pleadings should not be

considered for purposes of a motion under Fed. R.Civ. P. 12(b)(6).

     In the alternative, and to the extent that the Court intends to consider the Defendant's

attachments, the Court must convert Defendant's motion to one for summary judgment. Fed. R.

Civ. P. 12(b).  Although Plaintiffs believe Defendant's motion should be dismissed purely on the

pleadings, if the Court does convert this issue to one of summary judgement, Plaintiffs request

that the Court consider Plaintiff's attached exhibits.  *See* Ex. 1-14.  Plaintiffs also further move,

pursuant to Fed. R. Civ. P. 56(d), for discovery.  Plaintiffs attach their Rule 56(d) affidavit in that

regard. *See* Exhibit A (Rule 56(d) Affidavit).

a.      *The PD Form 42 reports satisfy § 12-309 notice requirements*

On October 7 and 9, 2007, Officer Jones and Officer Weeks filled out several PD Form 42 illness or injury reports as a result of the ongoing harassment, and requested Performance of Duty [POD] leave**.**  *See* Exs. 1 (Jones PD Form 42 reports) and 2 (Weeks PD Form 42 report). These reports detailed their symptoms, their relationship, their sexual preference, and the ongoing harassment they were receiving from their superiors because of their sexual orientation.

On October 7, 2007, Officer Jones filed a PD-42 with her duty official alleging that her work environment was "stressful" and that she could not continue her tour of duty at that time. Ex. 1.  On October 9, 2007, Officer Jones filed a subsequent PD-42 report, where she specified in greater detail the nature and cause of her illness.  *Id.*  She indicated that for weeks she had been suffering headaches, nausea, and chest pains due to her superior's statements that he was targeting Officer Jones and her partner Officer Weeks "based on our sexual orientation." *Id.*  She indicated that when Sgt. Washington learned of Officer Weeks and Officer Jones' personal relationship, he made statements that he was "going to put a stop to you and Weeks."  Officer Jones stated that the hostile behavior and statements were getting progressively worse.  She then reported to the MPD Clinic, which subsequently issued a report on her claim for POD leave as required by General Order 100.11. *See* Ex. 1 at 1; Ex. 3 (General Order 100.11).

Similarly, on October 7, and again on October 9, 2007, Officer Weeks also filed PD Form 42 reports of an on-the-job injury including "stress-related nausea and headaches," and indicating that the cause of the injuries was "[a]n Official Discriminating Against Me Due to Sexual Preference."  AC ¶¶ 83-88; Ex. 2.  In the PD-42s she informed the District that her supervisor unfairly chastised her in front of her colleagues; made derogatory remarks based on his personal

knowledge of her sexual preference; had stated to other officers that he would try to "burn" her if he had the chance; and used his supervisory authority to issue unfair assignments and isolate Officer Weeks during her tour of duty.  Ex. 2. She reported to the clinic soon thereafter, and an MPD report was also issued by the clinic on her claim for POD. *Id.*  AC ¶ 70-71; Ex. 5.

In addition, on January 22, 2008, Officer Jones filed another police report, a PD Form 119 Complainant Statement, after an incident involving Sgt. Washington which she believed to be retaliatory.  AC ¶103; Ex. 4 (PD Form 119 report). These police reports, created by employees of MPD and provided to MPD in the regular course of duty in accordance with MPD internal policies, therefore provided the District with ample notice as required under 12-309.[3]

b. *Additional MPD reports which satisfy notice*

In addition, additional MPD reports generated as a direct result of the PD 42 reports - MPD clinic medical reports and IAD investigative reports - further satisfied notice by providing the District with even more information on the details of Plaintiffs' injuries.  AC ¶¶ 70-71.

Because they filed the PD Form 42s, both Officer Weeks and Officer Jones appeared at MPD's Medical Services Division for further investigation of their claims for leave due to the alleged discrimination and harassment.  Exs. 1, 2; Ex. 3 at 6.  On October 30, 2007, and November 5, 2007, MPD's Medical Services Division issued written reports regarding Plaintiffs' POD leave.  AC ¶¶ 70-71; Ex. 5 (Oct. 30, 2007 Jones clinic report); Ex. 6 (Nov. 5, 2007 Weeks clinic report).   Both MPD reports identified that Officer Jones and Officer Weeks had not only

---

[3] While the District does not specifically argue that the reports are insufficient for Plaintiff Jones' non-promotion claims under the DCHRA, the police reports, in addition to the additional medical and IAD investigative reports, were sufficient to put the District on notice of potential liability for injuries stemming from the alleged hostile work environment, including intentional deprivations of promotional opportunities by the alleged harassers.

reported injuries stemming from sexual orientation harassment and discrimination, but also of "sexual harassment." Ex. 5 at 2; Ex. 6 at 2. Thus, the District was further notified that the cause of Plaintiffs' alleged injuries was not only sexual orientation discrimination, but also sex discrimination.

In October 2007, Plaintiffs also filed internal EEO complaints against their supervisors in 7D. AC ¶¶ 90, 119. These reports were filed with MPD's Office of Compliance and Diversity, under the Office of Professional Responsibility, Internal Affairs Division ["IAD"].[4] Plaintiffs and other witnesses were interviewed as a result of those complaints. Ex. 7 (IAD investigative documents). IAD did a brief investigation into Officer Weeks and Officer Jones' internal EEO complaints, before issuing exit letters to Plaintiffs stating their claims would not be processed for further investigation. AC ¶ 120; Ex. 8 (IAD exit letters). These reports also satisfy the notice requirements of §12-309 because they were written reports created, maintained, and preserved by MPD in the regular course of duty and in accordance with MPD's own police procedures.

### 2.   The Content of Plaintiffs' Police Reports Satisfy §12–309 Notice

As an initial matter, "the content requirements of the notice given to the District . . . are to be interpreted liberally," *Musgrove*, 602 F. Supp.2d at 144-45 (internal citation omitted). This Court has held that "in close cases [courts are to] resolve doubts in favor of finding compliance with the statute." *Mazloum v. District of Columbia,* 522 F.Supp.2d 24 (D.D.C. 2007) (internal quotation omitted). Recently, in *Clark v. Estate of Flach*, 604 F. Supp. 2d 1 (D.C. Cir. 2009),

---

[4] While Plaintiffs were not provided with copies of their internal EEO complaint forms or any additional written reports or internal findings created by IAD or the Office of Diversity during the OHR discovery process, additional such reports should exist pursuant to MPD's regular procedures. *See* Ex. 9.

