## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

TONIA L. JONES, *et al.*

      Plaintiffs,

  v.

DISTRICT OF COLUMBIA,          Civil Action No. 11-00215 (RMC)

      Defendant.

## OPPOSITION TO DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION AND SUMMARY

The District's motion for summary judgment is wholly without merit. The record is rife with disputed issues of material fact and direct evidence of discrimination and the District presents no legitimate reasons for its actions against Plaintiffs. *See* Ex. 1 (Plaintiffs' Statement of Disputed Material Facts). The evidence shows not only that there are a myriad of material disputed facts that makes summary judgment inappropriate at this stage, but that Plaintiffs have presented direct and compelling evidence of discrimination, reprisal, and hostile work environment harassment on the bases of their sex, sexual orientation, and EEO activity in violation of Title VII of the Civil Rights Act of 1991 and the D.C. Human Rights Act, D.C. Code §2-1401, *et seq.* Moreover, the Plaintiffs have identified numerous tangible employment actions that resulted from their supervisors' harassment, which went unabated for years.

At the outset, there are two threshold issues that alone are sufficient to defeat the Defendant's motion for summary judgment. As has become painfully clear as this case has

proceeded, the District woefully failed to meets it obligations to preserve relevant evidence. Both with respect to the missing emails and the missing electronic and hard copy PSS log books, critical evidence is missing and presumably destroyed. On the basis of the evidentiary inference this document destruction engenders alone, a jury could find for the Plaintiffs in this case. Accordingly, on this basis alone summary judgment must be denied.

Similarly, the existence of the Probable Cause finding from the D.C. Office of Human Rights is alone a sufficient basis to deny summary judgment. OHR found that the Plaintiffs had established claims of sexual harassment, hostile work environment and retaliation. These conclusions, well supported in the record, are admissible and, like spoliations, are sufficient on their own to support a jury verdict. Accordingly, the OHR Probable Cause findings are also sufficient to defeat summary judgment.

Moreover, the record is replete with examples of the most gross sexual harassment, not the least of which being Plaintiffs' supervisor asking them "**do you wanna fuck?**" and, along with others, offering to pay money to watch Plaintiffs have sex. The District made absolutely no effort to investigate Plaintiffs claims. Rather, those the Plaintiffs turned to for protection then began a campaign of retaliation openly asserting that they were "going to get" the Plaintiffs and castigating them for "playing the EEO card." Plaintiffs ultimately suffered tangible employment actions as a result of the harassment they endured-in performance ratings, job assignments, and disciplinary actions. As one manager bluntly stated, management's actions against Plaintiffs were taken "because they were gay."

As this Opposition argues, the District's spoliation of evidence precludes summary judgment.  Second, the D.C. Office of Human Rights' finding of Probable Cause on both of

Plaintiffs' complaints establishes genuine issues of material fact that must be presented to a jury. Third, in providing all inferences to Plaintiffs at this stage as the Court must, the evidence establishes violations of both Title VII and the D.C. Human Rights Act based on Plaintiffs' sex, sexual orientation, and EEO activity.

Despite Defendants' attempts to downplay the evidence of harassment by labeling it as "uncivil" or "unsavory," this is a case that more than surpasses the threshold for severe and pervasive sexual harassment under both statutes. Due to the District's spoliation, failure to take action to remediate the harassment once Plaintiffs lodged complaints, and its own Probable Cause finding, this case must proceed to trial. The Court should swiftly deny summary judgment and set a trial date.

## II.    ARGUMENT

As a threshold matter, the District's spoliation of evidence precludes summary judgment, and entitles Plaintiffs to an adverse inference that the District intentionally destroyed documents that would have corroborated Plaintiffs' claims. Additionally, the existence of an OHR finding of Probable Cause on both of Plaintiffs' complaints establishes genuine issues of material fact that must be presented to a jury. Finally, the evidence establishes a clearly discriminatory and retaliatory hostile work environment based on Plaintiffs' sex, sexual orientation, and EEO activity that the District cannot defend. There are too many issues of material fact and thus summary judgment must be denied.

### A.    The District's Spoliation of Evidence Precludes Entry of Summary Judgment

There can be no dispute that the District failed to maintain relevant evidence in this case. Indeed, the District directly concedes as much in the affidavit it filed in connection with its

opposition to Plaintiffs' motion for sanctions.  Specifically, the District asserts:

> Prior to July 0f 2009 . . . [b]ackup tapes were used to backup all email servers . . . on a [*sic*] daily, weekly and monthly intervals . . . .  These tapes were stored offsite for up to one year at which point they were put back in rotation.  Hence, *new data was written on the tapes which erased old data*.

Dckt. #66-1 at ¶¶ 6-8 (emphasis added).

The incidents at issue in this suit date back to 2006.  This Court approved email searches for several District employees reaching back to that date.  Yet as the District concedes, while these emails would have been backed up and maintained for "up to a year," thereafter the backup tapes were reused and "new data was written on the tapes which erased old data." *Id.*

### 1.    The Destroyed Emails Were Relevant to Plaintiffs' Claims

The District destroyed emails that were relevant to the Plaintiffs' claims.  As such, the Defendants' spoliation requires the Court to make inferences in Plaintiffs' favor.  *See Talavera v. U.S. Agency for Int'l Dev.*, 638 F.3d 303, 311 (D.C. Cir. 2011) ("This court has recognized the negative evidentiary inference arising from spoliation of records.")

For example, Detective Weeks testified that when she was first in the Detectives' office in 2008, she "sent out an e-mail" requesting training from her supervisors, and that her supervisor sent an e-mail response ridiculing her. Ex. 11 at 227-30. These emails could not be located in the District's ESI discovery production. This evidence would have supported Week's claims of a hostile work environment.

Similarly, Plaintiffs e-mailed Commander Maupin about their complaints, yet Commander Maupin could find no such emails in his search performed for OHR.  Ex. 14 (Maupin email to Diane Groomes 12/9/10).

Sgt. Podorski also admitted that he "may have" sent or received e-mails about Plaintiffs' complaints. Ex. 2 at 100. Yet of the very few emails produced for Sgt. Podorski by the District, most were from 2010, during the OHR investigation. Ex. 15 (Podorski sample ESI results). Only one email from March 3, 2008 was found from Sgt. Podorski, in the District's September 6, 2014 production, referencing Officer Weeks' transfer back to his PSA 703 in March 2008. Ex. 16 (March 24, 2008 email from Podorski). Of the total ESI production, very few emails were produced from Sgt. Podorski's account. Ex. 17 (Declaration of Jonathan Yu). Most of these emails made sexually inappropriate comments to other co-workers ("he has breasts," "sexual related pamphlets"). Ex. 15. Interestingly, an email from November 2009 indicates that Sgt. Podorski's email inbox, as well as that of several other officers, was full to capacity and MPD's System Administrator recommended deletion of email files. Ex. 18 (11/11/09 Email advising Podorski to delete emails).

The District also failed to produce relevant emails for Lt. Alan Hill for the 2006-2009 time period ordered by the Court. Only two emails of relevance were produced for Lt. Hill, both from January 2008. Ex. 9 (1/26/08 email from Hill to Maupin) and Ex. 19 (Hill email re: Weeks performance rating Jan 19, 2008). One advised Commander Maupin that the AWOL charge against Officer Weeks might not be sustainable. Ex. 9. The other opined that Sgt. Podorski held an "animus" against Officer Weeks for providing a statement against him in a case involving Assault with a Deadly Weapon against a gay teenager, Ex. 27 (IAD Investigation into Sgt. Podorski) and that someone else should do her performance evaluation for FY2007. Ex. 19.

      2.      Destruction of PSS Log Books

Similarly, there can be no dispute that the District failed to maintain relevant PSS log

books.  As detailed in Plaintiffs' motion for sanctions, the District sent Plaintiffs' counsel on a wild goose chase to review these books, only to be told that these books, for many of the relevant timeframes, were "missing."  So too, the electronic backups of these logs, which were required to be maintained under MPD General Order 201.23, and which the District's own witnesses testified were created and maintained, were nowhere to be found.

Plaintiffs raised the issue of the missing PSS log books (and several other missing personnel records) during a conference call with the Court on December 20, 2013.  The Court then ordered the District to "locate, copy, and produce to Plaintiffs . . . the computer printouts of 'PSS logbooks,' if located."  *See* Order dated Dec. 20, 2013.  The District's response was to tell Plaintiffs that there were "no electronic PSS records."  This response was inconsistent with MPD's General Orders requiring the Patrol Services and School Security Bureau (PSSSB) to maintain the hard copy PSS log books and to ensure that such entries matched electronic time and attendance records.  *See e.g.,* Ex. 20 (MPD General Order PER-201.23).  The District's position was also inconsistent with its own witnesses, such as Lt. Derek Larsen, who testified that the Roll Call Sheets "mirror the PSS books" and that the PSS books were typed up onto the electronic "Roll Call" sheets by the Sergeants, at which point they are printed and attached to the Watch Commander reports, which are then maintained in the 7th District.  Ex. 21 (Deposition of Derek Larsen).  The District never searched for these printed Roll Call sheets.

During a February 19, 2014 discovery hearing with the Court, the District again claimed these electronic Roll Call sheets did not exist.  The Court indicated that while it appeared such records were not available, Plaintiffs were free to make spoliation arguments regarding the missing PSS books and records.  *See* Feb. 19, 2014 Order.

The District has never explained why the large, voluminous green "PSS Log Books" disappeared, or even what could have possibly happened to them.  Those books contain the leave usage, duty assignments, car assignments, PSA assignments, and supervisory assignments for every tour of duty during the relevant time period in this case.  Ex. 22 (PSS Book samples). The books for January - March 2007, August 2007 - October 2007, January - April 2008 and September-October 2008 are now missing and presumed destroyed.  Had those books been produced for those time periods, Plaintiffs could have obtained relevant and admissible information regarding their claims.

Specifically, they could have presented documented proof that: Sgt. Podorski's allegation that Plaintiffs  were "unsafe" in January 2007 was unfounded; Plaintiffs were not permitted to ride in the same car from January- March 2007, and that Officer Jones was then prevented from bidding on PSA 703 in March 2007; other officers in different PSAs, and heterosexual couples, were permitted to ride together in the same car; car assignments and detail assignments on specific dates between August and October 2007, when they shifted to the midnight tour under Sgt. Washington, as compared to other officers' assignments; they were docked leave that male officers were not docked by Sgt. Washington on October 7, 2007; their stress and sick leave usage in October 2007, including  that they properly used annual leave for a vacation during that time; and Sgt. Podorski and Sgt. Washington remained their supervisors in 2008 even after they filed their internal EEO complaints of harassment and complained repeatedly to their supervisors.

This evidence would have been crucial to corroborating Plaintiffs' claims that they were unfairly separated because of their same-sex relationship, unfairly detailed as a means of separating them, the "PSA assignment" argument made by the District is not credible, and the

District did nothing to separate the offending officials from Plaintiffs' chain of command.

      3.      <u>Plaintiffs are entitled to an adverse inference as a result of spoliation</u>

In light of the District's failure to maintain evidence, Plaintiffs will be entitled to a

spoliation inference. *See Talavera v. U.S. Agency for Int'l Dev.*, 638 F.3d 303, 311 (D.C. Cir.

2011) ("This court has recognized the negative evidentiary inference arising from spoliation of

records."). *See also Webb v. District of Columbia*, 146 F.3d 964 (D.C. Cir. 1998) (supporting the

imposition of adverse evidentiary inferences where evidence has not been preserved). The

District's duty to maintain relevant evidence arose in January 2007, when Plaintiffs first

complained to their supervisors about harassment and were informed of their EEO rights, or at

the very latest October 2007, after Plaintiffs filed their internal EEO complaints. Ex. 23 (OHR

EEO Charge documents of Tonia Jones); Ex. 24 (OHR EEO Charge documents Kenniss Weeks);

Ex 41 (MPD Internal EEO complaints). *See* also Ex. 14 to Pltfs. Motion for Sanctions (MPD

PowerPoint presentation noting that the "obligation to preserve evidence arises when the party

has notice that the evidence is relevant to litigation or when a party should have known that the

evidence may be relevant to future litigation" including when "EEO receives a discrimination or

retaliation complaint."). The District can take no solace in its purported lack of a preservation

policy. *See Gerlich v. Department of Justice*, 711 F.3d 161, 170 (D.C. Cir. 2014) ("The fact that

the records were destroyed as part of the defendant's 'typical practice' was insufficient to

overcome the duty to preserve them.")

    The negative evidentiary inference that arises from the District's spoliation of relevant

evidence defeats the District's motion for summary judgment. In *Talavera*, the Court of Appeals

considered a case in which the District Court had granted summary judgment to the defendant

notwithstanding that the defendant had failed to preserve relevant evidence.  The Court of Appeals reversed the grant of summary judgment, holding that the district court erred in according only a "weak adverse inference" to the defendant's destruction of relevant evidence. 638 F.3d at 312.  Because the missing evidence "represented [the plaintiff's] best chance to present direct evidence that [the defendant's] proffered reason" was pretextual, the Court concluded that "[a] reasonable jury could conclude that [the defendant's nonaccidental destruction of his notes supports an inference that the notes would have contained information favorable to her claim." *Id.* *See also Sharma v. District of Columbia*, 10-cv-1-33 (GK), 2014 U.S. Dist. Lexis 117842 at *20 (Aug. 25, 2014) ("permissive adverse inference resulting from record destruction created genuine fact issue").