14

this Court focused on the content of the police reports, not the type of police report.  The Court

noted that the question of "whether any given police report satisfies § 12-309 is a question of

law," and that such determinations are on a case-by-case basis. Id at 7-8, citing Doe, 697 A.2d at

24 (D.C. 1997).  In *Flach*, the injuries at issue involved a hit and run accident that was allegedly

caused by a high-speed pursuit of a suspect by MPD police cruisers.  However, the two PD Form

police reports relied upon by the plaintiff were silent as to the extent of the involvement of the

District or its employees.  The reports in *Flach* did not satisfy notice because they made no

mention of District employees' involvement in causing the injury.  The Court discussed other

cases where such police reports did satisfy notice under §12-309 because they clearly set forth

the "District's direct involvement in the injurious event...such as when District employees

directly cause an injury," *Id*. at 8, *citing Jones v. Ritter*, 587 F.Supp. 2d 152, 158-59 (D.D.C.

2008) (assault and battery during arrest), or where "the injury occurs on District property," *id.*,

*citing Pitts*, 391 A.2d at 809-810 (slip-and-fall in public housing).

Further, the District courts have routinely found that PD Form reports, including PD 42s,

qualify as "[a] report in writing by [MPD]," and satisfy notice if the content of the reports

themselves is sufficiently detailed.  *See e.g., Jones*, 587 F.Supp. 2d at 158 (PD-163 sufficient);

*Powers-Bunce v. District of Columbia*, 479 F. Supp. 2d 146, 162 (D.C. Cir. 2007)(PD Form 251

noting that a victim died while in the custody and control of MPD satisfied notice).  In fact, as

noted *supra,* in *Feirson*, 315 F. Supp. 2d at 55-56, the District did not dispute that a PD Form 42

report filed by an MPD officer claiming injuries against D.C. was a "report in writing by [MPD]

in the regular course of duty."  The Court found the officer's PD Form 42 sufficient notice to the

District.  *Id*. at 56.

Following this analysis, the October 2007 PD Form 42 reports provided both a clear indication that the District's own employees had caused the alleged injuries, and that the injuries occurred on District property. The PD Form 42s detailed the onset of Plaintiffs' illnesses. The reports were filed within weeks of the most severe harassing behavior. Exs. 1, 2. They also detailed the time and place of their tours of duty, the individuals who were targeting them, and the cause and circumstances of their injuries. Specifically, they gave notice to the District that 7D was a hostile work environment and that Plaintiffs had been the targets of harassment, differential treatment, and discrimination. *Id.*

The reports issued by the Medical Service Division of MPD in response to Plaintiff's PD 42s further satisfy the notice requirement. Ex. 5 and 6. The reports were written by the director of MPD's Medical Services Division, on MPD letterhead. *Compare with Sanders v. D.C.*, 2002 U.S. Dist. LEXIS 6818 (D.D.C. 2002) (complaint to Chief Lanier insufficient notice because it was on Fraternal Order of Police letterhead, and thus not an "MPD" report). In *Feirson*, this Court distinguished between reports issued by MPD agencies, which are "MPD reports" and those issued by outside parties. 315 F. Supp. 2d at 55-56. The Medical Service Division reports were also required to be maintained in Plaintiff's "PD Form 42 file." Ex. 5 at 3, Ex. 6 at 3. The reports indicated the nature of Plaintiff's alleged injuries, and the cause of those injuries, namely discrimination and harassment on the basis of Plaintiffs's sexual orientation and sex. *Id.* They also described that this alleged harassment had occurred for a period of weeks.

The January 2008 report filed by Plaintiff Jones also details a continuing pattern of harassment and disparate treatment by Sgt. Yurell Washington. Ex. 4. Moreover, it described retaliatory comments made by Washington in relation to Plaintiffs Jones and Weeks "pull[ing]

16

that shit" and "jump[ing] on the bandwagon." *Id*. AC ¶ 103. Plaintiff Jones understood this as a reference to the EEO complaints against Washington and other supervisors filed shortly before this comment was made. The report put the District on notice that it could be subject to a future lawsuit regarding Sgt. Washington's treatment of Plaintiffs Jones and Weeks.[5]

Finally, Plaintiffs rely on the IAD investigative records created as a result of Plaintiffs' internal EEO complaints with MPD's Internal Affairs Division ["IAD"]. Exs. 7, 8. *See also* Ex. 9 (General Order 201.09). The reports generated from these filings and the Department's investigation into their complaints of harassment and discrimination further satisfy the notice requirement of § 12-309. In *Stevens v. Stover,* 1986 U.S. Dist. LEXIS 22752 (D.D.C. July 15, 1986)*,* this Court found the District's claims regarding a lack of notice "fatuous," instead recognizing that the plaintiff had complied with §12-309 where the MPD's *Internal Affairs Division's own reports and investigations* placed the District of Columbia on notice of the time and place of the incident and all of the salient allegations. This Court further found the IAD reports were sufficient to inform the District of Columbia that a lawsuit was a distinct probability. *Id.* Similarly, in *Shaw v. District of Columbia*, No. 05-1284, 2006 U.S. Dist. LEXIS 26904, 2006 WL 1274765, at *12 (D.D.C. May 8, 2006), this Court held that a MPD Office of Internal Affairs Complaint Summary Sheet and attached charge were a "police report" meeting notice requirements of § 12-309. This Court should deny Defendant's motion to dismiss Counts

---

[5] The Court should reject the District's argument that this report cannot be believed because is not signed. As noted above, a PD Form written by an MPD employee in the ordinary course of business is sufficient notice, regardess of whether it is signed or not. In any event, Plaintiffs have pled that the report was submitted, and thus the court must accept that assertion as true for purposes of considering the merits of Defendant's motion. Whether the report can be authenticated is a matter for another day.

2, 3, and 4, as Plaintiffs satisfied the notice requirements by filing multiple police reports.

Plaintiffs have complied with the requirements of section 12-309 and there is no basis upon

which to dismiss these claims.

> **3.      Plaintiffs' Police Reports Were Made in the "regular course of duty"
> Because They Were Written in Accordance with MPD Directives**

Contrary to the District's unpersuasive assertions, the reports described above were also

made in the "regular course of duty" at MPD.  All police officers in the District of Columbia are

issued copies of the Department's "General Orders," internal policies or directives that officers

are bound to comply with and enforce in the course of their employment.  *See* Ex. 10

(Metropolitan Police Department Standard Operating Procedures, Operational Handbook for the

Directives System, July 25, 2006) at 1.  All of the reports described above were required, created,

and maintained by MPD in accordance with these General Orders.[6]  Thus, these reports were

written in the "regular course of duty."