The District argues in its motion that its reason for refusing to allow Plaintiffs to patrol together was that they were "unsafe" and had too many injuries and use of force complaints.  So too, it argues that Plaintiffs have failed to identify comparators who were treated more favorably that they were.  But just as in *Talavera*, the destroyed evidence here "represented [Plaintiff's] best chance to present direct evidence" that these proffered reasons are pretextual.  Presumably, the District's electronic records from that time period would provide an objective basis to evaluate the assertion that Plaintiffs were "unsafe."  They might also have provided candid communications between Plaintiffs' supervisors about their requests to ride together and/or the supervisors' decisions to separate them. Because of the District's failure to maintain the evidence, the Court is left only with this naked assertion and Plaintiffs are left with no documentary evidence to refute it.  Similarly, the PSS log books would have provided concrete verification of Plaintiffs' assertion that they were treated differently than similarly-situated co-

workers–they would have shown which officers were assigned together, which PSAs they were assigned to, which supervisors were on duty on a given shift assignment, and would have corroborated Plaintiffs' evidence that heterosexual couples in different PSAs were routinely permitted to ride together.  SDF # 9; Ex. 22.  But because the District failed to maintain this evidence, Plaintiffs have been deprived of this source of direct evidence to support their claims.

In these circumstances, the District's destruction of evidence entitles Plaintiffs to an adverse evidentiary inference.  This inference alone is sufficient to defeat the District's motion.

> **B.**  **The Office of Human Rights' Probable Cause Findings are admissible evidence of discrimination and reprisal that must go before a jury**

Prior to initiating this action, Plaintiffs obtained a Probable Cause finding of discrimination, harassment, and reprisal from the D.C. Office of Human Rights.  *See* Exs. 25 (OHR Probable Cause Finding for Jones) and 26 (OHR Probable Cause finding for Weeks).  Probable cause findings may be admitted and juries are entitled to consider them.  Because the jury in this case could accept the probable cause findings as evidence of discrimination, harassment, and reprisal, those findings alone defeat the District's motion for summary judgment.

> 1.  OHR made factual findings that supported prima facie evidence of a hostile work environment and discrimination based on sex and sexual orientation, *quid pro quo* sexual harassment, and reprisal

The Office of Human Rights conducted a comprehensive investigation into Plaintiffs' allegations.  After considering the Plaintiffs' allegations and the MPD's response, interviewing witnesses with first hand knowledge of the events and reviewing the available documentary evidence, OHR found that the District had engaged in discriminatory and retaliatory treatment of

10

Plaintiffs and created a hostile work environment.  *See* Exs. 25 and 26.

In particular, OHR noted that Officer Jones and Officer Weeks had been subjected to unwelcome harassment that consisted of derogatory comments; disparate treatment in taking leave and receiving assignments; sexual advances and requests for sexual acts; and blatant references to their sexual orientation, their same-sex relationship, and their gender.  Exs. 25 and 26 *at* 19.  Moreover, the harassment was not limited to on-duty treatment, but spilled over into Department-sponsored social events, and was "frequent, pervasive, and offensive." *Id*.

OHR also made a finding that Plaintiffs had established that they were retaliated against for reporting this harassment and filing both internal and external complaints of discrimination between January 2007 and March 2008.  *Id*. at 16.  OHR found that Plaintiffs were retaliated against when the Department unfairly detailed them, attempted to separate them from each other, counseled them unfairly, including counseling Officer Weeks for being late when males and heterosexuals were not counseled similarly, and refusing to sign overtime paperwork or provide Officer Jones with her performance evaluation.  *Id*.

> 2. <u>OHR's factual findings are relevant and admissible evidence of discrimination that a jury should consider</u>

These factual findings and conclusions, are relevant and material evidence that support Plaintiffs' claims of discrimination, reprisal and hostile work environment.  Courts have determined that "[o]pinions and conclusions in official reports are admissible if they are based on factual investigation. Fed. R. Evid. 803(8)(C) renders presumptively admissible not merely factual determinations in the narrow sense, but also conclusions or opinions based upon factual investigation."  *In re: Metlife Demutualization Litigation*, 262 F.R.D. 217, 238 (E.D.N.Y. 2009).

In this case, OHR's factual development is complete and the analysis compelling.  OHR's

findings and conclusions are not are in any way "weak" but instead stand on their own merits.

These findings and conclusions should, therefore, be admitted into evidence.  *See Ponce v.*

*Billington*, 679 F.3d 840, 847 (D.C. Cir. 2012).  And, of course, because  they may properly

serve as a basis to support a verdict in Plaintiffs' favor, they also serve to defeat the Defendant's

motion for summary judgment.

    C.  **Plaintiffs Establish *Prima Facie* Case of Discrimination, Harassment, and
Retaliation**

Defendant argues that Plaintiffs cannot establish a *prima facie* case of hostile work

environment, characterizing Plaintiffs' complaints as merely alleging "stray" comments,

"infrequent uncivil behavior," that either were not sufficiently severe or pervasive to be

actionable, or that did not constitute tangible harm to the conditions of their employment.  In

addition, the District attempts to artificially separate Plaintiffs' allegations into discrete claims,

which is inappropriate in the context of a hostile work environment complaint.  *National*

*Railroad Passenger Corporation v. Morgan,* 536 U.S. 101, 120-21 (2002).  However, Plaintiffs

were subjected to numerous incidences of harassment on the basis of their gender, sexual

orientation, same-sex relationship, sex-stereotyping, and retaliation for refusing their supervisors'

sexual advances.  Defendant's actions were so severe and long-lasting that they led to physical

stress reactions requiring Plaintiffs' medical treatment, humiliation, lowered performance ratings,

loss of job opportunities, and the permanent dissolution of Plaintiffs' relationship.

    1.  <u>Legal Standard for Hostile Work Environment and Retaliation under Title
VII and DCHRA</u>

Under Title VII, "[t]o establish a *prima facie* case for a hostile work environment based

on [sex, sexual orientation, or reprisal], plaintiff[s] must demonstrate that (1) [they are]

member[s] of a protected class; (2) [were] subjected to unwelcome harassment; (3) the

harassment occurred because of [their status]; (4) the harassment affected a term, condition, or

privilege of [their] employment; and (5) the employer knew or should have known of the

harassment, but failed to take any action to prevent it." *Brady v. Livingood*, 456 F. Supp. 2d 1, 9

(D.D.C. 2006) (citations omitted).  Plaintiffs must prove that "the workplace is permeated with

discriminatory intimidation, ridicule, and insult, . . .that is sufficiently severe or pervasive to alter

the conditions of the victim's employment and create an abusive working environment." *Harris*

*v. Forklift Systems*, 510 U.S. 17, 21 (1992) (citations omitted).

Whether an environment is hostile is determined by looking at the totality of the

circumstances:

> the frequency of the discriminatory conduct; its severity; whether it is physically
> threatening or humiliating, or a mere offensive utterance; and whether it unreasonably
> interferes with an employee's work performance.  The effect on the employee's
> psychological well-being is, of course, relevant to whether the plaintiff actually found the
> environment abusive.

*Id.* at 23.  The severity of any particular incidents can counterbalance for a lack of  pervasiveness.

*Baloch v. Norton*, 355 F. Supp. 2d 246, 260 (D.D.C. 2005).  Very rarely will such fact-based

determinations be appropriate for determination on summary judgment.  *Armstrong v. Reno*, 172

F. Supp. 2d 11, 23-24 (D.D.C. 2001).

District courts have routinely acknowledged that hostile work environment claims  under

the D.C. Human Rights Act mirror those under Title VII.  *See e.g., Campbell-Crane & Assoc., et*

*al., v. Stamenkovic* (D.C. 2012)(defining hostile work environment under the DCHRA as

"harassment . . . severe and pervasive enough to affect a term, condition, or privilege of

employment").  Under the DCHRA the Plaintiff can establish discrimination by offering

evidence that the employer's actions were taken "wholly or partially" because of their sex, sexual

orientation, and/or reprisal.  D.C. Code 2001 §2-1402.11(a); D.C. Code 2001 §2-1402.61.

        To establish a *prima facie* case of illegal retaliation, a plaintiff must show that "(1) she

engaged in statutorily protected activity; (2) her employer took an adverse personnel action

against her; and (3) a causal connection exists between the two." *Carney v. Am. Univ.*, 151 F.3d

1090, 1095 (D.C. Cir. 1998)).

        Similarly, under the DCHRA, it is an "unlawful discriminatory practice" to retaliate

against a person for having "exercised or enjoyed, or on . . . aided or encouraged any other person

in the exercise or enjoyment of any right granted or protected under [the DCHRA], or "because

that person has opposed any [discriminatory] practice . . . or because that person has made a

charge, testified, assisted, or participated in any manner in an investigation, proceeding or

hearing authorized under [the DCHRA].  D.C. Code 2001 §2-1402.61.

        A party seeking to prove a claim of retaliation "must show that a reasonable employee

would have found the challenged action materially adverse, which in this context means it well

might have dissuaded a reasonable worker from making or supporting a charge of

discrimination." *Smith v. Office of Human Rights*, 11-CV-1623 (D.C. Oct. 17, 2013), *citing*

*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). The D.C. Circuit has

acknowledged that "[a] threatening verbal statement, standing alone, might well constitute a

materially adverse action." *Gaujacq v. EDF, Inc.*, 601 F.3d 565, 578 (D.C.2010).  The burden of

establishing a *prima facie* case of retaliation is minimal.  *Holcomb v. Powell*, 433 F.3d at 903.  It

is only required that the Plaintiff present adequate facts to permit an inference of retaliatory

motive.  *Id.*  The rule of thumb for inferring causation is that, generally, any amount of time under three months between the protected activity and the adverse action will support an inference of causation on temporal proximity alone.  *Hamilton v. Paulson*, 542 F. Supp.2d 37, 58 (D.D.C. 2008).   Moreover, in a case of retaliatory harassment, such as this one, the retaliatory incidents are further evidence of discrimination and serve to exacerbate an already hostile working environment.  *Gowski v. Peake*, 682 F.3d 1299 (11th Cir. 2012).

2.   <u>Plaintiffs were subjected to unwelcome harassment because they were females and in a same-sex relationship.</u>

Plaintiffs can easily establish the first three prongs of the prima facie case regarding harassment.  Plaintiffs are members of a protected class under Title VII as they are both female. They are also part of a protected class under the DCHRA due to their gender, sexual orientation and involvement in a same-sex relationship.[1]  Plaintiffs began a same-sex relationship in July 2006.  SDF #5.  The Sergeants began harassing the Plaintiffs after they learned that Officer Weeks was dating a female, Officer Jones.  In September 2006, Plaintiffs informed their direct supervisor on the day-work shift, Sgt. Podorski, that they were dating each other.  Ex. 7 at 28-30, 42.  Officer Jones first informed Sgt. Podorski that she was dating a female officer during a conversation in a scout car.  *Id.* at 28-30.  Plaintiffs then had a subsequent conversation with Sgt. Podorski where they informed him they were dating. *Id.* at 42. Ex 11 at 20-23. Prior to this, Plaintiffs were admittedly on friendly terms with Sgt. Podorski.  SDF at ¶7-8.  Officer Weeks testified that prior to disclosing her same-sex relationship, she "never had an issue with Sergeant

---

[1]As this Court has found, discrimination based on an employee's sexual orientation is sex discrimination in violation of Title VII.  *See Schroer v. Billington*, 577 F. Supp. 2d 293, 306-08 (D.D.C. Sept. 19, 2008); *Terveer v. Billington*, 97 Empl. Prac. Dec. (CCH) P45,046 (D.D.C. Mar. 31, 2014).

Podorski." Ex. 11 at 56.

Once Sgt. Podorski learned that Officer Weeks was dating Officer Jones, his attitude towards them abruptly changed. Ex. 11 at 25. Officer Jones testified that he became "upset" and "angry." Ex. 7 at 34-36, 227. Soon after Officer Jones identified Officer Weeks as the female she was dating, Sgt. Podorski told Officer Jones that Officer Weeks was "a drama queen," that she was "poison" in relationships, and that Officer Jones "shouldn't mess with" Officer Weeks. Ex. 2 at 36-38 ; Ex. 7 at 109-110. In October 2006 during a routine radio-run, Sgt. Podorski also told Officer Weeks that Officer Jones was "poison." Ex. 28 (Weeks OHR Rebuttal Statement Nov. 2008).

a.      *Sgt. Podorski was sexually interested in Officer Weeks*

Sgt. Podorski's harassment of Weeks and Jones was motivated by their gender and sexual orientation. Sgt. Podorski told Officer Jones that Officer Weeks was poison and a drama queen because, in his opinion, "Officer Weeks seems to want turmoil in some facet of her life at all given times, and if she doesn't have that, she actively seeks it out and tries to get herself involved in it." Ex. 2 at 33. Sgt. Podorski claimed he was trying to advise Officer Jones that "Weeks didn't seem to work out well in her relationships." *Id*. at 38. This was uncharacteristic of Sgt. Podorski's behavior towards Officer Weeks, who had previously exhibited signs of being romantically interested in Officer Weeks. Ex. 3 at 28-29; Ex. 7 at 75; Ex. 29 at 109; Ex. 2 at 52. Meanwhile, Sgt. Podorski was telling Officer Weeks that Officer Jones was also "poison," indicating that Sgt. Podorski may have been attempting to break Weeks and Jones apart before their relationship had barely begun.

Officer Weeks understood that Sgt. Podorski "had feelings" for her and was hurt to learn

16

that she had chosen to date a female.  Ex. 24 at Gender Amendment claims**.**  Witnesses

confirmed that Sgt. Podorski was overtly interested in Officer Weeks, romantically or sexually.