Of these directives, General Order 100.11 (Medical Services), addresses police officers'

reports of on-duty illnesses or injuries and the procedures officers must follow in reporting such

injuries promptly.  *See* Ex. 3 (Metropolitan Police Department General Order 100.11 (Medical

Services) at 9.  Officers who become ill or injured while on duty "shall immediately complete

and sign the PD Form 42,...submit the original PD Form 42 to the Watch Commander, and report

to the Clinic with a copy of the PD Form 42."  *Id*.  The Department is then required to make a

---

[6] The Court should take judicial notice of the General Orders attached hereto, as Exhibits 3, 9, 10, 13, and 14, because they are Metropolitan Police Department directives issued to MPD employees and the public, and are publicly available documents. *See* https://go.mpdconline.com/index_GO.html.  Plaintiffs' refer generally to the General Orders in their Amended Complaint, and merely attach them here for the convenience of the Court.

swift determination as to whether the officer's reported illness or injury is compensable or

otherwise eligible for "Performance of Duty" [POD] leave under applicable workers'

compensation laws.  *Id* at 11.  The PD Form 42 reports therefore caused the issuance of the

Medical Services Division determinations.

Plaintiffs also filed internal EEO reports of discrimination with IAD.  AC ¶ 90.  General

Order 201.09 states that an employee wishing to file an internal complaint may file with MPD's

Diversity and EEO Compliance office, a unit of MPD's Office of Professional Responsibility in

IAD.  Ex. 9 at 7-8.  In accordance with this General Order, MPD is required to conduct an

investigation in response to any such complaints filed with IAD.  *Id*. at 8.  *See also Faragher v.*

*City of Boca Raton,* 524 U.S. 775, 788 (1998)(employers must have procedures in place for

employees to address concerns of harassment to avoid liability).

This Court, as well as the local District courts, have recognized the applicability of

General Orders to employment matters such as this.  *See e.g., Fonville v. District of Columbia*,

2011 U.S. Dist. LEXIS 19084 (D.D.C. Feb. 28, 2011) (recognizing reliance on General Orders

by both the D.C. Office of Employee Appeals and the D.C. Superior Court); *Matthews v. District*

*of Columbia*, 730 F. Supp. 2d 33, 38 (D.D.C. 2010) (denying District's motion to dismiss and

finding plaintiffs' constitutional allegations "plausible" under *Iqbal*  because complaint

referenced violations of MPD's general orders).

Thus, Plaintiffs filed police reports, and MPD created additional reports, in accordance

with MPD directives "in [the] regular course of duty."  AC ¶¶ 83-88, 90, 92. While Defendant

argues none of these reports were created or taken by MPD in "the regular course of duty"

because Plaintiffs [MPD officers] filed them [with MPD] and because they related to on the job

injuries, Defendant provides no authority for its position.  Their position is also contrary to *Feirson*, discussed *supra*.  This Court therefore has no basis to dismiss Counts 2, 3, and 4, and Defendant's motion to dismiss should be denied.

### 4. Plaintiff's Claims for Liquidated Damages are Not Subject to §12-309.

In addition, Defendant's motion wholly ignores the fact that § 12-309 *only* applies to claims for *unliquidated* damages (e.g., compensatory damages).  Claims for backpay, injunctive or other remedial relief, and attorneys fees are liquidated damages not covered by § 12-309.  *See Blocker-Burnette v. District of Columbia*, 2010 U.S. Dist. LEXIS 82893 (D.D.C. Aug. 13, 2010) (Friedman, J.) (while Plaintiff failed to give section 12-309 notice, Plaintiff could still proceed on the back pay, injunctive, and attorneys' fees claims); *Bonaccorsy v. D.C.*, 685 F. Supp. 2d 18 (D.D.C. Feb. 12, 2010) (Roberts, J.) (because "[n]otice of one type of injury is not notice of another type of injury incurred in the same incident," damages are liquidated and "outside the purview of section 12-309 if they are for an easily ascertainable sum certain, such as back pay awards in discrimination cases.") Plaintiffs claims for unliquidated damages under Counts 2, 3, and 4, including back pay, injunctive relief, and attorneys fees, cannot be dismissed even if §12-309 notice was not provided.[7]

### 5. Plaintiffs Never "refused" to Provide the District with Proof of Notice.

Finally, Plaintiffs must correct the record regarding one of Defendant's allegations surrounding the police report notices.  In its motion to the Court, Defendant claimed that

---

[7] Defendant's proposed order thus overreaches in this respect, as he requests that all of Plaintiffs' claims under Counts 2, 3, and 4, be dismissed, when clearly, the issue of section 12-309 notice only goes to Plaintiffs' claims for unliquidated damages.  In addition, Defendants' proposed order requests that *all* Plaintiffs' claims under the DCHRA be dismissed, when it has only partially moved to dismiss Counts 2, 3, and 4.

"Plaintiffs refused" to provide the District with "evidence that plaintiffs had given the notice required by D.C. Code Section 12-309." Def. Mot. to Dismiss at 24. Defendant went on to claim that "Plaintiffs' unreasonable refusal to provide proof that notice was given" caused Defendant to "speculate" in the preparation of its motion to dismiss. *Id.*

Putting aside the question of the relevance of Defendant's accusations, these allegations are completely without support. Even though discovery is not yet underway and Plaintiffs had no obligation to provide Defendant with "evidence" at this juncture, in fact, Plaintiffs, *did* provide the District's attorney with the information it would likely need to assess whether proper notice was given. On March 2, 2011, counsel for the District telephoned undersigned counsel to request copies of any reports Plaintiffs would be relying on in support of 12-309 notice. *See* Ex. 11. In response, Plaintiffs reminded Defendant that the reports in question - those same reports identified by date in Plaintiffs' Amended Complaint - had previously been produced *to and by MPD* in the administrative proceedings before the D.C. Office of Human Rights. *Id.* Moreover, Plaintiffs referred the District to the OHR administrative file containing these reports, and to the MPD attorney who produced and received the police reports during the administrative proceedings. *Id.*

On March 3, 2011, District counsel responded by claiming that although he had found the PD 42 reports identified in the complaint by reviewing "the OHR files," he still demanded additional copies from Plaintiff's counsel, with the threat of a motion to dismiss if they were not provided. *See* Ex. 13. Plaintiff's counsel responded by further identifying the location of the reports at issue. *See id.* Specifically, Plaintiff's counsel noted that the reports 1) were already exchanged with the MPD attorney during the OHR discovery process, and therefore already in

the District's possession; 2) were contained in Plaintiffs' January 18, 2011, discovery production to MPD; 3) could also be found in MPD's own January 18, 2011, production as "attachments C, D, and E;" and that 4) the District should also have copies of these reports in that they are required to be maintained and preserved by MPD. *Id.* Defendant may have been confused in the preparation of its motion to dismiss, but it cannot lay the blame on Plaintiffs for its deficits.