Ex. 3 at 28-29; Ex. 7 at 75; Ex. 29 at 109.  When he learned that Officer Weeks had chosen to

date a female - specifically Officer Jones - Sgt. Podorski became "offended" and "upset."  Ex. 7

at 34-36, 75; Ex. 29 at 41; Ex. 3 at 93 ("I think that he liked Weeks and this is why he was upset,

that Weeks was with a female.")  Sgt. Branham testified that Sgt. Podorski was "interested in

Kenniss" because "he talked about her" and "talked about how [Weeks] was nice looking." Ex. 3

at 18, 27, 28.  Sgt. Podorski admitted to talking about Officer Weeks' physique and stating that

she was "an attractive woman"  Ex. 2 at 52.  As  Officer Jones testified, Sgt. Podorski liked, or

perhaps "loved" Officer Weeks and appeared "offended" that Officer Weeks would choose to be

with a woman rather than with him. Ex. 7 at 75; Ex. 30 (Jones transcript of Oct. 15, 2007 EEO

interview) at 7-8.  *See also* Ex. 24 (Weeks allegation that Podorski "had feelings" for her).

       b.   *Stanton Road incident*

     In late September 2006, an incident occurred that altered Sgt. Podorski's treatment of

Plaintiffs.  On September 24, 2006, Plaintiffs and Sgt. Podorski responded to a domestic violence

call on Stanton Road, S.E., regarding an alleged assault with a deadly weapon.  Ex. 27 (Podorski

IAD file narrative report, redacted)**.** The matter concerned a mother, a relative and a minor.  *Id*.

The mother and relative had responded violently after the teenager had informed them that she

was gay.  *Id*.  Upon reviewing the scene, Plaintiffs intended to arrest the mother and the relative

for Assault with a Deadly Weapon (knife), or at a minimum, Simple Assault.  *Id***.**  The evidence

was clear that the minor child had been assaulted because she was gay.  Ex. 27 at 7. But Sgt.

Podorski instructed the Plaintiffs to instead take the child to the Psychiatric Institute of

Washington.  *Id.* at 8.  He also stated that no arrest should be made because it was only a "family" disturbance.  *Id.*  Plaintiffs objected to this order and believed it was unlawful.

Officer Jones testified in her interview with MPD EEO that after placing the gay child in their scout car, Plaintiffs discussed the unlawful order and contacted MPD's GLU Unit.  Ex. 30 at 6 (note "Blue Unit" should read "GLU" unit - errata pending).  Officer Weeks' statement to OHR corroborated that Sgt. Parsons, of the GLU Unit, along with Officer Zennolia Hakir, returned to the scene, interviewed witnesses, and arrested the mother and female relative.  Ex. 24 at WEEKS Affidavit; Ex. 27.  Two attorneys on the scene witnessed the assault and gave the statements to Sgt. Parsons which are in the complaint.  Ex. 11 at 73. As a result of GLU's efforts and an ensuing investigation into misconduct, Sgt. Podorski was referred for "Failure to Make a Lawful Arrest" to the U.S. Attorneys' Office.  Ex. 7.  After a declination, Sgt. Podorski was investigated by IAD for "Neglect of Duty" and received a suspension for his failure to act along with Officer Darrell Garner.  Ex. 31 (Podorski discipline).  Sgt. Podorski thereafter held a retaliatory animus against Officer Weeks in particular for participating in this action.  Ex. 19.

Sgt. Podorski's subsequent discipline for giving Plaintiffs an improper police order not only highlights his animus towards lesbians in general, it also substantiates Plaintiffs' claims that after they disclosed their same-sex relationship, Sgt. Podorski took unjustified actions related to Plaintiffs that created a pervasive hostile working environment and raise a strong inference of discrimination.  *See e.g., St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993)(disbelief of defendant's reasons, accompanied by evidence of mendacity, may support a showing of intentional discrimination).  After this incident, which Plaintiffs maintain was caused in part by Sgt. Podorski's anger over their same-sex relationship, Sgt. Podorski began to separate Plaintiffs.

18

  c. *Separation of Plaintiffs was based on their sex and sexual orientation*

  The harassment was severe and pervasive enough to affect the terms and conditions of Plaintiffs' employment. Sgt. Podorski and Sgt. Washington made it clear to Plaintiffs and other MPD officers that they were treating Plaintiffs differently specifically because they had entered into a same-sex relationship, and that their intention was to separate Plaintiffs.  As Officer Jones testified:

> I am a woman who's dating a woman who all the guys want to date and who are attracted to. And, yes, they started to retaliate because of that.

Ex. 7 at 227.

  In October 2007, Officer Jones reported to IAD that after coming out to Sgt. Podorski about their relationship in late 2006, Sgt. Podorski began making comments to both Plaintiffs in an effort to separate them and turn them against each other.  In addition to calling them "poison," he told each Plaintiff that the other should "leave her alone." Ex. 30 at 5; Ex. 11 at 91; Ex. 28. His comments caused friction in Plaintiffs relationship.  Ex. 11 at 92.

  After that, Sgt. Podorski "started to separate [Plaintiffs] at work, said he didn't want [them] riding together. He made comments about the relationship at work that [Plaintiffs] didn't agree with." Ex. 30 at 5.  The first incident separating Plaintiffs occurred sometime in October 2006.  Ex. 11 at 53.  Both Sgt. Podorski and Sgt. Washington also accused Plaintiffs of "malingering" whenever they would take leave together, which became more frequent as the harassment increased.  Ex. 30 at 5-6.  Officer Weeks told Sgt. Podorski "in reference to all of this, to stop," and complained to him about being separated from officer Jones.  Ex. 11 at 58.

  Sgt. Branham also testified at length about how Sgts. Podorski and Washington singled

19

out Plaintiffs for differential treatment, refusing to let them ride together and conspiring to "get them" because "they were gay" and because Officer Weeks had chosen to date a female.  Ex. 3 at 26, 29.  Sgt. Branham overheard Sgt. Washington and/or Sgt. Podorski talking about how "they just didn't like . . . [Weeks and Jones] riding together or that they didn't like the fact that Officer Weeks was now in a homosexual relationship." *Id.* at 16-17.  She testified that while other sergeants didn't appear to have a problem with Plaintiffs' relationship, "for some reason, these two sergeants [Podorski and Washington] just never put them together." *Id.* at 27.

Witnesses testified that there was something about this unique pairing - Officer Jones, lesbian female police officer, and Officer Weeks, a formerly straight female officer - that "upset" the supervisors in 7D.  Ex. 3 at 93; Ex. 29 at 41.  For example, Lt. Rosenthal told the Office of Human Rights that during one conversation with Plaintiffs, "[they] informed her that [they were] not allowed to ride together with her partner and that everyone was upset that they were together." Ex. 25 at 10.  She also told OHR that "Complainant [Jones] and her partner requested to switch shifts because they felt that they were getting differential treatment," indicating supervisory knowledge that Plaintiffs were alleging discrimination by their supervisor *Id.* Plaintiffs had several conversations with Rosenthal, including one in early 2007 where they told her Sgt. Podorski was upset that Weeks and Jones were dating and that as a result, Podorski and others would not let them ride together or work together.  Ex. 29 at 41.

> d.   *Podorski claims Plaintiffs are "unsafe"*

The severity and pervasiveness of the harassment and retaliation continued in January 2007, when in January 2007, Sgt. Podorski began making unwarranted and public accusations that Plaintiffs were "unsafe" to work with.  Ex. 11 at 57; Ex. 2 at 44-46.  He posted a letter on the

roll call wall in 7D stating that Plaintiffs had too many "Use of Force" complaints (UFIRs) and were "unsafe" and had too many injuries.  Ex. 7 at 59-61; Ex. 11 at 85. He further stated that he wanted Plaintiffs transferred to another PSA (outside of 703).  Ex. 7 at 61.  Sgt. Podorski admitted that he told other sergeants that Plaintiffs were unsafe, including Sergeants Smallwood and Lafranchise.  Ex. 2 at 44-46.   He also told Lt. Larsen that Plaintiffs were unsafe and needed to be separated.  Ex. 21 at 28-30.

The inference of the "unsafe" comments is not that the supervisors were worried about Plaintiffs' safety.  Rather, it was meant as a denigrating comment about their abilities and that it was "unsafe" for others to work with the two of them.   For example, Lt. Larsen testified that Sgt. Podorski stated that Plaintiffs were "showing off" for each other and that this was leading to injuries.  *Id.* at 34.  None of this was true.  Lt. Larsen recalled that Sgt. Podorski "wanted to bring it to my attention that it might be best for those two to be separated." *Id.* at 30.  Ultimately, while Lt. Larsen told Sgt. Podorski that Plaintiffs had complained that his actions at Bike Week were unwelcome and could lead to an EEO complaint, Lt. Larsen  agreed to Sgt. Podorski's suggestion to separate Plaintiffs due to Sgt. Podorski's allegations that they were "unsafe."  *Id.* at 30, 46.

Sgt. Podorski ultimately followed through on this threat.  In March 2007, Plaintiff Jones was reassigned to PSA 701 and Plaintiff Weeks was assigned to PSA 703.  Ex. 7 at 227.  Plaintiffs had been placed in the same PSA 703 burglary TAC Unit since January 2007 by Lt. Larsen.  *Id*; Ex. 21 at 36-37.  However, Sgt. Podorski was the supervisor for PSA 703, and refused to have both Officers Jones and Weeks in PSA 703.  SDF# 106. As a result, Sgt. Podorski prevented Officer Jones from bidding for his PSA during open season along with Officer Weeks.  *Id.*  When open-season bidding occurred, Officer Weeks was able to bid on PSA

21

703, Sgt. Podorski's PSA.  However, Sgt. Podorski would not allow Officer Jones to come off-duty in time to bid for PSA 703.  *Id.*; Ex. 23 at 3.  Instead, he kept Officer Jones out on the street, intentionally, so that when she was finally able to bid for a shift assignment, the only available slot left was in PSA 701.  Ex. 23 at 3. Officer Jones was ultimately placed in a separate PSA (701) in March or April 2007, as a direct result of Sgt. Podorski's efforts to separate Plaintiffs. *Id.*

This led Plaintiffs to report their concerns of differential treatment to various supervisors over the next three months.

    e.  *The District knew about the harassment, but failed to take any action to prevent it.*

Plaintiffs also easily establish that their employer knew about the harassment, but failed to take any action to prevent it.  Plaintiffs repeatedly complained to their superiors, including the Commander, but nothing at all was done.  In January 2007, Plaintiffs first complained to other supervising sergeants in 7D, Sgt. Eric Levenberry and Sgt. Buddy Smallwood.  Ex. 11 at 61-64; Ex. 32 (Deposition of Eric Levenberry) at 13-15.  In response, Sgts. Smallwood and Levenberry told Plaintiff Weeks that she could file an EEO complaint, but if she did file a complaint, Sgt. Podorski might claim that Plaintiff Weeks had slept with him.  Ex. 11 at 63.

Plaintiffs next complained to their lieutenant, Lt. Derek Larsen, in January 2007.  Ex. 7 at 74.  Plaintiffs told Lt. Larsen that they did not want to work with Sgt. Podorski anymore because he was treating them differently, and requested reassignments away from Sgt. Podorski.  *Id.* at 76.  Lt Larsen spoke with Sgt. Podorski about his behavior and indicated that it was unwelcome.  Ex. 21 at 46.  He also told Sgt. Podorski that Plaintiffs could file an EEO complaint.  *Id.*

However, he did not take any further action to remedy the harassment, and in fact agreed with

Sgt. Podorski's proposal to separate Plaintiffs.  *Id*. at 30.

In February 2007, Plaintiffs also informed Lt. Ashley Rosenthal, a former EEO counselor

for 7D and trainer in the police academy, about Sgt. Podorski's  harassment.  Ex. 11 at 333; Ex

29 at 37-38.  Lt. Rosenthal had several conversations with Plaintiffs about their complaints about

Sgt. Podorski and the differential treatment they were facing.  Lt. Rosenthal even told an internal

MPD EEO representative that she was aware Plaintiffs had requested a shift change because of

"differential treatment."  Ex. 26 at 11; Ex. 34 (Rosenthal OHR statement) at 3.  Lt. Rosenthal

advised them to document their concerns.  Ex. 29 at 46. However, despite her EEO training, she

took no other action to report Plaintiffs' complaints.  *See e.g.,* Ex. 6 (Vaughn-Roach follow-up

with Rosenthal).

In March 2007, Plaintiffs complained directly to Commander Maupin.  Ex. 11 at 137.

Plaintiffs had a meeting where they reported Sgt. Podorski's treatment of them.  *Id*. at 137-141.

They "told him about the ill treatment that Sergeant Podorski was giving [them] on day work."

*Id.* at 137.   They told him about Sgt. Podorski posting a UFIR letter on the 7D bulletin board,

and about him preventing them from riding together.  *Id*. at 139.  They also told him that

heterosexual couples were allowed to ride together.  *Id.* at 141-142.   They "conveyed [to]

Commander Maupin that Sergeant Podorski was creating a hostile work environment" and that

they wanted to switch off day-work.  *Id*.  Despite these complaints, Commander Maupin told

them they could file an EEO complaint or find a "body for a body" but that it was "up to [them]"

to resolve the matter.  *Id*. at 126-128, 142; Ex. 7 at 128.  This "body for a body policy" was not in

the General Orders. Ex. 11 at 128.  This was a policy that Commander Maupin created and

selectively enforced.  *Id.* at 133.