### B. PLAINTIFFS' § 1983 CLAIMS (COUNTS 11, 12, 13) ARE NOT BARRED BY THE STATUTE OF LIMITATIONS BECAUSE THEY RELATE TO ONGOING HARASSMENT OVER A PERIOD OF YEARS

The Court must deny Defendant's motion to dismiss Counts 11, 12 and 13, as the claims are not barred by the statute of limitations. Defendant asserts that Plaintiffs' section 1983 claims are barred by the statute of limitations because the alleged discriminatory and harassing conduct "occurred in 2007." Def. Mot. at 12. However, Plaintiffs do not allege that the discriminatory and harassing conduct only "occurred in 2007." Rather, Plaintiffs have alleged a hostile work environment and a pattern of discrimination and harassment that began in late 2006, when their supervisors first learned of their same-sex relationship, that has continued to this day unabated. Because statute of limitations issues often depend on contested questions of fact, "the court should hesitate to dismiss a complaint on statute of limitations grounds based solely on the face of the complaint." *Smith-Haynie v. District of Columbia*, 155 F.3d 575, 578 (D.C. Cir. 1998).

The District relies on *Moore v. District of Columbia*, 686 F. Supp. 2d 88, 90 (D.D.C. 2010) for its proposition that Plaintiffs' claims must be barred by the three-year statute of limitations. However, *Moore* is distinguishable. In *Moore*, an MPD officer sued the District for damages under both § 1983 and § 1981, claiming sex discrimination and sexual harassment. The plaintiff in that case had obtained an internal MPD EEO finding of sexual harassment in 2005 for

events that had occurred in 2004 regarding an internal allegation against her superior.  She then claimed that she was retaliated against for filing the complaint when she was not restored to her prior position.  However, that plaintiff never filed a claim with EEOC and waited until 2009 to file her § 1983 claims.  In addition, she was not alleging ongoing harassment from 2004 to the date of the complaint.  In fact, none of the allegations of the complaint in *Moore* involved discriminatory actions occurring past 2005.  *See* Complaint of *Vanessa L. Moore v. District of Columbia*, CA No. 09-00054, Docket # 1, filed 1/09/2009.  Instead, the relief sought involved an alleged breach of a settlement agreement previously reached with MPD in her prior complaint. *Moore*, 686 F. Supp. 2d at 91. This is invariably distinguishable from the instant case.

Plaintiffs in this case have alleged a continuing pattern of harassment that began in 2006, when their supervisor Sgt. Jon Podorski began targeting them, making sexually suggestive comments, attempted to separate them, and gave them negative performance reviews.  *See e.g.,* AC ¶¶ 47,50, 55-58, 95.   By 2007, the harassment had became so severe and such a part of their daily work environment that they filed injury reports and had to take two months of stress leave. AC ¶ 83-88.  Their supervisor Sgt. Yurell Washington had openly stated to other sergeants and co-workers that he was out to "get them" and intended to separate them.  Exs. 1, 2.  When Plaintiffs  returned from stress leave in late 2007, they filed EEO complaints and continued to receive harassment, in addition to reprisal, including from their Commander, Joel Maupin.  AC ¶¶ 90. 111. This pattern of behavior continued in 2008 and 2009, and involved unfair disciplinary actions, denials of grievance rights and promotional opportunities, as well as harassment of Plaintiff Weeks in the Detectives' Office.  *See e.g.,* AC ¶¶ 22, 31, 72, 97, 100, 103, 110, 121, 122.   In 2010, Plaintiff Jones also continued to experience harassing treatment from her

supervisors in 7D, including detail and training denials and threatening comments.  AC ¶¶ 45, 51, 76-78.

The continuing violation doctrine thus applies to Plaintiffs' claims of hostile work environment harassment, sexual harassment, and reprisal harassment.  *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101,117 (2002) ("A hostile work environment is composed of a series of separate acts that collectively constitute one unlawful employment practice.")  Under the continuing violation doctrine, as long as some of the discriminatory actions fall into the limitations period, all acts and allegations covering the discriminatory practice will not be barred.  *Chennareddy v. Dodaro*, 698 F. Supp. 2d 1  (D.C. Cir. 2010) (noting hostile work environment claims are an exception to the bar on the doctrine of continuing violations) (*citing Morgan*).

The continuing violation doctrine applies to Section 1983 claims.  For example, in *Annis v. County of Westchester*, 136 F.3d 239, 245 (2d Cir. 1998), the Second Circuit sustained a female police officer's Section 1983 claim based on sexual harassment, holding that the continuing violation exception extends the limitations period for all claims of discriminatory acts committed under an ongoing policy of discrimination even if those acts, standing alone, would have been barred by the statute of limitations. This Court has itself recognized the applicability of the continuing violations doctrine to civil rights cases.  In *Brady v. Livingood*, 360 F. Supp. 2d 94 (D.C. Cir. 2004), the D.C. Circuit acknowledged an exception to the statute of limitations in civil rights cases if the plaintiff has demonstrated a "continuing violation."  *See also Thompson v. Capitol Police Board*, 120 F. Supp.2d 78, 82-83 (D.D.C. 2000) ("[t]he continuing violations doctrine applies in the civil rights context...when an employer commits repeated, but distinct, discriminatory acts, some inside and some outside of the limitations period")**.**

Plaintiffs' Section 1983 claims therefore cannot be dismissed based on the District's proposition that they are outside the limitations period.