Commander Maupin took no other action with regard to Sgt. Podorski.  Nothing was done to remove Plaintiffs from the hostile work environment, and management conducted no internal investigation into Plaintiffs' claims. Ex. 13 at Response 10.   As a result, the harassment continued, and escalated to overt sexual advances towards Plaintiffs.  Officer Weeks was not approved for a shift change to midnights for six months, until August 2007, after finding someone to switch with her.  Ex. 11 at 123.  Officer Jones obtained her shift change in September 2007, after finding a body for a body.  Ex. 30 at 9.

In summary, between January and September 2007, MPD supervisors who were informed of Sgt. Podorski's inappropriate behavior took no prompt or remedial action to prevent his further harassment of Plaintiffs.  No investigation was conducted.  Ex. 13 at Response 10. No one reported the matter to EEO.  Plaintiffs were denied their requests to change shifts, and Sgt. Podorski remained their supervisor.  The EEOC's Guidance on Vicarious Liability for Supervisor Harassment, and MPD's own EEO policies, makes clear that a supervisor who engages in discriminatory harassment of subordinates should be reassigned out of the complainants' supervisory chain.  *See* EEOC Enforcement Guidance: Vicarious Employer Liability for Unlawful Harassment by Supervisors, Notice 915.200 (June 18, 1999), available at http://www.eeoc.gov/policy/docs/harassment.html.  Alternatively, if the harassment victim requests a reassignment, the employer should grant that request as a means to remedy the hostile work environment and prevent future harassment.  *Id*.

> f.      *Plaintiffs were subjected to sexual harassment by their supervisors and co-workers after complaining of a hostile work environment*

The record is replete with direct evidence of sexual harassment of Plaintiffs and sexually inappropriate behavior by Sgt. Podorski, Sgt. Washington, and others in 7D.   As noted, several witnesses testified that Sgt. Podorski frequently made comments about Officer Weeks' physical appearance, such that Sgt. Branham and others perceived him as being attracted to Officer Weeks.  Many of these comments occurred after Plaintiffs had first requested a transfer from Lt. Larsen and then Commander Maupin.

The atmosphere in 7D regarding Plaintiffs' relationship was that they were fair game for male officers and supervisors to make blatantly sexual overtures towards them with impunity. For example, on May 26, 2007, Sgt. Washington asked Plaintiff Weeks why she "switched to being with a woman."  SDF# 47; Ex. 35 (Deposition of Yurell Washington) at 78.  Sgt. Smallwood asked if he could "kiss" Officer Jones and told her that Officer Weeks "wouldn't know."  Ex. 7 at 262.  So, too, in September 2007, Officer Stephen Prestoop told Plaintiffs that he "want[ed] to watch" Plaintiffs have sex, and that he would pay them $5000 for the opportunity to do so.  SDF #62; Ex. 7 at 264**.**  One sergeant testified he was "not surprised that someone would say that because 'we are a male dominant organization.'" Ex. 25 at 9.  Sgt. Washington also testified that he regularly discussed "women or a particular woman that you might have seen that you want to get, you know, you're trying to meet or you might be even trying to get her into bed," around Plaintiffs, ostensibly because they were lesbians.  Ex. 35 at 131-132.  Other officers, including Officer Chapman, attempted to encourage Officer Weeks to "go back" to men. Thd. Am. C. ¶ 18; SDF # 47.

Sgt. Podorski and other 7D sergeants also lobbed gender stereotypes at Plaintiffs after learning of their same-sex relationship.  In addition to Sgt. Podorski's "drama queen" comments,

25

which he never made towards any other officer, Ex. 2 at 35, other officers also frequently

referred to Plaintiff Weeks as a "drama queen" or "EEO queen." Ex. 24 (Weeks OHR file

excerpts) at amended complaint.  Meanwhile, Sgt. Washington often referred to Officer Weeks

as "the femme one" and Jones as "the butch one," stating that was a "known impression" of

officers in 7D at the time.  Ex. 35 at 80; Ex. 11 at 95-97.  On one such occasion, Sgt. Washington

had Officer Weeks go check on a girlfriend of his named "Mook," and told Mook that he was

"sending you the femme one, not the butch one," referring to Plaintiffs. Ex. 11 at 96.

g.      <em>Bike Week incident</em>

The sexual harassment continued even while Plaintiffs were off-duty.  Plaintiffs took a

trip to Myrtle Beach, South Carolina over Memorial Day weekend in May 2007 to attend Bike

Week 2007, an annual event for motorcycle enthusiasts. SDF #49. Plaintiffs accepted a ride from

Sgt. Washington, who offered to take Plaintiffs and their bikes down to Myrtle Beach.  *Id*; Ex. 11

at 97-99.  Plaintiffs paid Sgt. Washington to tow their bikes in his trailer and for gas costs, while

they rode in his truck with him and his girlfriend "Mook."   Ex. 11 at 100; SDF#12.

During Bike Week, Plaintiffs attended a party at which many MPD officers from 7D were

in attendance.  AC 25; Ex. 11 at 104-105, 107; SDF #50.  At the party, Sgt. Podorski approached

Plaintiffs, in front of dozens of other MPD officers, and loudly yelled at Plaintiffs, "do you

wanna fuck?" Ex. 2 at 66-67**.**  Sgt. Podorski admitted to making this comment to Plaintiffs.  Ex.

2 at 66.  Sgt. Podorski explained "if I want to find somebody to fuck, [I] put it out there." *Id* at

67.  Plaintiffs were mortified, embarrassed and threatened by this verbal assault.  Officer Jones

testified that when other male officers overheard the comment, she had to keep them from "trying

to assault" Sgt. Podorski.  Ex. 7 at 106.  The male officers approached Plaintiffs and asked them

26

"Do you want us to take care of it?" meaning they were going to "take care of" Sgt. Podorski. *Id*. Instead, Plaintiffs left the MPD event.   SDF #50.

The District has implied that Sgt. Podorski's "unsavory comments" to Plaintiffs during the Bike Week party incident should be considered in a vacuum, because they were allegedly off-duty and made in a social setting.   However, a hostile work environment claim need not rest solely on incidents that occurred while the plaintiff was physically at the workplace. *Greer v. Paulson*, 505 F.3d 1306, 1314 (D.C. Cir. 2007) (joining five other circuits in "rejecting a per se rule against considering incidents alleged to have occurred while an employee was physically absent from the workplace").   A plaintiff can demonstrate that her employer's off-duty acts were work-related and collectively gave rise to a hostile environment.   *Peart v. Latham and Watkins* order at 12.   As the Supreme Court has stated, "[w]orkplace conduct is not measured in isolation . . . ." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270 (2001) (per curiam).   As Sgt. Branham noted, "[w]hether in South Carolina or in China, he's still [a] supervisor."   Branham dep at 94-95.

In this case, Lt Allen Hill organized the MPD Bike Week trip and rented houses for MPD officers' use while in Myrtle Beach.   Ex. 35 at 148-149.   Lt. Hill had to approve Officer Weeks and Officer Jones to stay in his house during Bike Week.   Ex. 11 at 107-108.   He collected the payments from the MPD officers staying in the houses.   *Id*.   The attendees were primarily MPD employees.   Ex. 35 at 148-149.   For all intents and purposes, this was an MPD-sanctioned and organized event.   Additionally, Sgt. Podorski, like all supervisors, was obligated to maintain a certain standard of decorum, even in his off-duty conduct.   Ex. 12 at 91 ("there is a part of a general order that talks about . . . members should be respectful to each other on and off duty and

should not bring detriment to the department."). *See e.g.,* General Order GO-201.26, Duties,

Responsibilities and Conduct of Members of the Department (*available at*

http://mpdc.dc.gov/page/written-directives-general-orders).  Yet, he has admitted to asking

Plaintiffs if they wanted to "fuck" him, which is certainly inappropriate behavior for a supervisor.

Ex. 2 at 66; Ex. 21 at 62 (Larsen admitting the comment was not appropriate).

       Sgt. Podorski's comment was overtly sexual in nature.  Neither Plaintiffs found his

comment amusing, and both found it humiliating.  Officer Weeks testified that she believed he

was seriously asking her to have sex with him and that he was not joking.  Ex. 11 at 117-118.

Officer Jones also took his comment seriously and was offended.  Jones at 107-108.  Officer

Jones testified that it was "inappropriate," "sexual in nature," and "unprofessional," which the

District has conceded. Ex. 7 at 46-48, 107.   Officer Jones was "absolutely" offended by Sgt.

Podorski asking them to "fuck" him.  *Id.* at 106.   Other officers who overheard the comment

reacted by making physical threats about Sgt. Podorski.  While the District attempts to downplay

this comment by labeling it "stray" or "unsavory," the reality is that the context of Sgt.

Podorski's behavior towards Plaintiffs over the preceding nine months since learning of their

relationship shows that his animus for their relationship and his desire for Officer Weeks was

escalating.

       These comments and actions had a direct effect on Plaintiffs' terms and conditions of

employment.   As Detective Weeks testified, Sgt. Podorski's actions from October 2006 to

August 2007 impacted her integrity, and "all you have on this department, Mr. Anderson, is your

name. Your integrity or what you stand for is your name."  Ex. 11 at 78-80.  Detective Weeks

explained that Sgt. Podorski was harming her reputation, and that of Officer Jones, and that as a

police officer who testifies under oath in court, reputation is everything.  *Id*.

They also foreshadowed more tangible employment actions, including the lowering of Plaintiffs' performance appraisals in November 2007.

> h.    *Podorski lowers Plaintiffs' ratings without justification*

In December 2007, Plaintiffs received notice of their FY2007 performance evaluations for the period October 2006 to September 2007.  Ex. 4 (Jones rating) and Ex. 5 (Weeks rating); Ex. 7 at 213.  Sgt. Podorski was their rating official for those evaluations.  Ex. 6.  While in years prior their evaluations had always been rated as "Exceeds Expectations," Sgt. Podorski lowered Plaintiff Jones and Plaintiff Weeks's performance ratings to "Meets Expectations" for FY2007. *Id*. at MPD141.  However, Sgt. Hunter reviewed the rating and stated "'Whoa, this is wrong.'" to Officer Weeks.  Ex. 11 at 213.  As Officer Weeks explained:

> And he changed the evaluation. So whatever Podorski gave me, you could see it on the copy. It was lower than whatever Sergeant Hunter. The final -- the final evaluation is what Sergeant Hunter gave me.

*Id*.  Sgt. Hunter upgraded Officer Weeks' rating to "Exceeds Expectations" by changing her scores in Professionalism and Interpersonal Relations.  Ex. 5.[2]

Sgt. Podorski did not deliver the Plaintiff Jones's rating to her in person.  After preparing an initial rating on the "wrong form," Sgt. Podorski told Sgt. Jamison-Logan to complete Officer Jones' performance evaluation for him, and to rate Officer Jones as "Meets Expectations."  Ex. 7 at 208; Ex. 6.  Sgt. Podorski never counseled Officer Jones regarding her lowered performance

---

[2] The District has never produced Detective Weeks' original FY2007 rating filled out by Sgt. Podorski, but concedes that he did rate her Meets Expectations, and that Sgt. Hunter re-did her appraisal for FY2007.  Ex. 6.  Exhibit 5 indicates where Sgt. Hunter erased Sgt. Podorski's rating and hand-wrote in a new rating.

rating, as required by MPD policy.  Ex. 7 at 208.  Interestingly, despite alleging that in 2007

Officer Jones had too many UFIR's and was unsafe, he rated Officer Jones successfully in those

categories.  *See* Ex. 4 (Jones FY2007 rating at 4-5). Plaintiff Jones asked for a copy of her

evaluation from Sgt. Mack, but was unable to get a copy until February 2008.  Ex. 7 at 213.

While the District claims Officer Jones could have easily accessed the rating in her personnel

jacket, it ignores testimony by Officer Jones that she did attempt to obtain a copy from her jacket,

but the rating was not placed in her jacket.  *Id.* at 214.  This delay prevented Plaintiff Jones from

meeting the deadline in which to grieve her evaluation.  *Id.*

        As a result of the lowered rating, Officer Jones was not selected for an Investigator

position in July 2008, because her examination results were unfairly affected by her low FY2007

performance rating.   Ex. 36 (Jones declaration dated 10/31/14).  Officer Jones testified that after

learning of her low score on the Detectives' Exam , she spoke with an MPD official who told her

"my evaluation had a lot to do with placement on the list. That exceeds expectations goes higher

than meet expectations." Ex. 7 at 211; Ex. 36.

        The District conducted a review of Podorski's evaluation of Plaintiffs in October 2008, in

responding to Plaintiffs' OHR charges.  Ex. 6; SDF #112.  The MPD EEO office concluded that

Sgt. Podorski misused his authority when he "devalued Plaintiffs' work performance" by

unjustifiably lowering their FY2007 evaluations.  *Id*.  It also found the fact that Sgt. Hunter

changed Officer Weeks' rating indicated that the ratings were unjustified.  *Id*. The internal

recommendation, which found "management misconduct" on the part of Sgt. Podorski, suggested

that Officer Jones' evaluation should be re-done and that she should be reconsidered for a

Detective position.  *Id*.  No such corrective actions were ever taken.

3.      Sgt. Washington harassed Plaintiffs on midnights

After repeatedly requesting a reassignment to a different shift, Plaintiff Weeks and

Plaintiff Jones were finally able to transfer to midnights in August and September 2007,

respectively, after finding "a body for a body."  SDF #44; Ex. 11 at 126-128, 142; Ex. 7 at 128.

This was nine months after first complaining of mistreatment by Sgt. Podorski, and after his

harassment had escalated to blatant sexual overtures.