### C.  PLAINTIFFS HAVE PROPERLY AND PLAUSIBLY STATED CLAIMS FOR RELIEF UNDER § 1983

In order to avoid a motion to dismiss Section 1983 claims, "[b]y the plain terms of § 1983, two–and only two–allegations are required in order to state a cause of action under that statute. First, the plaintiff must allege that some person has deprived him of a federal right. Second, he must allege that the person who has deprived him of that right acted under color of state or territorial law." *Gomez v. Toledo*, 446 U.S. 635, 640 (1980); *see also, Groman v. Township of Manalapan*, 47 F.3d 628, 633 (3d Cir. 1995) ("A prima facie case under § 1983 requires a plaintiff to demonstrate: (1) a person deprived him of a federal right; and (2) the person who deprived him of that right acted under color of state or territorial law."). As noted in *Turner v. District of Columbia*, a Plaintiff must also allege that the violation resulted from "policy or custom of the District of Columbia" to hold the District responsible for the constitutional violation.  383 F. Supp. 2d 157, 166 (D.D.C. 2005) (*citing Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003).

The District has not argued that Plaintiffs failed to allege that the discriminatory actions did not occur "under color of law."  Nor has it argued that Plaintiffs failed to identify a municipal policy or custom which caused the alleged constitutional violations.  Indeed, other than generally stating propositions of law, Defendant does not specify why it contends that Plaintiffs' 1983 claims are deficient.  It appears the District is only alleging that Plaintiffs failed to establish the predicate constitutional violations claimed.  This Court should deny Defendant's motion on these

points outright because it does not contain the requisite specificity for Plaintiff to effectively oppose it. *See e.g., Davis v. District of Columbia,* 503 F. Supp. 2d 104, 126-127 (D.D.C. 2007)(noting"[i]t is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones. . . . Judges are not expected to be mind readers.")  Regardless, Plaintiffs have properly stated claims under §1983 and the District's motion to dismiss these claims must fail.[8]

### 1.     Count 12 - Plaintiffs Alleged a Procedural Due Process Claim

#### a.     *Plaintiffs have alleged claims for relief for constitutional violations*

The crux of the District's motion to dismiss Plaintiffs' Due Process claim appears to be that Plaintiffs have only alleged *inadequate* or *insufficient* or *untimely* due process, not a total lack of process.  Def. Mot. at 17, 18.  However, the District, once again, misreads and misstates the actual factual allegations raised in the Amended Complaint.

The Fifth Amendment Due Process Clause protects individuals from deprivations of "life, liberty, or property, without due process of law." A plaintiff asserting a violation of her Fifth Amendment right to procedural due process must establish (1) that she was deprived of a protected interest in life, liberty, or property and (2) that she did not receive the process that was

---

[8]The District correctly notes that it is subject to the Fifth Amendment Due Process Clause, not that of the Fourteenth Amendment.  Plaintiffs respectfully request that the Court construe Counts 12 and 13 as claims under the Fifth Amendment.  *See e.g., Libertarian Party v. D.C. Bd. of Elections & Ethics,* 2011 U.S. Dist. LEXIS 23029 (Mar. 8, 2011) (noting that the Fourteenth Amendment's protections are applied to the District of Columbia through the Fifth Amendment, and treating Plaintiffs' Fourteenth Amendment claims as Fifth Amendment claims) (*citing Bolling*, 347 U.S. at 499-500); *American Towers, Inc. v. Williams*, 146 F. Supp. 2d 27, 30 n.2 (D.D.C. 2001).  Plaintiffs will seek leave of the Court to file a corrective amendment for this purpose.

due.  *Payne v. District of Columbia*, 741 F. Supp. 2d 196, 220 (D.D.C. 2010).  Liberty interests

may either be located in the Constitution itself or "may arise from an expectation or interest

created by state laws or policies." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005).  Regulations

"may give rise to a constitutionally protected liberty interest if they contain substantive

limitations on official discretion, embodied in mandatory statutory or regulatory language."

*Atherton*, 567 F. 3d 672*; Price v. Barry*, 53 F.3d 369, 370 (D.C. Cir. 1995) (*citing Ky. Dep't of*

*Corr. v. Thompson*, 490 U.S. 454 (1989)).

> Contrary to the District's claim, Plaintiffs alleged that they did not receive the procedural

process that was due under the District's police regulations.  Specifically, Plaintiffs allege that

their 7D supervisors violated their rights to procedural due process when they deprived them of

their grievance rights; failed to provide them with the minimum due process required for

disciplinary actions; improperly ignored required procedures for initiating such actions; failed to

investigate their internal EEO complaints in accordance with Department procedure; and failed

to comply with MPD General Orders on required procedures for grievances, performance

evaluations, disciplinary actions, and internal complaints of discrimination and harassment.  AC

¶¶ 202, 205.

> First, Plaintiffs have alleged that supervisors in 7D improperly initiated disciplinary

actions in contravention of MPD's own disciplinary processes and procedures.  AC ¶ 63, 64, 74.

For example, Sgt. Washington initiated disciplinary actions against Plaintiff Weeks that failed to

comply with police procedures on the timing of formal investigations and notice of charges.  In

September 2007, Sgt. Washington charged Plaintiff Weeks with a disciplinary action but refused

to reveal the nature of the discipline. AC ¶ 74.  Sgt. Washington then stated he would "figure it

out as we go along." *Id*.  Similarly, on October 7, 2007 (the same day that Plaintiffs filed their

PD Form 42), Sgt. Washington initiated an AWOL charge against Plaintiff Weeks for an alleged

failure to report to the MPD clinic after requesting sick leave.  AC ¶¶ 62-63.  However, Sgt

Washington failed to follow police procedures for timely investigation of disciplinary charges,

and failed to timely notify Plaintiff Weeks of the investigation into her alleged AWOL, in

violation of MPD procedure.   Ex. 14; AC ¶ 63-64, 205.  Subsequently, in February 2008,

Commander Maupin sustained a decision to propose Plaintiff Weeks for suspension, AC ¶ 65,

however, she was never notified of this proposed suspension in accordance with General Order

120.21 (Disciplinary Procedures and Processes) and discipline was not imposed within the

required deadlines.  *See* Ex. 14.  While Plaintiff Weeks was not suspended, MPD still maintained

the AWOL discipline record in Plaintiff Weeks' personnel file.  AC ¶ 66.

Defendant asserts that this does not state a claim for procedural due process because it

contends Plaintiff Weeks was provided with "an opportunity to respond *via* some form of

hearing."  Def. Mot. at 17.  However, Plaintiff Weeks alleges quite the opposite - that she was

*not* provided with notice of the proposed discipline and an opportunity to be heard.  AC ¶ 64.

And, while the Defendant's failure to abide by its own procedures required a dismissal of the

proposed action on a technicality, the Defendant maintained the AWOL on Plaintiff Weeks'

record. Plaintiff Weeks was never provided the opportunity to rebut the AWOL charge and

obtain a clean record.  AC ¶ 64-66.