Once on the midnight shift, Plaintiffs almost immediately began to be targeted by Sgt.

Washington, the midnight supervisor.  When Officer Weeks came to midnights in August 2007,

Sgt. Washington started calling her incessantly and asking her to ride into work with him on their

motorcycles.  Ex. 33 (Weeks Intake Questions for Sexual Harassment); Ex. 11 at 263-264.  Sgt.

Washington knew that Officer Weeks was dating Officer Jones.  Officer Weeks felt this was

inappropriate, unwelcome, and repeatedly refused his phone calls and requests to ride into work.

Ex. 33 at Intake Questions notes ("unwelcome").  Sgt. Washington also had officers drive by

Officer Weeks' home.  *Id*.

Once Officer Jones came to midnights in September 2007, Plaintiffs were informed by

other officers that Sgt. Washington was upset that Plaintiffs were always together and that his

intention was to separate them.  Ex.7 at 130.  In an effort to separate them, Sgt. Washington

began putting Plaintiffs on fixed-duty, isolated details, outside their assigned PSAs.

As a result, Sgt. Branham overheard Sgt. Washington "saying that he was going to get

[Jones and Weeks]," to Sgt. Podorski.  Ex. 3 at 20, 31-32. Sgt. Branam also testified, to both

OHR and again in her deposition, that "whoever did role call didn't put [Jones and Weeks]

together, it was either Podorski or Yurell Washington. . . . it's because they were gay."  Ex. 37

(Branham OHR statement MPD 547-MPD 551).  Ex. 3 at 26.   She also recalled that either Sgt.

Podorski or Sgt. Washington stated "they were gonna make it difficult for Kenniss particularly."

Ex. 37 at 550; Ex. 3 at 32.  Sgt. Branham observed that while Sgt. Washington treated herself

and other 7D officers "regular," Sgt. Washington "paid more attention to Weeks and Jones. He

made sure they didn't ride together and he related to other sergeants that they didn't ride

together."  Ex. 37 at MPD 551; Ex. 3 at 35.  Similarly, Officer Smith told Plaintiff Weeks that he

overheard Sgt. Washington state that he was upset that Plaintiff Jones and Plaintiff Weeks were

always put together.  Ex. 38 (Weeks EEO Interview audio transcript) at 9.  Sgt. Washington

himself admitted that he was angry because  Plaintiffs requested to be assigned to ride together.

Ex. 335 at 146.

  Sgt. Washington also subjected Plaintiffs, particularly Officer Weeks, to unwarranted

disciplinary actions.  For example, on September 19, 2007, Sgt. Washington assigned Plaintiff

Weeks to the Marjorie Court detail.  SDF#54; AC 41.  This detail was an eight-hour fixed-post

detail, outside of Officer Weeks's assigned PSA.  Ex. 38 at 11; Ex. 11 at 157-158.  Sgt.

Washington admitted that Officer Stokes "may have" asked for the detail and Sgt. Washington

"may have" told Officer Stokes he was placing Officer Weeks on the detail.  Ex. 35 at 157. Sgt.

Washington said, "I'm saving this for my girl." Ex. 24 at Gender Amendments Claim, ¶ 14.  He

also said "I am going to get them," meaning Plaintiffs Weeks and Jones.  Ex. 3 at 26, 29.   On

October 5, 2007, Sgt. Washington assigned Plaintiff Weeks to the Marjorie Court detail again.

En route to her detail, Weeks arrested a suspect for an unrelated matter and requested relief from

her detail in order to process the suspect.  Instead, she was told to report to her detail, and Sgt.

Washington ordered MPO West to take over the lock-up. Sgt. Washington stated that "by no

means necessary is Officer Weeks allowed to have this lockup." Ex. 38 at 11.

 In addition, on September 26, 2007, Sgt. Washington charged Plaintiff Weeks with "Neglect of Duty."  Ex. 8**.**  Plaintiff Weeks' union representative asked Sgt. Washington the basis of the charge of discipline against Plaintiff Weeks.  Sgt. Washington responded that he did not have a charge in mind.  Ex. 11 at 178.

On October 3, 2007, Plaintiff Weeks called in sick as a result of the stress she was experiencing relating to the ongoing harassment.  Ex. 28 at 3**;** Ex. 9.  Sgt. Washington, who was not the Roll Call official that day, nonetheless called the medical clinic to see whether Plaintiff Weeks had appeared.   Ex. 38 at 12.  When Plaintiff Weeks reported to work the next evening, she worked for several hours.  Despite having already worked for two hours on that shift, she was told by management that she could not work until she reported to the medical clinic.  Ex. 28 at 3; Ex. 9 at Hill email dated 1/26/08.  When Plaintiff reported to the medical clinic, she learned from Medical Assistant Powell that Sgt. Washington had called repeatedly to see whether Plaintiff Weeks had reported to the clinic.  Ex. 28 at 3.  Sgt. Washington then initiated a disciplinary investigation into Plaintiff Weeks's conduct, four days later, for AWOL.  Ex. 28 at 3; Ex. 35 at 62.  Plaintiff Weeks was never informed by Defendant about this investigation or the charges until nearly a year later.   Ex. 28 at 3-4.  The investigation records were never placed in Plaintiff Weeks' personnel file and she was out on leave when the investigation was initiated. Nor did Sgt. Washington inform Plaintiff Weeks that he had initiated the investigation.  Despite prevailing in her challenge to this discipline, the AWOL documentation apparently remains in her personnel file to this day.  Ex. 9.

The last straw for Plaintiffs occurred on October 7, 2007.  Along with other officers from

7D, Plaintiffs attended the wedding ceremony of two heterosexual officers.  Ex. 11 at 160-62.

Plaintiffs timely requested leave for the first hour of their shift so that they could attend the

wedding.  *Id*. at 161.  Upon arriving for duty, Plaintiffs were informed by their peers that Sgt.

Washington ominously said that "he was going to get them" and that "he had something for

them." Ex. 39 (Plaintiffs' PD-42 forms); Ex. 7 at 186.  Plaintiffs then learned that Sgt.

Washington had docked two hours of leave for each of them.  Ex. 39; Ex. 11 at 160-163.  *See*

*also* Ex. 40 (Roll Call sheets for Oct. 7, 2007).  Sgt. Washington did not impose the same

treatment upon other heterosexual and/or male officers, including Andre Kimvalkani and Robin

Sims, who attended the wedding and arrived later to their shifts than Plaintiffs. Ex. 40; Ex. 11 at

162**.**

As a result, on October 7, 2007, Plaintiffs requested stress leave and filed PD-42 Injury or

Illness forms describing the ongoing harassment they had experienced. Ex. 39. Commander

Maupin reviewed and signed off on Plaintiffs' harassment reports and their request for stress

leave.  *Id.*  While on stress leave, Plaintiffs initiated an internal MPD EEO complaint.  Ex. 41

(Plaintiffs' internal MPD EEO complaints.  On October 15, 2007, the investigator, Debbie Burt,

took Plaintiff's statements of their complaints of harassment and hostile work environment due

to sex and sexual orientation discrimination.  *See* Exs. 30 (Jones) and 38 (Weeks). MPD's EEO

office never interviewed any other witnesses.

On November 19, 2007, MPD made a determination not to investigate Plaintiff's

complaints of sexual orientation discrimination, sexual harassment and hostile work

environment.  The District has admitted that it conducted "no investigation" into Plaintiffs'

complaints.  Ex. 13.

34

4.      Treatment of Detective Weeks in the 7D Detectives' Office

In October 2008, Officer Weeks was transferred to the 7D Detectives Office.  Ex. 41
(Weeks selection for Investigator position).  Even after leaving the supervision of Sgts. Podorski
and Washington to join the Detective's Office, experienced ongoing gender-based harassment
and reprisal during her time in the 7D Detectives' office from October 2008- November 2009.
Ex. 24 at Gender Claim Amendment.  In particular, she was counseled on at least four occasions
by her detective supervisors, while males, heterosexuals, and those who had not engaged in
protected EEO activity were not counseled for similar matters.  Ex. 43 (Handwritten notes of
Kenniss Weeks).

Officer Weeks was counseled on several occasions by Sgt. Avis King and Lt. Andre
Wright. During one counseling session, Plaintiff Weeks was asked by Sgt. King about her EEO
complaint, and was told not to be so "timid."  Ex. 24 at Gender Amendment Claims, ¶¶ 12-21;
Ex. 11 at 259.  Sgt. King admitted to talking about Detectives Weeks' EEO complaint with other
officers in 7D.  Ex. 45 at 21.  In addition, Detective Weeks testified that when she first joined the
Detectives Office, she sent an email[3] requesting training from Sgt. King, but was "ridiculed" for
doing so and placed in the domestics squad.  Ex. 11 at 227-229.

> Then she stuck me in with domestics, in domestics. Now, I came in with, like, I think four
> or five other investigators.  Now, why are all the male detectives assigned to ADW and
> robberies and I was assigned to domestics?

*Id*. at 227.  *See also* Ex. 44 (Weeks emails from Detectives Office) at 11/29/08 email (assignment
to domestics).

---

[3] Plaintiffs could not locate this email in the ESI produced by the District. Given the
District's policy of not retaining emails prior to July 2009, this email was likely destroyed.

Plaintiff Weeks was also treated differently with respect to assignments in the Detectives' Office. Ex. 24 at Gender Amendment Claims, ¶¶ 12-21; Ex. 11 at 217-218.  It was common practice that her cases, search warrants, and other job duties were routinely taken away from her and then given to male officers with less experience.  *Id.*  In November 2008, Detective Weeks noticed almost immediately that males were allowed to do search and arrest warrants, while she was not. Ex. 43; Ex. 7 at 218.   On November 25, 2008, Sgt. King gave Officer Cornell the arrest warrant for a case that Detective Weeks had started.  *Id.*  On other occasions, Sgt. King would take away active cases from Detective Weeks, and give them to Detectives Bolden or Della-Camera.  Ex. 7 at 218-224.  Detective Bolden complained about this mistreatment to Lt. Wright and Lt. Wright gave the case back to Detective Weeks.  *Id.* at 225-226.

On December 9, 2008, Plaintiff Weeks' case was taken away from her and given to a male officer.  *Id.* Ex. 11.  That same day, Sgt. King verbally counseled her after Detective Weeks sought assistance from a colleague in Homicide to arrest a suspect in a case of hers.  Ex. 43; Ex. 44 at 12/9/08 email.   Sgt. King then sent an email to everyone in the 7D Detectives' Office condemning the practice of seeking assistance, and calling Detective Weeks's actions "cancerous." *Id.*

Similarly, Sgt. King and Lt. Wright treated Detective Weeks differently than male officers with regard to leave requests.  On December 18, 2008, Detective Weeks requested an hour of leave to attend a cemetery service of a fallen police officer.  Ex. 43.  Sgt. King refused, claiming there was a mandatory staff meeting.  *Id.*  When Detective Weeks reported for duty, Lt. Wright counseled her for requesting an hour of leave.  *Id.*  Meanwhile, Detectives Pemberton, Della-Camera, and Francis arrived late, and attended the funeral service, but were not counseled.

36

*Id.*

On February 17, 2009, someone put an open tampon and parts of the tampon wrapper on Plaintiff Weeks's desk. Ex. 11 at 249; Ex. 24 at Gender Amendment Claims. Plaintiff Weeks reported the incident to her supervisors - Lt. Andre Wright and Sgt. Stephanie Ellison - and requested an official investigation into the matter. However, the District never initiated an investigation of this incident. Ex. 11 at 250-51. Sgt. King testified that she was informed about the tampon incident by another sergeant a few days after it happened. Ex. 45 at 48. Sgt. King confirmed that no investigation was done. *Id.* at 49.

> 5.   The Plaintiffs Have also Established Retaliation under Title VII and DCHRA

There is also substantial direct evidence in this case of reprisal and retaliatory animus by Plaintiffs' supervisors. The supervisors have, in many cases, admitted to knowing about Plaintiffs' complaints and making retaliatory comments as a result. Ex. Officer Weeks was labeled an "EEO queen" after filing her complaints. SDF #102. After learning of Officer Jones's complaints about Sgt. Washington, Sgt. Washington yelled to Officer Jones on November 26, 2007, her first day back at work, "[y]ou can feed the dogs but they will bite you." Ex. 35 at 83-84. Sgt. Washington admitted to making this comment, and that this was his way of responding to her EEO "reports." *Id.* In January 2008, Sgt. Washington made further threatening comments to Plaintiff Jones when he yelled to Officer Jones, "Ya'll pulled that shit. You jumped on the bandwagon with Weeks. I always been straight with you. That shit is fucked up. You and your girl fucked up." Ex. 46 (Jones PD-119 report); Ex. 35 at 84-85. Sgt. Washington called Officer Jones "a dog" and admitted that these comments were also in response to Officer Jones' EEO

complaints: "we had always been friends, and then you go ahead and make some false

allegations. Why?" Ex. 35 at 84-85 (false allegations meaning EEO complaints).  Officer George

Yong then stated he "just came out of the office because Sgt. Washington said he is about to start

some shit." Ex. 46.

      Sgt. Podorski further exhibited retaliatory animus toward Plaintiffs after they reported

their complaints to Lt. Larsen and Commander Maupin and after Plaintiffs filed their internal

MPD EEO reports.   In addition to lowering their FY2007 performance appraisals without cause,

Sgt. Podorski also refused to sign off on routine paperwork presented to him by Plaintiffs.  For

example, on February 19, 2008, Plaintiff Jones tried to have him sign Destruction of Property

complaint.  Ex. 28 at 7; Ex. 23 (Jones OHR charge).  However, he refused to sign it and threw it

on the floor.  Ex. 7 at 52.  Officer Jones then gave the report to Sgt. Lafranchise who signed it

and handed it back to Officer Jones.  Ex. 7 at 50-51.  Officer Alford Meyer witnessed the

incident and stated "that was messed up." Ex. 23 at OHR Charge Amendment.  On another

occasion, Sgt. Podorski threw Officer Jones' paperwork on the floor while refusing to sign it.