Plaintiffs also allege that Defendant violated constitutional due process by failing to

timely provide Plaintiffs with adverse actions so that Plaintiffs could timely grieve them.  In

addition to the above example, Plaintiff Jones was deprived of her right to grieve MPD's

determination of non-Performance of Duty leave with regard to her October 2007 report of

illness because Sgt. Washington failed to timely deliver MPD's non-POD decision.   AC ¶¶ 71.

Similarly, Sgt. Podorski deprived Plaintiff Jones of her opportunity to grieve her 2007

performance evaluation by intentionally failing to provide her with a copy until February 2008,

past the grievance deadline.  AC ¶¶ 78, 97.  General Order 201.20 requires that all officers

"[r]eceive timely and objective performance evaluations" and "be provided with the opportunity

to review and discuss their job performance with their supervisor upon request." Ex. 13 (General

Order 201.20) at 5.  Performance ratings are to be given out at the end of October of each year,

and officers only have until January 15 of the following year to grieve their ratings.  *Id*. at 13.

Sgt. Podorski's intentional delay in not providing Plaintiff Jones with her evaluation until

February 2008 resulted in a loss of her appeal rights and an ineligibility to apply for the

Detectives Class. *Id*.

        The essence of Plaintiffs' claim is that MPD intentionally deprived Plaintiffs of access to

the proper process due to them, as set forth by MPD's General Orders, as it prevented them from

being able to timely grieve or rebut the actions taken against them.  While the Defendant argues

that the CPMA provides District employees with adequate procedures for grieving performance

ratings, if employees are prevented from accessing those procedures through an intentional

deprivation of process, then it cannot be said that due process under the CPMA was actually

afforded.  Further, Plaintiffs claim is not that the procedures in place, either under the CPMA or

the General Orders, are inadequate.  Rather, Plaintiffs claim is that they were deprived of those

procedures.  AC ¶ 202.  In *Deschamps v. District of Columbia*, 582 F. Supp. 2d 14, 17 (D.D.C.

2008), a plaintiff's section 1983 due process claim failed because she had *not* pleaded that the

agency impeded her ability to seek redress under the procedures set forth at D.C. Code §

1-623.24 (part of the CPMA).  In contrast, Plaintiffs plainly pleaded that Defendant did just that -

impeded their ability to access disciplinary and grievance procedures.  AC ¶¶ 202, 205.   Thus,

Defendant's argument to the contrary must fail.

The District also claims that whether or not Plaintiff Jones was able to timely grieve her

performance evaluation is "immaterial for due process purposes."  Def. Mot. at 17.  The Court

must reject that argument.  An intentional deprivation of timely notice of an adverse action,

which results in an inability to grieve that action, is of course "material" to a determination of

whether that initial deprivation violated constitutional due process.

Finally, Plaintiffs alleged that the District deprived them of due process by failing to

properly investigate their internal EEO complaints of discrimination and harassment.  AC ¶¶ 205.

The District argues that its failure to investigate Plaintiffs' internal discrimination complaints "is

not an element of ... a due process claim," without any support for that assertion.  Def. Mot. at

19.  However, MPD General Order 201.09 sets forth the procedures that MPD's Office of

Professional Responsibility must follow when employees file internal EEO complaints.  *See* Ex.

9.  Further, the General Orders on discipline and misconduct require the Department to fully

investigate any allegations of unlawful discrimination.  Ex. 14 at 5.  The District's failure to

abide by any of these procedures deprived Plaintiffs of the process afforded them as victims of

unlawful discrimination.  Defendant has provided no legitimate reason for why these allegations

fail to state procedural due process violations.  Its motion to dismiss this claim should be denied.

2.  **Count 13 - Plaintiffs Properly Alleged an Equal Protection Claim**

a.  *Plaintiffs have properly stated an equal protection claim based on*

*gender.*

Defendant cites to cases noting that sexual orientation is not a class protected by the

Equal Protection Clause, Def. Mot. at 21, while failing to acknowledge that Plaintiffs' equal

protection claim is based squarely in their claims of gender discrimination.  Defendant's motion

on these claims must fail.  The courts have routinely recognized that 1983 claims based on sex

discrimination and/or sexual harassment properly state Equal Protection claims.  In *McLaughlin*

*v. Rose Tree Media School District*, 1 F. Supp. 2d 476, 489, (E.D.Pa. April 22, 1998), the Third

Circuit held that because "sexual harassment has been determined to be sex discrimination that

can violate the Fourteenth Amendment right to equal protection . . . there is a separate

constitutional right -- equal protection -- which serves as the basis for [the] § 1983 claim." (*citing*

*Andrews v. City of Philadelphia,* 895 F.2d 1469 (3d Cir. 1990); *Starrett v. Wadley,* 876 F.2d 808,

814 (10th Cir. 1989); *and Davis v. Passman,* 442 U.S. 228, 235, (1979)).  Similarly, in *Annis v.*

*County of Westchester*, 136 F.3d 239, 245 (2d Cir. 1998), a female police officer's 1983 claim

based on sexual harassment was sustained because, as the court noted:

> An employee is denied her equal protection right to be free from gender
> discrimination when she is treated differently from other similarly situated
> employees, thus suffering disparate treatment because of gender. A supervisor
> may be liable when he has been deliberately indifferent to an employee's
> complaints of sex discrimination.

The court in *Annis* further noted that in analyzing whether alleged sexist conduct was

unlawfully discriminatory for purposes of 42 U.S.C. § 1983, the court borrows the

burden-shifting framework of Title VII claims.  136 F.3d at 345.  *See also Turner,* 383 F. Supp.

2d at 166 (applying Title VII case law to sex discrimination claim brought under § 1983) *(citing*

*Richardson v. Leeds Police Dep't,* 71 F.3d 801, 805 (11th Cir. 1995) (holding that claims of sex

discrimination brought under §1983 and Title VII are subject to "identical methods of proof")).

This Court has adopted the same standard for evaluating Equal Protection claims based on sex discrimination and sexual harassment.  In *Byrd v. District of Columbia,* the Court acknowledged that a claim for sexual harassment "satisfactorily alleges a constitutional violation."  538 F. Supp. 2d 170, 178 (D.C. Cir. 2008).   The *Byrd* court went on to note that "the Supreme Court has specified that, "[w]ithout question, when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor 'discriminate[s]' on the basis of sex."  *Id.*, *citing Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64,(1986) (discussing Title VII); *and Southard v. Tex. Bd. of Crim. Just.*, 114 F.3d 539, 550 (5th Cir. 1997) ("sex discrimination and sexual harassment in public employment violate the Equal Protection clause'").   *See also Turner*, 383 F. Supp. 2d at 166 (standard for proving sex discrimination claim under § 1983).