Officer Jones noticed that other officers had no trouble getting forms signed by Sgt. Podorski, but

that Sgt. Podorski would regularly refuse to sign Officer Jones' or Officer Weeks' reports.  Ex.

23**.**

      Commander Maupin also retaliated against Plaintiffs once he learned of their EEO

activity.  Soon after learning of Plaintiffs' reports of harassment, Commander Maupin

sustained Plaintiff Weeks' AWOL in December 2007.  Ex. 9.  However, the evidence suggested

that the Department was partly at fault, for permitting Officer Weeks to work for 12 hours prior

to sending her home.  Ex. 9 at 1/26/08 email from Lt. Hill.  Then, in May 2008, in the middle of

a pay period, Commander Maupin placed Plaintiff Weeks on the midnight shift but kept Plaintiff

Jones on the day shift.  Ex. 23 at OHR Charge Amendment. When Plaintiffs complained to

Maupin about the switch, he retorted, "why do you two have to follow each other around?" *Id*.

Ex. 12 at 73**.**  He also told Plaintiff Jones, "you don't have to follow [Weeks] everywhere she

goes." *Id.* at 74.

This behavior was often echoed by other co-workers.  For example, in May 2008,

Plaintiff Weeks was in a car accident while on duty and was hospitalized.  Ex. 11 at 206-207.

When Plaintiff Jones heard about the accident, she asked Sgt. LaFranchise if she could go to the

hospital to visit her partner.  Ex. 23 at OHR Charge Amendment, pg. 2, and Jones OHR

Statement at ¶15.  Instead, he gave Plaintiff Jones a detail and told her to go on duty. *Id*.  Plaintiff

Weeks had to once again involve the help of Sgt. Brett Parsons of the Department's Gay and

Lesbian Unit (GLU) to allow Plaintiff Jones to go to the hospital.  Ex. 11 at 207.  Lt. Jannifer

commented "why can't a Sergeant take Kenniss home? Why does Tonia have to take her home?"

Ex. 23 at Jones OHR Statement  ¶15**.** The obvious answer to this question was that Plaintiffs

lived together and owned a home together**.**  Ex. 11 at 210.

Supervisors in7D also retaliated against Plaintiff Jones when they learned that OHR was

investigating their charges of discrimination. In 2010, Sgt. Levenberry, who had previously been

friendly with Plaintiffs, began harassing Officer Jones and retaliating against her for involving

him in her OHR complaint. Sgt. Levenberry harassed Officer Jones about her requests to be

assigned, or not assigned, with certain 7D officers**.**  Ex. 47 (Levenberry emails); Ex. 32 at 59.

Sgt. Levenberry indicated his animus towards Officer Jones in a series of emails to OHR

investigator, Luisa Portillo.[4]  Sgt. Levenberry stated:

> I am contacting you based on the questions you asked me relating to your Investigation and the **common knowledge that Officer Tonia Jones filed EEO complaints against her two previous supervisors**. I am Officer Tonia Jones' current supervisor. It has been brought to my attention that Officer Jones is readying herself to file an EEO complaint against me. Based on her **past history of filing EEO complaints** against her two previous supervisors I believe the assertion to be true and I am seeking guidance regarding this matter. It is my observation that when Officer Jones is given assignments to work with someone other than who she would like to work with **she pulls out the EEO complaint card against the supervisor**.

Ex. 47 (emphasis added).

Sgt. Levenberry also complained to OHR about Officer Jones' "propensity to file EEO complaints on her former supervisors." *Id*.  In reprisal for involving him as a witness in her OHR complaint, Sgt. Levenberry admits to OHR that he documented Officer Jones' assignment requests in her interim performance appraisal, and that he contacted MPD's Employee Assistance Program (EAP) to make them "aware of what was going on with Officer Jones in her personal life," namely her recent split with her same-sex partner, Plaintiff Weeks.  *Id.* Given the context of his communications to OHR, there could be no other motive but retaliation for these actions.

In addition, on August 31, 2010, Plaintiff Jones learned that her take home car was assigned to another male officer and that Commander Maupin had refused to allow her a take home car.  Ex. 7 at 150-157.  One official told Officer Jones that the Commander did not want her to have a car.  *Id.* at 154-155, 166. On September 14, 2010, only after complaining about this differential treatment in the course of proceedings at the D.C. Office of Human Rights ("OHR"), was Plaintiff Jones re-assigned a take-home car.  *Id*.

---

[4] Note: The majority of these emails were not produced to Plaintiffs during discovery by the District. Instead, Sgt. Levenberry brought them directly to his deposition, and provided them to Complainant's counsel. Ex. 32 at 59, 64-66; 98.

D.     **Plaintiffs can establish vicarious liability for a hostile work environment based on their sex, sexual harassment, sexual orientation, and reprisal**

As discussed, the evidence indicates ongoing comments of a graphic and sexual nature, including overt solicitations for sex from fellow officers as well as their own supervisor, Sgt. Podorski, who blatantly asked them "do you wanna fuck?"  Ex. 2 at 66-67.  The record also reveals harassment because Officer Weeks chose to date a female officer (and not a male sergeant), harassment "because they were gay," Ex. 3 at 29, and differential treatment with regard to car assignments, shift assignments, details, performance appraisals, leave usage, disciplinary actions, and reprisal for participating in the EEO process.

1.     The existence of tangible employment actions resulting from Defendant's harassment precludes summary judgment and makes the District vicariously liable

More importantly, there is also evidence of tangible employment actions taken by Plaintiffs' supervisors - Sgt. Podorski and Sgt. Washington - that make the District vicariously liable.  *Vance v. Ball State*, 570 U.S. ___, Slip. Op. 11-556, at 5, 9 (U.S. 2013), *citing Faragher v. Boca Raton,* 524 U. S. 775 (1998).  Sgt. Podorski lowered Plaintiffs' FY2007 performance appraisals unjustifiably after learning of their same-sex relationship and their reports to management about his inappropriate behavior.  Ex. 4 (FY2007 Performance Rating of Jones); Ex. 5 (FY2007 Performance Rating of Weeks).  The District acknowledged internally that Sgt. Podorski misused his authority in doing so, and that Officer Jones's performance evaluation should have been re-done by another official.  Ex. 6 (Vaughn-Roach memo to Newsham Aug. 27, 2008)[5] at MPD 141.  As a result of the negative rating, Officer Jones's eligibility for the

_____

[5] This document has been redacted pursuant to Federal Rule of Evidence 408 (Compromise Offers and Negotiations).

Investigator Class and future promotion potential in the Detective ranks was compromised.  Ex. 7
(Deposition of Tonia Jones) at 221.  Further, after rebuffing Sgt. Washington's advances on the
midnight shift, Officer Weeks was charged with Neglect of Duty and AWOL, disciplinary
actions which remain in her personnel jacket. Ex. 8 (Weeks Neglect of Duty); Ex. 9 (Weeks
AWOL documents).  After making their complaints of harassment, Commander Maupin affirmed
the AWOL charge against Officer Weeks in December 2007, despite evidence that he was
advised not to sustain the charge. Ex. 9 (*see* Alan Hill email to Commander Maupin January 26,
2008).

The Supreme Court has found that these types of adverse actions could constitute
"tangible employment actions" which open the employer to vicarious (and strict) liability for the
supervisors' harassment.  *Vance,* 570 U.S. ___ at 9 (actions causing "a significant change in
benefits").  *See also*  EEOC Enforcement Guidance on Recent Developments in Disparate
Treatment Theory (July 14, 1992) (noting that evidence "that an adverse action was taken on the
basis of stereotyped attitudes about the charging party's class would also constitute direct
evidence of discrimination.")

2.    <u>Defendants cannot establish defense of prompt and remedial action</u>

Moreover, even without the evidence of tangible employment actions, Plaintiffs can still
establish liability because Defendants will not be able to establish that they took prompt remedial
action to correct the harassment.

MPD's EEO policies are clear that sexual harassment is not to be tolerated. Ex. 10
(General Order PER-201.09, Equal Employment Opportunity).  Officer Weeks testified that she
told Sgt. Podorski "to stop" treating her in a harassing manner, but he did not.  Ex. 11

(Deposition of Kenniss Weeks) at 88.  When he refused, she reported his behavior to Sgt.

Levenberry and Sgt. Smallwood.  *Id*.  They did nothing to protect her from this offensive and

unlawful conduct but advise her of her option to file an EEO complaint.  They never reported the

matter to their superiors, as is required by MPD's EEO policy, nor did they initiate an

investigation into Sgt. Podorski's misconduct.  Ex. 10.  Further, when Plaintiffs reported Sgt.

Podorski's behavior to Commander Maupin in March 2007, he admitted to doing nothing, and

assumed that was for the EEO office to handle:

> The allegations contained in the complaint are all EEO or sexual harassment type
> allegations. They wouldn't be investigated at patrol district.  They would be investigated
> by the department EEO officer or EEO counselor.

Ex. 12 (Deposition of Joel Maupin) at 21.  This was despite acknowledging that the General

Orders required him and other supervisors to initiate an investigation into potential misconduct

and report the matter to EEO upon learning of potential discrimination allegations.  Ex. 12. at 23-

26.  As a result of Commander Maupin's inaction, Plaintiffs were further subjected to overt

sexual advances by Sgt. Podorski, Sgt. Washington, and others.

Defendants admittedly failed to respond promptly or reasonably to remedy Plaintiffs'

complaints regarding this ongoing hostile work environment.  In fact, Defendants were given the

explicit opportunity to raise this defense, and chose not to do so.  *See* Nov 14., 2013 Order.

Instead the District conceded in open court that it took no action with regard to Plaintiffs' 2007

complaints - no investigation was conducted, no efforts were made to remedy the harassment

aside from telling Plaintiffs to file an EEO complaint, and Commander Maupin informed

Plaintiffs they would have to find their own way out of the hostile work environment via his

"body for a body" policy.  Ex. 13 (District's Amended Answers to Plaintiffs' Interrogatories) at

Response 10; Ex. 11 at 126-128, 142; Ex. 7 at 128.

**E.  Defendant's asserted legitimate reasons are pretext for discrimination.**

The District gives a litany of reasons why the actions of Sgt. Podorski and Sgt. Washington were legitimate.  Those reasons can be distilled into three primary claims of legitimacy: 1) Plaintiffs were assigned to different PSAs; 2) Plaintiffs had "performance deficiencies" and were "insubordinate"; and 2) Plaintiffs were "unsafe" and  had "too many use of force complaints."  However, these reasons are not credible.  First, Plaintiffs were not assigned to different PSAs when the harassment began, and the evidence shows that officers from different PSAs were often assigned to ride together.  Second, there is no evidence in the record of Plaintiffs being poor performers, being counseled about performance deficiencies during the FY 2007 performance cycle, or being insubordinate.   Finally, the District has provided no documented evidence of excessive injuries, unsafe practices, or use of force complaints against Plaintiffs.  Instead, the evidence shows that despite the harassment, Plaintiffs were good officers, obtained awards for work they performed as partners and when separated, and were well-reviewed by officers and supervisors alike in 7D.

    1.  <u>District's "PSA assignment" rationale is not supported by the evidence</u>

The District claims that the real reason why Plaintiffs were not permitted to ride together was because they were in separate PSAs.  However, this assertion ignores record evidence indicating that from September 2006 to March 2007, Plaintiffs *were assigned to the same PSA*. Plaintiffs were both assigned to PSA 703 at the time they came out to their supervisor, Sgt. Podorski, who was the supervisor for PSA 703.  Ex. 22 (PSS Logs Sept-Oct. 2006).  Yet, he still refused to allow them to ride in the same vehicle.

The District has no credible explanation for why other heterosexual or married couples, and individuals from different PSAs, were allowed to ride together during that time.  Plaintiffs identified many such examples: Officer Erica Dortch-Jones and Darren Marcus, who were assigned at the time to PSA 703 and 705 (and similarly Dortch-Jones and Officer Thomas Jefferson, also in different PSAs); Ebony Merit and Allen Jenkins, who were allowed to ride together on the midnight shift; and Officer Tonia Jones (once she switched to PSA 701) riding in June of 2007 with Officer Gregory Arrington, in PSA 703.  *See e.g.,* Ex. 2 at 83-86 (it "may have happened").   Sgt. Branham also testified to the fact that when she was an officer on midnights, she was permitted to ride with Officer David Smith, with whom she had a relationship, even though they were in different PSAs.  Ex. 3 at 48.  She also recalled that a married couple, Officers Lynelle Sam and Charles "C.K." Williams, were allowed to ride together though in different PSA assignments.  *Id.*  Similarly, MPD witnesses testified that due to "manpower" reasons, officers from different PSAs could often be assigned to ride together.

During its investigation, OHR determined that there was no policy regarding assignment of officers to patrol cars from day to day, and instead that it was highly discretionary. As Sgt. Branham told OHR:

> Usually what we did was that if you were a productive worker and you had a preference, you could ride with that person. There was no policy. You would be assigned who the Officer was comfortable, or if the supervisor saw that they worked well together, they would be partnered up.