Accordingly, Plaintiffs' Equal Protection claims are not subsumed under their Title VII claims and cannot be dismissed for failure to state a claim.  *McLaughlin,* 1 F. Supp. 2d at 480; *see also Sharp v. City of Houston,* 960 F. Supp. 1164, 1176-77 (S.D. Tex. 1997) ("plaintiff can pursue a remedy under § 1983 as well as under Title VII when the employer's conduct violates both Title VII and a separate *constitutional or statutory right*")(emphasis in original).

> b.      *Plaintiffs have plausibly alleged purposeful discrimination*

At the outset, it is unclear from the District's motion (Section D) whether the District is only alleging that Plaintiffs failed to state a predicate constitutional violation, or failed to meet some other standard that it believes makes Plaintiffs' Equal Protection claim insufficient.  The District cites to many cases standing for various propositions, but provides no argument or analysis as to why those cases evidence any deficiencies in Plaintiffs' complaint.

For example, the District cites to an unpublished slip opinion from the U.S. District of

Puerto Rico for the proposition that "Plaintiffs claiming violations of their equal protection rights

must 'first identify and relate specific instances where persons similarly situated in all relevant

aspects were treated differently, instances which have the capacity to demonstrate that plaintiffs

were singled out for unlawful oppression.'" Def. Mot. at 20, *citing Air Sunshine, Inc. v. Carl,*

Civ. No. 09-2019 at *17 (Dist. Puerto Rico Nov. 30, 2010).   However, it is not clear whether the

District is actually arguing that Plaintiffs failed to identify similarly situated individuals who

were treated differently.

Even so, Plaintiffs alleged throughout their Amended Complaint that they were treated

differently by their 7D supervisors than similarly situated male officers because of their sex.  *See*

*e.g. generally,* AC ¶¶ 36-69, 108-110.  Plaintiffs alleged that 7D supervisors treated them

differently than male officers with regard to daily shift assignments, leave and attendance, and

sick leave requests.  AC ¶¶ 36, 52, 53, 55, 57, and 62.  Plaintiffs even provided specific

examples.  On one occasion, a male officer was permitted to switch shifts despite an alleged

"policy" instituted by the Commander prohibiting Plaintiffs from switching shifts. AC ¶ 36.  On

another occasion, Plaintiffs attended the funeral of a colleague and were docked two hours of

leave by Sgt. Washington, while two male officers who arrived later than Plaintiffs were not

docked leave.  AC ¶¶ 68-69.  On another occasion, Sgt. Washington ordered a male officer to

take over a lock-up of a suspect whom Plaintiff Weeks had arrested, which is not standard

procedure.  AC ¶ 43.  Plaintiff Weeks also experienced disparate treatment based on her gender

upon joining the Detectives Office.  Plaintiff Weeks was counseled for matters that male officers

were not counseled about; she was treated differently from male officers with respect to case and

warrant assignments; and her cases and other job duties were routinely taken away from her and given to male officers with less experience.  AC ¶¶ 106-110.

The District next claims Plaintiffs were required to have alleged that such disparate treatment was "irrational" in order to survive a motion to dismiss. Def. Mot. at 22.  While the District cites *Atherton v. D.C.*, 567 F. 3d 672 (D.C. Cir. 2010), in support of its argument, *Atherton* does not stand for this proposition.  Instead, *Atherton* follows the plausibility standard of *Twombly* and *Iqbal*.  To sustain a claim under §1983 based on the Equal Protection Clause, Plaintiffs must show not an "irrational prejudice" but "the existence of purposeful discrimination" *See Iqbal*, 129 S. Ct. at 1948 (requirement of showing discriminatory purpose).

Plaintiff's allegations are not bald, conclusory assertions of intentional discrimination without any factual support, *ala Twombly* and *Iqbal.*  Rather, Plaintiffs have pled a pattern of intentional conduct on the part of MPD's Seventh District, involving over four years of harassment, disparate treatment, and retaliation directed at Plaintiffs because of their gender (and sexual orientation and EEO activity).  Plaintiffs' alleged throughout their complaint that their supervisors made frequent sex-based comments that were based on gendered stereotypes, such as calling Plaintiff Jones "butch" and calling Plaintiff Weeks "femme" or "EEO queen" or "timid." AC ¶¶ 19, 20, 21, 107.  Plaintiffs have also alleged that supervisors and co-workers in 7D routinely made direct sexual comments, solicited them for sex, or threatened to claim that they would claim Plaintiffs' slept with a supervisor if they pursued their EEO claims.  AC ¶¶ 23, 24, 25, 26, 79.  These comments were often made in earshot of other co-workers or supervisors, without any recourse. AC ¶ 25.  Plaintiffs also alleged that MPD created and tolerated an environment where supervisors and coworkers could harass Plaintiffs based on their sex and their

sexual relationship without any investigation, discipline, or repercussions.  *See e.g.,* AC ¶¶ 15-72.

These allegations are grounded in specific factual circumstances which, when read as a whole, paint a picture of such targeted and intentional misconduct taken against Plaintiffs specifically because of their gender (and sexual orientation and EEO activity) that more than nudges the claims "across the line from conceivable to plausible." *Twombly,* 550 U.S. at 570. Plaintiffs' supervisors explicitly and routinely verbalized their intention to target Plaintiffs. Plaintiffs allege their supervisors routinely told their co-workers that they were "going to get them" or "had something for them" (meaning Plaintiffs).  AC ¶¶ 41, 68.  Plaintiffs were specifically told by other co-workers, including Lt. Leebra Branham, that their supervisors were singling them out for differential treatment.  AC ¶ 53.  Sgt. Washington even made explicitly threatening comments to Plaintiff Jones.  AC ¶ 103; Ex. 4.