Ex. 25 at 10, Ex. 26 decision at 10 (summarizing Sgt. Leebra Branham's testimony to OHR)(Emphasis in original).  OHR found the policy was quite "open" and "there were no guidelines for choosing a riding partner." *Id.*  Other witnesses confirmed there was no written

policy or practice regarding car assignments. OHR at MPD 561 (Statement of Sgt. Podorski).  Of course, subjective and discretionary policies that are arbitrarily applied or enforced can constitute evidence of discrimination.

The District's reliance on Plaintiffs' PSA assignments to explain the blatant separation attempts is completely lacking in credence given these clear examples of the policy not being followed for other heterosexual individuals.

2.    <u>Plaintiffs were well-performing officers</u>

Despite the District's attempts to paint Plaintiffs as troubled employees, the District's own witnesses testified to the contrary.  Sgt. Washington testified that Plaintiffs were "good officers." Ex. 35 at 137.  And while he alleged that Officer Weeks was "insubordinate" he admitted to never documenting any such alleged insubordination.  *Id.* at 136.  Sgt. Levenberry testified that Officer Jones was an "outstanding" officer and that Officer Weeks "went above and beyond" when she was on patrol.   Ex. 48 (Levenberry OHR statement) at MPD 542.   He also stated that "I don't think I would have given Tonia Jones a "meets expectations" because Tonia Jones is a very good police officer." Ex. 32 at 53.  Even when complaining about Officer Jones' EEO activity, Sgt. Levenberry had to admit that "Officer Tonia Jones has received good performance evaluations, numerous letters of commendation and     meritorious service awards under my leadership." Ex. 47.  Commander Maupin echoed this sentiment, stating that Officer Jones was "well-respected" and "doing a great job" in PSA 701, and that Officer Weeks "had to be pretty good to become a detective."  Ex. 12 at 76-77.  Further, despite the constant harassment by their supervisors, Plaintiffs both received numerous awards and commendations for their on-the-job performance, including while partnered together. Ex. 50 (Weeks and Jones performance

46

awards).

While Sgt. Podorski lowered Plaintiffs' FY2007 ratings to "Meets Expectations," Sgt. Podorski never claimed on either of Plaintiffs' ratings that they were "unsafe," had too many UFIRs, or had performance deficiencies that warranted closer supervision. Exs. 4 and 5. The OHR findings also summarized testimony of a Sergeant who did "not recall any performance deficiencies for Complainant and her partner." Ex. 26 at 13. That sergeant was identified as Sgt. Podorski. See Ex. 54 (Podorski OHR Statement) at MPD 561. Thus, Sgt. Podorski could "not recall" any reason why he lowered Plaintiffs' performance ratings.

Furthermore, as the MPD internal memo concluded, the fact that Officer Weeks' rating was overturned and upgraded by Sgt. Hunter lends credence to the fact that Sgt. Podorski's initial rating was not legitimate.

3.    There is no documented evidence of Plaintiffs being "unsafe"

Additionally, the District has not provided *any documentary evidence* to confirm its vague allegations that Plaintiffs generated too many complaints or too many injuries when paired together. That is because, as Sgt. Podorski himself admitted, he "[didn]'t have anything documented" to show that Plaintiffs had more UFIRs than any other officer. Ex. 2 at 127. While Sgt. Podorski testified in his deposition that Plaintiffs often "escalated" a situation beyond what was necessary, he failed to recall a November 2006 award he gave to Plaintiffs for de-escalating a situation in which a 300-pound man had exposed his genitalia to minors. Ex. 2 at 128; Ex. 50. Moreover, at the time that Sgt. Podorski posted an allegation of Plaintiffs' excessive UFIR's on the board in 7D, Plaintiffs only had one documented UFIR report. Ex. 28. Sgt. Podorski's rationale for why he split up Plaintiffs is simply not believable.

As Sgt. Levenberry testified, if officers received Use of Force complaints, those complaints have to be documented, investigated, and then decided on.  Ex. 32.  As the UFIR subject matter expert for 7D, Sgt. Leveberry was in a unique position to know whether Officer Jones or Officer Weeks had "too many" UFIRs as compared with other officers.  He testified that he was not aware of any such allegations.  *Id*.  Sgt. Podorski admitted that he did not document any alleged UFIRs incidents that lead him to separate Plaintiffs, and could not even "recall" posting negative information about Plaintiffs' safety on the 7D board.  Ex. 2 at 127.

Thus, the record belies the District's "legitimate non-discriminatory reasons," and raises more questions than it answers about the real reasons for Podorski and Washington's actions against Plaintiffs.

**F**.      **Plaintiff Jones' Non-Promotion Claim**

The District's arguments on Plaintiff Jones' non-promotion claim entirely miss the mark. Plaintiff Jones has alleged from the outset of her complaint that Sgt. Podorski unjustifiably lowered her FY2007 performance rating, and that the lowered "Meets Expectations" rating had a harmful effect on her ability to obtain a seat in the 2008 Investigator's (Detectives') Class. Plaintiff Jones' complaints about the non-promotion, and the District's belabored arguments in response, raise a clear question of mixed-motive that must be answered by a jury.

1.      Plaintiff has established a prima facie case of retaliation with respect to her non-promotion claim.

Title VII contains two separate clauses which prohibit an employer from retaliating against an employee -- an "opposition clause," which prohibits discrimination or retaliation against an employee because the employee "has opposed any practice made an unlawful

48

employment practice by [Title VII]," and a "participation clause," which prohibits discrimination or retaliation against an employee because the employee "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]."  42 U.S.C. § 2000e-3(a).  *See also King v. Jackson*, 468 F. Supp. 2d 33, 37 (D.C. Cir. 2007).  The first prong of the *prima facie* test for reprisal (i.e., protected activity) is satisfied due to Plaintiff's opposition to discriminatory harassment from January - October 2007, and the initiation of her discrimination complaint in October 2007.

The second prong - an adverse employment action - is also met.  Sgt. Podorski unjustifiably lowered Officer Jones' (and Weeks') performance appraisal in November 2007. Exs. 4 and 5; Ex. 6.  As a result, Plaintiff Jones' opportunity to obtain the rank of Detective - a "promotion" not only in pay but in assignment and job duties,- was severely hampered.  Ex. 36.

The third prong - the causal connection - is met as well.  Prior to Plaintiff Jones' complaints to Lt. Larsen, which Sgt. Podorski was made aware of in early 2007, and her complaints to Commander Maupin and the EEO Office in October and November 2007, Sgt. Podorski rated Officer Jones' performance as "Meets Expectations."  Ex. 4.  Yet, after Lt. Larsen told Sgt. Podorski that Plaintiffs had complained about Sgt. Podorski's treatment of them and that Lt. Larsen advised them to file an EEO complaint, Sgt. Podorski's view of Plaintiffs' performance changed.  He issued false allegations regarding their use of force statistics. He separated them and refused to have both of them in his PSA. And he lowered their performance ratings.  The District long-ago conceded that Sgt. Podorski misused his authority and "devalued" Plaintiffs' job performance without justification.  Ex. 6.  The District's post-hoc rationalizations that Sgt. Podorski's evaluation of Officer Jones' performance was "reasonable" are not credible

49

and are not supported by the evidence.  Rather, the evidence suggests a direct causal relationship

between Plaintiffs' complaints and the lowered performance evaluations.

<blockquote>
2.   <u>Plaintiff Jones suffered tangible employment actions after complaining
about discriminatory harassment by her supervisor</u>
</blockquote>

The District is incorrect that lowered performance appraisal and lost promotion potential

is "not a tangible employment action."  In making this ludicrous argument, the District ignores

the Supreme Court's holdings in *Faragher-Ellerth*, and mis-cites old District caselaw that pre-

dated the Supreme Court's recent holdings in *Vance v. Ball State*, 570 U.S. ___, Slip. Op. 11-

556, at 5, 9 (U.S. 2013).  The Supreme Court long-ago defined a "tangible employment action"

as "a significant change in employment status, such as hiring, firing, failing to promote,

reassignment with significantly different responsibilities, or a decision causing a significant

change in benefits." *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 761 (1998); *accord*,

*Faragher*, 524 U.S. at 760.  More recently in *Vance*, the Court contemplated that a lowered

performance appraisal could constitute a "tangible employment action." About the definition of a

tangible employment action, the *Vance* Court noted:

> "...the law often contemplates that the ability to supervise includes the ability to take
> tangible employment actions. *See e.g.,* 5 CFR §§9701.511(a)(2), (3) (2012) (referring to
> a supervisor's authority to "hire, assign, and direct employees . . .and [t]o lay off and
> retain employees, or to suspend, re-move, reduce in grade, band, or pay, or take other
> disciplinary action against such employees or, with respect to filling positions, to make
> selections for appointments from properly ranked and certified candidates for promotion
> or from any other appropriate source"); §9701.212(b)(4) (defining "supervisory work" as
> that which "may involve **hiring or selecting employees**, assigning work, **managing
> performance**, recognizing and rewarding employees, and other associated duties").

570 U.S. ____ at 14 (emphasis added).  The Court in *Vance* emphasized that under *Faragher,* a

tangible employment action constituted "employment decisions having direct economic

consequences for [a supervisor's] victims." *Id.* at n 8.

Here, Officer Jones' poor performance rating had a directly adverse affect on her ability to compete for the investigator position.  Officer Jones testified that after learning of her low score, she spoke with an MPD official who told her "my evaluation had a lot to do with placement on the list. That exceeds expectations goes higher than meet expectations." Jones at 211; Ex. 36**.**  Additionally, the investigator selection process was a *hiring decision*.  While the District claims the investigator position was not a promotion, in fact selection for an investigator position results in an approximately $3,000 per year pay increase, in addition to uniform allowances and other benefits such as enhanced overtime not available to patrol officers. Ex. 36**.** This falls squarely within the Supreme Court's long-held definitions of a tangible employment action as "employment decisions having direct economic consequences."

Furthermore, the District fails to realize that Plaintiffs' reprisal claim is a retaliatory hostile work environment.  Thus, the claim is not just that a performance appraisal was lowered, or a promotion was lost; but rather that these actions - tangible employment actions- resulted from an ongoing discriminatory and retaliatory hostile work environment created by their supervisors that went unabated for years.  This creates vicarious and strict liability for the District.  Alternatively, the Court in *Ellerth* and *Faragher* held that, even when a supervisor's harassment does not culminate in a tangible employment action, the employer can be vicariously liable for the supervisor's creation of a hostile work environment if the employer is unable to establish an affirmative defense.  *Vance*, 570 U.S. at *7.  Here, the District has conceded that it can raise no *Faragher-Ellerth* defense, because it failed to investigate Plaintiffs' claims and cannot show that it took any prompt or remedial action.  Ex. 13; Ex. 6.

51

3.      Defendant's mixed-motive argument precludes summary judgment

In asserting that Plaintiff Jones failed to obtain a seat in the 2008 Investigator's Class because of her performance on the Detective's Exam, rather than because of her lowered performance appraisal, the District has placed this claim squarely within the rubric of a "mixed-motive" analysis.  42 U.S.C. § 2000e-2(m) (2012).  The District makes conclusory assertions that it is "undisputed" that Jones was not selected for a detective position because of her score, not her appraisal.  Dist. Mot.  However, the District cites to *no documentary or testamentary evidence for that conclusion.  Id.*

As set forth in the February 22, 2008 Circular (CIR-08-01) on the Investigator Selection Process, there were five ranking factors that were assessed in achieving an overall examination score - Oral (Investigator Competency Review) (50%); Written (Case Documentation Exercise) (20%); Officer Achievement Package (10%); Supervisory Evaluation of Investigator Potential (10%); and FY2007 Annual Performance Rating (10%).  Dist. Ex 13. The FY2007 Annual Performance Rating was worth up to 35 points (out of 177), and was weighted 10% of the total final score.  *Id.*. Thus, the November 2007 lowered performance rating - which the District conceded in 2008 was unjustified - was part of the selection process, and affected Plaintiff Jones' ability to fairly compete in the investigator selection process.

Interestingly, in addition to the 2007 evaluation, an applicants' direct first and second-level supervisors were also required to provide a "Supervisory Evaluation" of the applicant's potential ability to become a detective.  Dist. Ex. 13. Those documents (Form PD-413B) are notably absent from the District's supporting exhibits on the 2008 Investigator Selection Process, and were not provided to Plaintiffs in discovery**.**  There is no evidence in the record regarding

who those reviewing supervisors were.   Without this Supervisory Evaluation rating, there is no

way to know how the rating supervisors' knowledge of Plaintiff Jones' EEO activity could have

also affected her overall Investigator ranking score.

Plaintiff Jones' allegation of non-promotion is therefore related to the potential relief she

could obtain for the discriminatory rating.  The District's claim that the overall score - which

included the discriminatory 2007 rating - was the reason for Plaintiffs' non-promotion essentially

raises a mixed-motive defense that the District must now prove.  That is, the non-promotion was

based on multiple factors, some presumable legitimate (*e.g.*, the Investigator Competency

Review) and some affected by unlawful motive (*e.g.*, the lowered performance appraisal).  Under

this analysis, a plaintiff can "establish a prima facie case of an unlawful employment practice by

demonstrating that discrimination or retaliation played a 'motivating part' or was a 'substantial

factor' in the employment decision."  *Porter v. Natsios*, 414 F.3d 13, 18 (D.C. Cir. 2005) (citing

*Price Waterhouse v. Hopkins*, 490 U.S. 228, 244 (1989).  The burden then shifts to the employer

to show that it would have made the same employment decision in the absence of the unlawful

motive.  *Id.*

Even if the employer carries this burden, however, that does not absolve it of liability for

its unlawful conduct.  Rather, it merely affects the damages that the plaintiff can recover.