The District argues that "either intermediate scrutiny or rational basis analysis would be appropriate with respect to the plaintiffs' equal protection claim," Def. Mot. at 21, *citing Craig v. Boren*, 429 U.S. 190 (1976).  The District fails to acknowledge that gender is a "quasi-suspect class" that requires intermediate scrutiny.  *Id.*  (applying intermediate scrutiny or "heightened review" to gender-based equal protection claims).  While "the government may use a gender classification if the government has an important governmental objective and uses means that are substantially related to that objective," *Saunders v. White*, 191 F. Supp.2d 95, 124 (D.C. 2002) (*citing United States v. Virginia*, 518 U.S. 515, 532-33 (1999)), there can surely be no important government objective that requires a municipal agency to allow supervisors and coworkers to routinely solicit female police officers for sex, make openly sexist and sex-stereotyped comments to female officers, or openly vocalize management's intention to target those same female

officers for differential treatment.  Instead, one can only presume from these allegations, construing them in Plaintiffs' favor, that the alleged conduct was taken for intentional and purposeful, rather than an important government objective.  The District certainly cites to no such reason in its defense.

> c.    *Plaintiffs have identified offending customs which violate equal protection*

Plaintiffs have further alleged a District policy or custom that created the constitutional violation.  *See Monell v. Dept. of Social Services*, 436 U.S. 658, 694 (1978) (Section 1983 liability alleged when "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury . . . .").  In *Turner*, this Court, noted there are "a number of ways in which a 'policy' can be set by a municipality to cause it to be liable under § 1983: the explicit setting of a policy by the government that violates the Constitution; the action of a policy maker within the government; the adoption through a knowing failure to act by a policy maker of actions by his subordinates that are so consistent that they have become 'custom'; or the failure of the government to respond to a need (for example, training of employees) in such a manner as to show 'deliberate indifference' to the risk that not addressing the need will result in constitutional violations." *Turner*, 383 F. Supp. 2d at 166.

Plaintiffs have identified the custom or policy which violated their Equal Protection - the Seventh District's supervisory harassment of Plaintiffs, and management's utter failure to take timely or appropriate steps to prevent further harassment.  *See e.g., Garrett v. Kutztown Area Sch. Dist.,* CA 98-0966 at *12 (E.D.P.A. Aug. 11, 1998)*, (*management's harassment of

36

Plaintiffs' compounded with its utter failure to take timely or appropriate steps to stop and prevent further harassment, can constitute a policy or custom that would attribute liability) (*citing Praprotnik*, 485 U.S. at 127).  Defendant's motion to dismiss this claim must  be denied.

### 3.   Count 11 - Plaintiffs' First Amendment Claim Raises Matters of Public Concern

To prevail on a First Amendment retaliation claim, a plaintiff must prove that "(1) he has an interest protected by the First Amendment; (2) defendants' actions were motivated or substantially caused by his exercise of that right; and (3) defendants' actions effectively chilled the exercise of his First Amendment right." *Curley v. Village of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001) (citation omitted); *see Baker v. Coxe*, 230 F.3d 470, 475 (1st Cir. 2000) (holding that the delay of a land use permit in unjustifiable retaliation for the applicant's expressions of his political views may violate the First Amendment).  Courts have held that a public sector employee's complaints to supervisors regarding alleged constitutional violations constitutes clearly established protected speech under the First Amendment, not protected by qualified immunity.  *See Capozzi v. DOT*, 135 F. Supp. 2d 87, 96 (D. Mass. 2001) ("allegation that FAA employees delayed regulatory action to punish [plaintiff] for complaining about the alleged sexual harassment by is viable as a Bivens action under clearly established First Amendment jurisprudence.")

Although the boundaries of what constitutes speech on matters of public concern are not well defined, the Supreme Court has said that speech is of public concern when it can "be fairly considered as relating to any matter of political, social, or other concern to the community," *Connick v. Myers*, 461 U. S. 138, 146, or when it "is a subject of general interest and of value

and concern to the public." *San Diego v. Roe*, 543 U. S. 77, 83–84.

Plaintiffs Weeks and Jones vocalized their complaints about MPD's treatment of them as lesbian officers, and of gays in general.  Most notably, Plaintiffs reported Sgt. Podorski in October 2006 (after he learned of their lesbian relationship) for giving them what they deemed was an unlawful order related to a domestic violence call.  AC ¶ 29.  Plaintiffs and Sgt. Podorski responded to a call regarding an alleged assault with a deadly weapon. A mother and relative had responded violently after their child had informed them that she was gay.  Plaintiffs intended to arrest the mother and the relative but Sgt. Podorski instead instructed the Plaintiffs to take the child to the Psychiatric Institute of Washington and have her committed, because she was gay. Plaintiffs objected to this order and reported him to Sgt. Brett Parsons, then commander of MPD's Gay and Lesbian Unit (GLU).  Sgt. Podorski was investigated and suspended as a result of this unlawful order. AC ¶ 30.

More recently, Plaintiffs raised complaints about a series of homophobic flyers which circulated throughout the MPD Detectives' Office, and which so shocked the conscience of the community that local news organizations reported on the creation and distribution of those flyers. In July 2010, a flyer, created by certain detectives in the Detective's Office, was left on MPD employees' desks. The flyer lambasted "naked sweaty man love" and made fun of gay marriage. AC ¶ 32.  Plaintiffs brought these flyers to the attention of the D.C. Office of Human Rights, and MPD's Diversity Manager, during the administrative proceedings below.

These incidents highlights the anti-gay sentiment that is pervasive throughout the MPD, which clearly has a direct effect on the gay community of the District.  Plaintiffs' complaints about anti-gay sentiment in 7D are more than just personnel matters, as the District would make

them out to be.  These complaints go to the very core of MPD's duty to protect the citizens of the

District, including those in the gay community.  *See Hall v. Ford*, 856 F.2d 255, 259(D.C. Cir.

1988) (*quoting McKinley v. City of Eloy*, 705 F.2d 1110, 1114 (9th Cir. 1983) (citations omitted)

(speech that concerns "issues about which information is needed or appropriate to enable

members of society" to make informed decisions about the operation of their government merits

the highest degree of first amendment protection).   The District's motion to dismiss Plaintiffs'

First Amendment retaliation claim must be denied.

## IV. CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss must be denied in its entirety.

A proposed order is attached.

DATED: April 14, 2011                          _____/s/_____
                                               Cathy A. Harris (Bar No. 467206)
                                               Juliette Niehuss (Bar No. 977316)
                                               KATOR, PARKS & WEISER
                                               1200 18th Street, N.W., Suite 1000
                                               Washington, DC 20036
                                               (202) 898-4800
                                               (202) 289-1389 (fax)
                                               charris@katorparks.com
                                               jniehuss@katorparks.com
                                               Attorneys for Plaintiff