Because the question of whether the District can show that notwithstanding the 2007 rating,

Officer Jones still would not have been selected for the 2008 Investigator Class, goes only to the

damages Plaintiff Jones can recover, summary judgment on this claim is inappropriate.

4.      Plaintiff Jones' non-promotion claim is not time-barred

The District asserts, belatedly, that Officer Jones' promotion claim is time-barred because

she did not seek new EEO counseling on this issue. The District is mistaken for a variety of reasons.[6]

First, and most obviously, when Officer Jones filed her charge of discrimination with OHR, *she had not yet been nonselected for the Detectives' Class.*  The Selection Register did not come out until July 2008.  By July 2008, her OHR charge of sexual orientation discrimination and harassment was already being processed.  And by December 2008, Officer Jones had amended her complaint to add a basis of gender, and to cross-file her complaint with the EEOC. Ex. 23.  This was done within 300 days of her non-selection.

The District also wrongly claims that Officer Jones' Title VII and DCHRA gender claims for non-promotion are time-barred because she did not timely amend her claims to include a basis of gender.  Setting aside the fact that the District has waived these timeliness arguments, *see e.g.,* Fed. R. Civ. Pro. 12(b)(6) and 12(g), the District's position fails to acknowledged settled law that a complainant can amend a complaint to include a new basis (i.e. gender) of discrimination at any time. *See e.g., Sanchez v. Standard Brands,*  431 F.2d 455 (5th Cir. 1970). In *Sanchez*, the Court held that additional claims may be included in a complaint if they would be discovered during an investigation reasonably growing out of the EEOC charge, noting "[i]n the context of Title VII, no one · should be boxed out."  *See also Oubichon v. North American Rockwell Corp.,*  482 F.2d 569, 571 (9th Cir.1973)("[w]hen an employee seeks judicial relief for incidents not listed in his original charge . . . the judicial complaint nevertheless may encompass any discrimination like or reasonably related to the allegations . . . including new acts occurring

---

[6] For the same reasons discussed below, the District has waived this argument by failing to present it in any of its previous dispositive motions.  *See* F.R.Civ.P. 12(g)(2).

during the pendency of the charge.")

Finally, the District misses the mark completely in characterizing Plaintiff Jones'
promotion claim as a "discrete act."  While it is true that one avenue of relief would be for
Plaintiff Jones to allege disparate treatment as a discrete act of non-promotion, that is not the
case here.  As the Supreme Court held in *National Railroad Passenger Corporation v. Morgan*,
536 U.S. 101, 120-21 (2002), in a hostile work environment complaint (such as this case) where
the allegation is one of an ongoing pattern of discrimination comprised of both discrete and non-
discrete acts, acts that are otherwise time-barred can qualify as part of a hostile work
environment claim if they involve the same type of employment actions, occur relatively
frequently, and are perpetrated by the same managers, as in the instant case. *See also*, EEOC
Compliance Manual, §2-IV.C (rev. July 2005).  Here, Officer Jones has alleged from the very
beginning of her complaint that Sgt. Podorski subjected her and Officer Weeks to unwelcome
and harassing treatment, unwelcome comments, and tangible employment actions such as a
lowered performance rating, on the basis of her sexual orientation and sex.  Ex. 23 at Charge of
Discrimination and Amendment**.**  The denied promotion claim is part and parcel of her allegation
that Sgt. Podorski's unjustified FY2007 Meet Expectations rating harmed her chances of being
selected as a detective and was therefore discriminatory.  In essence, Officer Jones' nonselection
for an investigator position is the effect of the lowered performance rating.

     5.     <u>Plaintiff Jones was not required to identify similarly situated comparators</u>

Lastly, the District is incorrect that Plaintiff Jones failed to make out a *prima facie* case of
discrimination or reprisal with regard to her non-promotion because she failed to identify
similarly situated comparators who did receive promotions.  In light of the District failure to

preserve relevant documents, as discussed above, it ill lies in the District's mouth to make this

argument: but for the District's destruction of the e-mails and the PSS log books, Plaintiffs

would have ample comparator evidence.  In any event, the Supreme Court has emphasized that

the *McDonnell Douglas* model of the *prima facie* case is not intended to be "rigid, mechanized,

or ritualistic" and that its requirements can vary depending upon the factual context.  *Teneyck v.*

*Omni Shoreham Hotel*, 365 F.3d 1139, 1150 (D.C. Cir. 2004), *citing Swierkiewicz v. Sorema*

*N.A.*, 534 U.S. 506, 512, (2002) (*quoting Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577

(1978)).

This Circuit recently reaffirmed that a Plaintiff may establish a prima facie case without

identifying a similarly-situated comparator, stating:

> T]he court in *Stella v. Mineta* articulated an alternative formulation of the Title VII prima
> facie case, pursuant to which a plaintiff must establish that "(1) she is a member of the
> protected class; (2) she suffered an adverse employment action; and (3) the unfavorable
> action gives rise to an inference of discrimination." *Stella v. Mineta*, 284 F.3d 135, 145
> (D.C. Cir. 2002) (quoting *Brown v. Brody*. 199 F.3d 446, 452 (D.C. Cir. 1999)).  This
> alternative formulation is designed to accommodate the wide variety of employment
> discrimination claims that extend beyond the typical "failure-to-hire" situations of the sort
> confronted in *McDonnell Douglas*.

Teneyck, 365 F.3d at 1150.  *See also*, *George v. Leavitt*, 407 F3d 405, 412 (D.C. Cir. 2005) ( a

plaintiff need not present comparators to raise an inference of discrimination); *Czekalski v.*

*Peters*, 475 F.3d 360, 356-67 (D.C. Cir. 2007)(same).

Thus, it is sufficient that Officer Jones can show that she is a member of a protected class

- a gay female who engaged in EEO activity - who suffered a series of adverse employment

actions, namely her lowered performance appraisal followed by her non-selection for the

Investigator position, which were unjustified and followed closely after her protected EEO

activity.  After she reported Sgt. Podorski's "unsavory" behaviors to Lt. Larsen, Commander

Maupin, and the MPD EEO Office in October 2007, Sgt. Podorski unjustifiably lowered her

FY2007 rating.   When she applied for the Investigator class, she was told by a selecting official

that her Meets Expectations rating was not acceptable and was one of the reasons she was ranked

lower in her overall examination score.  Ex. 36.  A follow-up inquiry by MPD's EEO branch

uncovered that Sgt. Podorski engaged in management misconduct with respect to his treatment of

Officer Jones and Officer Weeks, and recommended that Officer Jones' evaluation be re-done by

a new official and that she be assessed for eligibility for the Detectives' Class.  Ex. 6.

G.     **Plaintiff Weeks' claims were properly before OHR**

The District argues that Plaintiff Week's DC Human Rights Act claims should be

dismissed as time-barred because she did not file her OHR Charge of Discrimination within

fifteen days of receiving her exit letter.  For a variety of reasons, the District's argument is

unpersuasive and legally unsound.

1.     Defendant waived the right to raise the timeliness of the OHR charge

As an initial matter, the District has waived the right to assert, for the first time at this late

stage of the litigation, that Plaintiff Weeks' OHR charge was untimely filed.  It is well-settled

that an exhaustion of administrative remedies defense is an affirmative defense.  *Terveer v.*

*Billington*, 2014 U.S. Dist. LEXIS 43193, 20-21 (D.D.C. Mar. 31, 2014).  "Because untimely

exhaustion of administrative remedies is an affirmative defense, the defendant bears the

responsibility of pleading and proving it." *Terveer,* quoting *Bowden v. United States*, 106 F.3d

433, 437 (D.C. Cir. 1997) (*citing Brown v. Marsh*, 777 F.2d 8, 13(D.C. Cir. 1985)).

In this case, the District has filed not one, but two unsuccessful motions to dismiss based

on exhaustion of administrative remedies and/or timeliness.  MPD waived its right to challenge

the timeliness of Plaintiffs' claims when it failed to include this argument in either of its prior

motions to dismiss. As noted recently in *Gilmore v. Palestinian Interim Self-Gov't Auth.*, 8 F.

Supp. 3d 9 (D.D.C. 2014), "[i]f a party files a Rule 12(b) motion to dismiss, it may not

subsequently assert any Rule 12(b) defenses that were available when the first Rule 12(b) motion

was filed." *Candido v. Dist. of Columbia*, 242 F.R.D. 151, 161 (D.D.C. 2007) (citing Fed. R.

Civ. P. 12(g),(h)(1)); *Chatman-Bey v. Thornburgh*, 864 F.2d 804, 813(D.C. Cir. 1988)).

Federal Rule of Civil Procedure 12(g)(2) limits a defendant's ability to raise a "defense or

objection that was available to the party but omitted from its earlier [12(b)(6)] motion."  "The

Rule 'contemplates the presentation of an omnibus pre-answer motion in which defendant

advances every available Rule 12 defense and objection he may have that is assertable by

motion.'"  *McCurdy v. Am. Bd. of Plastic Surgery*, 157 F.3d 191, 194 (3d Cir. 1998) (quoting 5a

Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure: Civil 2d § 1384 at 726

(1990)) (alterations and quotation marks in original).  Since MPD has filed two motions to

dismiss, while having the opportunity to raise this issue, and twice ignored this issue, then Rule

12(g)(2) prohibits the Agency from now making such an objection.

MPD had at least two opportunities to object to the timeliness of Plaintiff Weeks'

DCHRA claims and failed to utilize the proper procedure of including such an objection in either

of its motions to dismiss.  Its failure to timely present this defense effects a waiver of any defense

it might otherwise have had.[7]

---

[7] The District of Columbia Circuit Court of Appeals has held that "administrative
deadlines . . . are not jurisdictional but function like a statute of limitations and 'like a statute of
limitations, [are] subject to waiver, estoppel, and equitable tolling.'"  *Brown v. Marsh*, 777 F.2d

2.     Officer Weeks' complaints of sexual harassment do not require an exit letter prior to being filed with the Office of Human Rights

Additionally, the District fails to acknowledge that Detective Weeks' OHR complaint included claims of sexual harassment.  Ex. 24 at Rebuttal Statement, Dec. 23, 2008 letter.  Although her internal MPD EEO charge was initially based on sexual orientation, her allegations from the beginning clearly raised sexual harassment.  *See e.g.*, Ex. 51 (Nov 5, 2007 Weeks Medical Services Division report on PD-42 Injury).  On October 9, 2007, during her interview with MPD's Medical Services Division regarding her claim for POD-stress leave, Officer Weeks "reported 'I'm experiencing sexual harassment since revealing sexual orientation and relationship with a fellow officer. I am being harassed by a sergeant." *Id.* 2.  Once before the OHR, Plaintiff Weeks amended her charge of discrimination to include gender and sexual harassment, in her affidavit presented to OHR dated November 11, 2008. Ex. 28.  *See also* Ex. 24 (Dec. 23, 2008 letter from Plaintiffs' counsel amending claims).

District of Columbia law is clear that "a complaint of sexual harassment may be filed directly with OHR" and that District employees need not first seek EEO counseling or obtain an exit letter for such claims.  4 DCMR §105.1.  The District's own witnesses acknowledged this fact.  Ex. 29 at 31. Thus, Detective Weeks did not have to go through the internal EEO process to obtain an exit letter prior to filing suit or filing a charge with the Office of Human Rights.  Further, Plaintiff Weeks' Charge of Discrimination was not dismissed as untimely by the

---

8, 14 (D.C. Cir. 1985) (*quoting Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982)); *see also Terveer v. Billington*, 2014 U.S. Dist. LEXIS 43193, at *20--21 (D.D.C. Mar. 31, 2014) ("Importantly, however, the administrative deadlines imposed by this scheme are not jurisdictional in nature: 'they function like a statute of limitations and . . . are subject to waiver . . . .'") (*citing Brown*, 777 F.2d at 14).

Director of the Office of Human Rights.  4 DCMR §105.7.

       3.       <u>Plaintiff Weeks' complaint was continuing in nature</u>

Finally, the District fails to recognize that Plaintiff Weeks' complaint was one of an ongoing nature - a hostile work environment complaint - not a singular complaint of a discrete act.  In fact, many of the sexual harassment incidents raised in the OHR charge occurred *after* November 2007.  As a result, Plaintiffs Weeks could not have, and did not, receive an exit letter regarding those incidents.  Nonetheless, it was appropriate for her to proceed with her claims to the Office of Human Rights in March 2008.

## V.   CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment must be denied.  A proposed order is attached.

                      Respectfully submitted,


                      _____/s/_____
                      Michael Kator (Bar No. 366936)
                      Juliette Niehuss (Bar No. 977316)
                      KATOR, PARKS, WEISER & HARRIS, P.L.L.C.
                      1200 18th Street, N.W., Suite 1000
                      Washington, D.C. 20036
                      Phone: (202) 898-4800
                      Fax: (202) 289-1389

Oct. 31, 2014             Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| TONIA L. JONES, *et al.* | |
| Plaintiffs, | |
| v. | |
| DISTRICT OF COLUMBIA, | Civil Action No. 11-00215 (RMC) |
| Defendant. | |

**[proposed] ORDER**

Upon consideration of the Defendant's Motion for Summary Judgment, Plaintiffs'

Opposition to Defendant's Motion for Summary Judgment, Defendant's reply, and the entire

record, it is this ____day of _____, 2014, hereby

ORDERED that Defendant's Motion for Summary Judgment is DENIED.

_____
Rosemary Collyer
Judge, United States District Court
for the District of Columbia

61