# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

TONIA L. JONES, *et al.*

       Plaintiffs,

  v.

DISTRICT OF COLUMBIA,

       Defendant.

Civil Action No. 11-00215 (RMC)

## PLAINTIFF JONES'S OPPOSITION TO DEFENDANT'S SECOND MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

I.   STATEMENT OF FACTS..................................................................................2
     A.   Officer Jones's employment with MPD..........................................................2
     B.   Supervisors begin harassing Officer Jones when she discloses her
          lesbian relationship with Officer Weeks..........................................................3
     C.   Plaintiffs complain to Commander Maupin and other supervisors
          about harassment.................................................................................7
     D.   Sgt. Washington harasses Plaintiffs after they switch to midnight shift....................11
     E.   Plaintiffs take stress leave—October 2007......................................................13
     F.   Officer Jones receives lowered performance appraisal after filing
          EEO complaint....................................................................................15
     G.   Officer Jones Files Charge of Discrimination With OHR—March 2008..................16
     H.   Officer Jones harassed and retaliated against after filing EEO Complaints..............17
     I.   Retaliation and harassment continued during OHR investigation.............................18
     J.   OHR finds probable cause that Jones was subjected to sex
          harassment, sexual harassment, sexual orientation harassment, and reprisal.............19
II.  ARGUMENT...............................................................................................19
     A.   Officer Jones's gender claims under Title VII and DCHRA are
          timely (Counts I, III, and V)....................................................................20
     B.   Officer Jones was subjected to unwelcome harassment because
          she is female and was in a same-sex relationship..............................................21
          1.   The District subjected Officer Jones to severe
               and pervasive harassment because of her sex...............................................23
          2.   The District subjected Officer Jones to
               unwelcome harassment based on sexual orientation.......................................28
          3.   Harassment unreasonably interfered with Officer Jones's work...................31
               a.   The District improperly applies a disparate
                    treatment analysis to Officer Jones's
                    hostile work environment allegations.................................................32
               b.   The District's actions were not legitimate but
                    were pretext for illegal discrimination...............................................35
                    i.    Officer Jones brings evidence of
                          pretext concerning her leave allegations....................35
                    ii.   Officer Jones brings evidence of
                          pretext concerning her shift changes..........................38
                    iii.  The District has long conceded that
                          Sgt. Podorski lowering Jones's 2007
                          Performance Evaluation was
                          unjustified misconduct.................................................40
          4.   Officer Jones establishes vicarious liability.................................41

C.     Officer Jones establishes a *prima facie* case of retaliatory hostile work environment (Counts VII and VIII)........................................44

D.     The District's spoliation of evidence precludes summary judgment.........50

     1.    PSS Log Books.............................................................................52

     2.    Emails sent prior to July 2009....................................................54

E.     The OHR Probable Cause Findings are admissible evidence of discrimination and reprisal that must go before a jury...........................56

**III.**     **CONCLUSION**........................................................................................57

## PLAINTIFF JONES'S OPPOSITION TO DEFENDANT'S SECOND MOTION FOR SUMMARY JUDGMENT

In its second Motion for Summary Judgment, the District argues that the Court should dismiss Plaintiff Tonia L. Jones's claims under Title VII and DCHRA because Officer Jones did not timely file a charge of hostile work environment.  The District also argues that Officer Jones fails to establish a *prima facie* case of hostile work environment as any personnel decisions were legitimate and the complained-of behaviors were infrequent and merely uncivil.  Further, the District contends that Officer Jones fails to establish a *prima facie* case of hostile work environment, her claim of retaliatory hostile work environment also fails.  The District is wrong, and is not entitled to judgment as a matter of law.

Officer Jones, a fourteen-year veteran of the District's police force, was sexually harassed and subjected to illegal sex stereotyping and sexual orientation harassment at the hands of her supervising sergeants for years without relief.  The harassment led to tangible employment actions resulting in the District's vicarious liability.  The District's motion for summary judgement should be denied because the parties dispute nearly every material fact in this case.  The District should also be sanctioned with an adverse evidentiary inference for its negligent destruction of relevant evidence in this case.  On the basis of the evidentiary inference this document destruction engenders alone, a jury could find for the Officer Jones in this case.  Finally, the D.C. Office of Human Rights, after a comprehensive investigation of Officer Jones's claims, made factual findings of discrimination, harassment, and reprisal, which preclude summary judgment.

## I.    STATEMENT OF FACTS

In addition to her Statement of Material Facts in Dispute ("JSMFD") submitted as Exhibit 1, Officer Jones sets forth the following statement of facts in support of her claims.

### A.    Officer Jones's employment with MPD

Officer Jones is a female police officer in the District of Columbia's Metropolitan Police Department ("MPD").  JSMFD ¶ 001; Defendant's Statement of Undisputed Facts ("DSUF") ¶ 1.  MPD hired Officer Jones on November 5, 2001.  JSMFD ¶ J002; DSUF ¶ 2.  Since June 2002, and during all times relevant to this case, she has been assigned as an officer to MPD's Seventh District ("7D") (with the exception of a short detail assignment to the Emergency Response team in July 2010).  JSMFD ¶ J003; DSUF ¶ 3; Ex. 7, Jones Deposition, Jan. 2, 2014 at 6.

In 2006, Officer Jones was assigned to Patrol Service Area ("PSA") 703, on the day-work shift within 7D.  Ex. 22, PSS Log Books.  Supervisors on the day-work shift in 2006 included, among others, Sergeant Jonathan Podorski, Sergeant Yurell Washington, Sergeant Eric Levenberry, Sergeant Buddy Smallwood, and Sergeant James LaFranchise.  *Id.* at Sept.-Nov. 2006.  In September 2006, Sgt. Podorski was the supervising sergeant for PSA 703.  DSUF ¶ 77; Ex. 2, Podorski Deposition, Oct. 22, 2013 at 10-12.  Sgt. Washington was assigned to the day-work shift from at least September to December 2006.  Ex. 22, PSS log Books.  In 2007, Sgt. Washington was the supervisor for the midnight shift in 7D, but returned to 7D's Vice Unit in 2009.  JSMFD ¶ J007; Ex. 35, Washington Dep. at 24-25.[1]  At all times relevant to this case, Joel Maupin was the Commander of 7D.  JSMFD ¶ J011; Ex. 12, Maupin Deposition, Oct. 21, 2013  at 8-11.  Lt. Derek Larsen was Officer Jones's supervising lieutenant in PSA 703 until October 2007.  JSMFD ¶ J012,

---

[1] Sgt. Washington was reassigned back to 7D two years later, and retired from 7D in 2013. JSMFD ¶ W007; Ex. 35, Washington Dep. at 11, 24-25).

Ex. 21, Deposition of Lt. Derek Larsen, Jan. 30, 2014 at 39-40.  At all times relevant to this case,

Lt. Alan Hill was Officer Jones's supervising lieutenant.  DSUF ¶ 12.

> B.      Supervisors begin harassing Officer Jones when she discloses her
>         lesbian relationship with Officer Weeks

Officer Jones became squad car partners with MPD Officer Kenniss M. Weeks[2] beginning

in early 2006.  Ex. 11, Weeks Dep. at 18-19.  In July 2006, Plaintiffs began a romantic lesbian

relationship.[3]  DSUF ¶ 76; Ex. 7, Jones Dep. at 11.  Officers Jones and Weeks  allege that from the

time they disclosed their lesbian relationship to their supervisors in late 2006, through 2010, they

were subjected to an ongoing hostile work environment and harassment based on their sex, sexual

orientation, and in retaliation for opposing such illegal harassment.

In September 2006, Plaintiffs informed their immediate supervisor, Sgt. Podorski, of their

same-sex relationship.  JSMFD ¶¶ J016, J017, J018; DSUF ¶ 15; Ex. 7, Jones Dep. at 28-33, 42-43;

Ex. 11, Weeks Dep. at 19-20.  Officer Jones first informed Sgt. Podorski that she was dating a

female officer during a conversation with him in a scout car.  Ex. 7, Jones Dep. at 28-30.  During

---

[2]Officer Weeks is a female police detective in MPD's Criminal Investigations Division ("CID"). (DSUF ¶ 73).  Officer Weeks joined MPD on March 20, 2000 and was assigned to the Seventh District ("7D").  Weeks Charge of Discrimination, p 1.  In 2006, Officer Weeks was assigned to PSA 703.  Ex. 11, Weeks Dep. at 66.  Officer Weeks was promoted to the rank of Detective in October 2008, and served in the Seventh's District's Detectives' Office until November 2009.

[3]In its June 30, 2016 Order, Dkt. 89, the Court observed that Plaintiffs had stated in their charges of discrimination filed with the D.C. Office of Human Rights on March 31, 2008 that their relationship began in January 2007.  Since the inception of their complaints of discrimination and harassment within MPD in October 2007, Plaintiffs have consistently stated that their relationship began in the summer of 2006 and that they notified Sgt. Podorski of their relationship in September 2006.  *See*, *e.g.*, Ex. 30, Transcript of Jones EEO interview, Oct. 15, 2007 at 4 ("Approximately a year and a half ago, Officer Weeks and I started a romantic relationship."); Ex. 28, Weeks OHR Rebuttal Affidavit, Nov. 10, 2008 at 1; Ex. 33, Weeks OHR File Intake Notes at 5; Ex. 11, Deposition of Officer Kenniss Weeks, Dec. 19, 2013 at 11; Ex. 7, Deposition of Officer Tonia Jones, Jan. 2, 2014 at 47, 116.  The District does not dispute the timing of when Plaintiffs' relationship began.  DSUF ¶¶ 4, 76.

a subsequent conversation that included both Officer Weeks and Officer Jones, Plaintiffs informed Sgt. Podorski that they were dating. *Id.* at 42-43; Ex. 11, Weeks Dep. at 20-23. Shortly after learning that Officers Jones and Weeks were in a relationship, Sgt. Podorski's attitude towards them changed. JSMFD ¶¶ J018, W020; Ex. 7, Jones Dep. at 42, 45-64; Ex. 11, Weeks Dep. at 27-28, 56. Whereas previously he had been friendly toward both Plaintiffs, JSMFD ¶ J006; DSUF ¶ 6; Ex. 2, Podorski Dep. at 27; Ex. 11, Weeks Dep. at 9, Sgt. Podorski instead became "upset" and "angry" with them, and he began to treat Officers Jones and Weeks with hostility. Ex. 7, Jones Dep. at 34-36, 227; JSMFD ¶¶ J017, J018, J019, J020, J021.

Soon after Officer Jones identified Officer Weeks as the female she was dating, Sgt. Podorski told Jones that Weeks was "a drama queen," that she was "poison" in relationships, and that Officer Jones "shouldn't mess with" Officer Weeks. JSMFD ¶ J020; Ex. 2, Podorski Dep. at 35-38; Ex. 7, Jones Dep. at 109-111; Ex. 11, Weeks Dep. at 31-32; Ex. 28, Weeks OHR Rebuttal 2008 at 6. In September 2006, Officer Jones learned from Officer Weeks that during a routine radio-run, Sgt. Podorski also told Officer Weeks that Officer Jones was "poison." Ex. 28, Weeks OHR Rebuttal Statement Nov. 10, 2008 at 6.

Sgt. Podorski also exhibited his animus towards gay individuals in other work-related incidents involving Officer Jones.[4] On September 24, 2006, Sgt. Podorski gave Officers Jones and Weeks an unlawful order when they responded to an assault of a gay teenager. JSMFD ¶¶ J038, J039; Ex. 27, Podorski IAD File at 2; Ex. 31, Podorski IAD Discipline Final Investigative Report; Ex. 7, Jones Dep. at 120-124. The evidence was clear that the minor child had been assaulted

---

[4]Contrary to the District's argument, Def.'s Br. at 48-49. Plaintiffs do not allege that this incident is evidence of direct discrimination against them, but implicates Sgt. Podorski's true attitudes toward homosexual people.

because she was gay.  Ex. 27, Podorski IAD File 2 at 7.  As a result,  Officers Jones and Weeks intended to arrest the teenager's relatives on assault charges.  Ex. 7, Jones Dep. at 122.  However, Sgt. Podorski instructed Officers Jones and Weeks to take a domestic report instead, and transport the child to the Psychiatric Institute of Washington, because she was gay.  JSMFD ¶¶ J039, J040, J041; DSUF ¶¶ 24, 25; Ex. 7, Jones Dep. at 122-23; Ex. 11, Weeks Dep. at 29-31; 65-81; Ex. 2, Podorski Dep. at 52-56.  Officers Jones and Weeks objected to this order and believed it was unlawful.  Ex. 7, Jones Dep. at 123.  Officers Jones and Weeks immediately complained to MPD Gay and Lesbian Unit (GLU) Sergeant Brett Parsons, and Sgt. Podorski was investigated for the incident.  As a result of Officers Jones's and Weeks's complaint, Sgt. Podorski was referred to the U.S. Attorneys' Office for "Failure to Make a Lawful Arrest."  Ex. 31, Podorski IAD Discipline Final Investigative Report.  Sgt. Podorski was later investigated by MPD for "Neglect of Duty" and was suspended for the incident.  Ex. 30, Transcript of Jones EEO interview, Oct. 15, 2007 at 6 (note, transcription of "Blue Unit" should read "GLU" unit); Ex. 31, Podorski IAD Discipline Final Investigative Report.  At this point Sgt. Podorski increased the intensity with which he mistreated Officer Jones.  Ex. 19, Hill email re: Performance Evals Jan. 19, 2008.

Sgt. Podorski also exhibited signs of being inappropriately and sexually interested in Officer Weeks and conveyed disdain for her choice to date Officer Jones, a female.  JSMFD ¶¶ J018; Ex. 7, Jones Dep. at 75-76, 226-27; Ex. 29, Deposition of Lt. Ashley Rosenthal, Nov. 13, 2013 at 61; Ex. 30, Jones IAD Interview, Oct. 15, 2007, at 7.  Officer Jones felt that Sgt. Podorski liked, or perhaps "loved" Officer Weeks and appeared "offended" that Weeks would choose to be with Officer Jones, a woman, rather than with him.  Ex. 7, Jones Dep. at 75; Ex. 30, Jones IAD Interview,

Oct. 15, 2007, at 7-8.  This led Sgt. Podorski to target both Officers Jones and Weeks for disparaging and differential treatment.

After disclosing their relationship, Sgt. Podorski "started to separate [Plaintiffs] at work, said he didn't want [them] riding together.  He made comments about the relationship at work that [Plaintiffs] didn't agree with."  Ex. 30, Jones IAD Interview, Oct. 15, 2007, at 5.  Sgts. Podorski and Washington refused to allow Plaintiffs to ride in the same vehicle, while they did allow heterosexual couples and officers from different Patrol Service Areas ("PSAs") to ride together. JSMFD ¶ J024;  Ex. 7, Jones Dep. at 112-118; Ex. 11, Weeks Dep. at 138, 141-47; Ex. 3, Deposition of Sgt. Leebra Branham (Willis), Oct. 25, 2013 at 16-17, 26, 29.  Other sergeants also commented that they intended to split up Officer Weeks from Officer Jones, by not allowing them to ride together in the same patrol car.  Ex. 7, Jones Dep. at 112-118; Ex. 11, Weeks Dep. at 29, 53-58; Ex. 3, Branham (Willis) Dep. at 26, 29.  The first incident of Officer Jones being separated from Officer Weeks occurred some time in October 2006.  Ex. 11, Weeks Dep. at 53.

Sgt. Podorski's behavior towards Plaintiffs also created an environment in which other officers and supervisors felt comfortable harassing and belittling Officers Jones and Weeks.  For example, Sgt. Washington referred to Officer Jones as "the butch one" and called Officer Weeks "the femme one."  JSMFD ¶ J037; Ex. 7, Jones Dep. at 89-90; Ex. 11, Weeks Dep. at 95-97; Ex. 35, Washington Dep. at 79-80.  Sgt. Podorski and Sgt. Washington made it clear to Officer Jones and other MPD officers that they were treating Officers Jones and Weeks differently because Officer Jones was dating a previously straight female to whom other male officers were attracted.  Ex. 7, Jones Dep. at 227.  Other Officers and sergeants questioned Officer Weeks's decision to date Officer Jones, and urged Officer Weeks to leave Officer Jones and "go back" to men.  *Id.* at 79-81; Ex. 25,

Jones Probable Cause Finding at 7; Ex. 26, Weeks Probable Cause Finding at 6.  Sergeants also made sexual overtures towards Officer Jones and her partner.  For example, Sgt. Smallwood asked Officer Jones if he could kiss her, and told her that Officer Weeks "wouldn't know."  Ex. 7, Jones Dep. at 262-63.

In January 2007, Sgt. Podorski began making public and unwarranted accusations that Plaintiffs were "unsafe" to work with.  JSMFD ¶¶ J035, J038; Ex. 7, Jones Dep. at 48, 55-61; Ex. 11, Weeks Dep. at 57-59, 81-89, 141, 211; Ex. 21, Larsen Dep. at 27-30, 32-35.  He posted a letter on the roll call wall in 7D stating that Officers Jones and Weeks had too many "Use of Force" complaints (UFIRs).  Ex. 7, Jones Dep. at 59-61; Ex. 11, Weeks Dep. at 85.  He further stated that he wanted Plaintiffs transferred to another PSA outside of 703.  Ex. 7, Jones Dep. at 61.  To that end, he informed Lt. Larsen that he wanted to separate Officer Jones from Officer Weeks.  Ex. 21, Larsen Dep. at 28-30, 46.

Sgt. Podorski also refused to approve Officer Jones's requests for overtime compensation, and one time threw Officer Jones's written request on the floor.  JSMFD ¶ J034; Ex. 7, Jones Dep. at 75-77, 210; Ex. 28, Weeks OHR rebuttal Affidavit at 6; Ex.11, Weeks Dep. at 63; Ex. 2, Podorski Dep. at 59-62.  Both Sgt. Podorski and Sgt. Washington also baselessly accused Plaintiffs of "malingering" when they would take leave together.  Ex. 30, Jones IAD Interview, Oct. 15, 2007, at 5-6.

C.      Plaintiffs complain to Commander Maupin and other supervisors about harassment

In January 2007, Officers Jones and Weeks complained to Sgt. Eric Levenberry and Sgt. Buddy Smallwood, other supervising sergeants in 7D, about the ongoing harassment related to their relationship.  Ex. 7, Jones Dep. at 74; Ex. 11, Weeks Dep. at 60-61; Ex. 32 Levenberry Deposition,

Oct. 24, 2013 at 13-15.  Those supervisors failed to take any action to remedy the harassment.  Ex. 13, Defendant Interrogatory Responses, Answer 10.  As a result, later in January 2007, Plaintiffs complained to Lt. Derek Larsen.  Ex. 7, Jones Dep. at 72-79.  Officer Jones told Lt. Larsen that she and Officer Weeks did not want to work with Sgt. Podorski anymore because he was treating them differently, and requested reassignments away from Sgt. Podorski.  Ex. 7, Jones Dep. at 76-79.  However, he did not take any further action to report the complaints to his supervisory chain or remedy the harassment, and instead agreed with Sgt. Podorski's proposal to separate Officer Jones from her partner, Officer Weeks.  Ex. 21, Larsen Dep. at 21.

In February 2007, Plaintiffs also informed Lt. Ashley Rosenthal, a former EEO counselor for 7D and a trainer in the police academy, about the harassment from Sgt. Podorski.  Ex. 29, Rosenthal Dep. at 61; Ex. 11, Weeks Dep. at 332-37.  Lt. Rosenthal advised them to document their concerns but took no action to report Plaintiffs' complaints.  Ex. 29, Rosenthal Dep. at 45, 53.

In March 2007, Officer Jones was reassigned to PSA 701 and Officer Weeks remained in PSA 703.  This signaled a change in how the District treated Plaintiffs.  Lt. Larsen had previously asked Officers Jones and Weeks, in late 2006, to ride together as a TAC unit in Barry Farms, within his PSA 703.  In January 2007, Lt. Larsen had promised to keep them in that TAC unit.  *See* Jones April 2009 OHR Statement; *see* Jones OHR Discovery Responses, Interrogatory response 7; *see also* Ex. 7, Jones Dep. at 112-115; Ex. 21, Larsen Dep. at 36-37.  In November 2006, officers bid for new shift assignments during "open-season."  During open season, Officer Weeks bid on, and received, her same assignment to PSA 703.  However, Sgt. Podorski was the supervisor for PSA 703, and refused to have both Officers Jones and Weeks in PSA 703.  When it was time for Officer Jones to bid for a new assignment, Sgt. Podorski would not allow Officer Jones to come off duty in time to

-8-

bid for PSA 703 by intentionally keeping Officer Jones out on the street.  Ex. 23, Jones OHR File at 3.  By the time Officer Jones was allowed to bid for a PSA assignment, the only available slot was in PSA 701.  *Id.*  From November 2006 to when the assignment changes took effect in March 2007, Sgt. Podorski and other sergeants continued to separate Officer Jones from Officer Weeks, even though they were both assigned to PSA 703.  For example, during that time, Sgt. Podorski and other 7D sergeants would place Officers Jones and Weeks at isolated fixed details at Howard University Hospital or Greater Southeast Hospital, where they had to spend eight-hour shifts waiting for arrested suspects to be released from medical care to be taken to lock-up.  Ex. 55, Plaintiffs' Response to the District's Interrogatory Requests, Mar. 24, 2014 at 24.

When she was re-assigned to PSA 701 in March 2007, Officer Jones requested to switch PSAs, but was not permitted to do so.  Commander Maupin required that Officer Jones find a "body for a body" replacement.  Even when Officer Courtney Flash, who had been assigned to PSA 703, offered to switch with Officer Jones and take her assignment in PSA 701, the sergeants and Commander Maupin would not allow it.  Ex. 23, Jones OHR File Excerpts at 13.  Once Sgt. Podorski started doing Roll Call in March 2007, he also began separating Plaintiffs by placing them in different scout cars, and refusing to let them ride together even while other officers who were assigned to different PSAs were permitted to ride together.  Ex. 7, Jones Dep. at 115.

As a result, in March 2007, Officers Jones and Weeks had a meeting with Commander Maupin about how Sgt. Podorski treated them.  Ex. 11, Weeks Dep. at 137-141.  During the meeting, Officers Jones and Weeks complained directly to Commander Maupin about Sgt. Podorski's harassment and differential treatment.  They "told him about the ill treatment that Sergeant Podorski was giving [them] on day work," including about Sgt. Podorski posting the UFIR letter on the 7D

bulletin board and preventing them from riding together.  *Id.* at 136-141.  They "conveyed [to] Commander Maupin that Sergeant Podorski was creating a hostile work environment" and that they wanted to switch off the day-work shift.  *Id.* at 142; *see also* JSMFD ¶ J047; DSUF ¶ 30; Ex. 7, Jones Dep. at 127-28.   Commander Maupin refused to allow Officer Jones to change to the midnights shifts.  Commander Maupin told Plaintiffs they could file an EEO complaint if they wanted, but that they could not transfer shifts unless they found another officer for "a body for a body" switch.[5]  Ex. 7, Jones Dep. at 126-128; Ex. 11, Weeks Dep. at 141-42.  Commander Maupin took no other action with regard to Sgt. Podorski, did nothing to remove Officer Jones or her partner from the hostile work environment, and conducted no internal investigation into Officer Jones's complaints.  Ex. 13, Defendant Interrogatory Responses, Answer 10.

Thereafter, the Sergeants in 7D increasingly sexually harassed Plaintiffs.  In May 2007, during an MPD party in Myrtle Beach, South Carolina, while surrounded by other MPD officers, Sgt. Podorski approached Officers Jones and Weeks and asked them both, "do you want to fuck?"  JSMFD ¶ J070;  Ex. 7, Jones Dep. at 45-48, 103, 263; Ex. 11, Weeks Dep. at 112-119; Ex. 2, Podorski Dep. at 66-67.  Sgt. Podorski explained "if I want to find somebody to fuck, [I] put it out there."  Ex. 2, Podorski Dep. at 67.   Officer Jones and her partner were offended and felt it was inappropriate and unprofessional for a supervisor to say such a thing.  Ex. 7, Jones Dep. at 46-48, 105-08.  While the District argues that there is no evidence that Sgt. Podorski was directing the obscene comment at Officer Weeks and Officer Jones, Def.'s Br. at 50, other male officers who overheard the comment certainly recognized that it was directed at Plaintiffs to the extent that Officer Jones had to keep them from "trying to assault" Sgt. Podorski in response.  Ex. 7, Jones Dep.

---

[5] This "body for a body policy" was not in the General Orders.  Ex. 11, Weeks Dep. at 128.  This was a policy that Commander Maupin created and selectively enforced.  *Id.* at 133.

at 106.  The male officers approached Officer Jones and asked, "do you want us to take care of it?" meaning they were going to "take care of" Sgt. Podorski for what he said.  *Id.* at 106.

This was not the only time Officer Jones was subjected to such blatant harassment.  Another officer approached Officers Jones and Weeks in September 2007 to propose that he pay them $5,000 to watch the Plaintiffs have sex with each other.  JSMFD ¶¶ J068, J069; J0171; DSUF ¶ 44; Ex. 7, Jones Dep. at 264-66; Ex. 11, Weeks Dep. at 265-66.

### D.   Sgt. Washington harasses Plaintiffs after they switch to midnight shift

Around this time, Officer Weeks and Officer Jones were finally able to leave the day work shift.  In September 2007, Officer Jones was permitted to switch to the midnight shift.  Ex. 11, Weeks Dep. at 135-36.  Officer Weeks had been switched to the midnight shift a month prior, in August 2007.  *Id.* at 135-36.  This was nearly eight months after Plaintiffs first complained of mistreatment by Sgt. Podorski, and nearly six months after requesting a shift change from Commander Maupin.  During this time, the harassment had escalated from statements about Officer Jones's safety with Officer Weeks as her squad car partner to blatant sexual overtures and solicitations.  While the harassment by Sgt. Podorski slowed somewhat once Plaintiffs were both on the midnight shift, they were not spared harassment by other supervisors and officers who Sgt. Podorski had informed that Plaintiffs should be separated and treated differently because of their same-sex relationship.  One such supervisor was Sgt. Washington, the midnight-shift supervisor.

After Officer Jones joined the midnight shift in September 2007, other officers informed her that Sgt. Washington was upset that Plaintiffs were always together and that his intention was to separate them.  Ex. 7, Jones Dep. at 118-19; Ex. 11, Weeks Dep. at 149-50; Ex. 38, Weeks EEO Interview audio transcript at 9.  Officers testified that Sgt. Washington was repeatedly heard "saying

that he was going to get [Jones and Weeks]," to Sgt. Podorski.  Ex. 3, Branham (Willis) Dep. at 20, 31-32.  Sgt. Branham testified that "whoever did roll call didn't put [Jones and Weeks] together, it was either Podorski or Yurell Washington."  *Id.* at 26; Ex. 37, Branham (Willis) OHR statement at MPD000547-MPD000551.  Sgt. Branham also testified that Sgt. Washington and Sgt. Podorski separated Plaintiffs "because they were gay."  Ex. 3, Branham (Willis) Dep. at 29.  Sgt. Washington in particular "paid more attention to Weeks and Jones.  He made sure they didn't ride together and he related to other sergeants that they didn't ride together."  Ex. 37, Branham OHR statement at MPD 551; Ex. 3, Branham (Willis) Dep. at 35.

In an effort to separate Officer Jones from Officer Weeks, Sgt. Washington began assigning Officers Jones and Weeks to fixed-duty, isolated details, outside of their assigned PSAs.  Ex. 35, Washington Dep. at 55;  Ex. 11, Weeks Dep. at 158-59.  On October 7, 2007, Sgt. Washington improperly docked Officers Jones and Weeks for leave hours that they had not requested and did not use.  JSMFD ¶ J077; Ex. 7, Jones Dep. at 186, 65-66; Ex. 39, PD-42 Reports.  Along with other officers from 7D, Officers Jones and Weeks had attended the wedding ceremony of two heterosexual officers.  Ex. 11, Weeks Dep. at 160-62.  Plaintiffs both timely requested leave for the first hour of their shift to attend the wedding.  *Id.* at 161.  Upon arriving for duty, other officers informed Plaintiffs that Sgt. Washington ominously said that "he was going to get them" and that "he had something for them."  Ex. 39, PD-42 forms; Ex. 7, Jones Dep. at 186.  Sgt. Washington docked Officer Jones and her partner for 2 hours of leave, alleging that they were late.  However, Sgt. Washington did not impose the same treatment upon other heterosexual and male officers, including Andre Kimvalkani and Robin Simms, who attended the wedding and arrived later to their shifts than

Plaintiffs did, but were not docked leave.  Ex. 40, Roll Call Sheet, Oct. 7, 2007; Ex. 11, Weeks Dep. at 162.

        E.      <u>Plaintiffs take stress leave—October 2007</u>

In October 2007, Plaintiffs complained again to Lt. Larsen about the harassment they were experiencing.  Ex. 21, Larsen Dep. at 39-41.  Lt. Larsen told Plaintiffs to file an EEO complaint. *Id.* at 43.  Lt. Larsen later spoke with Sgt. Podorski about his behavior and indicated that it was unwelcome, but he did not take any further action to report the complaints to his superiors or to remedy the harassment.  *Id.* at 45-47.

On October 7, 2007, Officer Jones filed with her chain of command a PD-42 Illness or Injury Report detailing the ongoing hostile work environment and harassment.  JSMFD ¶ J081; DSUF ¶ 52; Ex. 39, PD-42 Reports; Ex. 7, Jones Dep. at 266-67.  Officer Weeks filed a similar report on the same day.  Ex. 11, Weeks Dep. at 199-200.  As a consequence of the ongoing harassment, Officer Jones also requested and took stress leave beginning on October 7, 2007.  JSMFD ¶ J081; DSUF ¶ 52; Ex. 39, PD-42 Reports; Ex. 7, Jones Dep. at 266-67.  Officer Weeks also took stress leave at the same time.  Ex. 11, Weeks Dep. at 199-200.  Commander Maupin reviewed and signed off on both of Plaintiffs' harassment reports and their requests for stress leave.  Ex. 39, PD-42 Reports; Ex. 12, Maupin Dep. at 57-60.  When Plaintiffs complained again to Commander Maupin of the harassment while they were on leave, he directed them to report to the Diversity and Equal Employment Opportunity (EEO) branch.  Ex. 13, Defendant Interrogatory Responses, Answer 10. While on stress leave, Plaintiffs initiated internal MPD EEO complaints.  Ex. 39, PD-42 Reports; Ex. 41, MPD EEO Complaints.

As part of the process of filing her PD-42 Injury and Illness Report, the Medical Services Section evaluated Officer Jones to determine whether her leave would be classified as "Performance of Duty" or "Non-Performance of Duty." In that evaluation, dated October 30, 2007, the Medical Services Section Director took inventory of Officer Jones's complaints, including that Sgt. Washington was targeting her and her partner because of their sexual orientation, Ex. 51, Medical Services Division Report at 1, and that Officer Jones had reported to Behavioral Health Services on October 7, 2007 that she had "experienced sexual harassment since revealing my relationship with another officer." *Id.* at 2.

In December 2008, Officer Jones requested to amend her OHR complaint to specify that she was complaining of discrimination based on her gender, her sexual orientation, and that she was being sexually harassed and retaliated against for filing the complaint. Ex. 23, OHR File Excerpts at 3. Although Officer Jones initially described her claim as based on "sexual orientation," in her internal MPD Form PD-42, her allegations raised sexual harassment from the beginning. Ex. 39, PD-42 Reports. On October 9, 2007, during her interview with MPD's Medical Services Division regarding her PD-42 form, Officer Jones reported "I've experienced sexual harassment since revealing my relationship with another officer. Our Sergeant has been making our work environment impossible." Ex. 51, Weeks Medical Services Division report on PD-42 Injury, Nov 5, 2007 at 2. OHR acknowledged that Officer Jones raised a sexual harassment claim and found *prima facie* evidence of sex harassment in its determination of probable cause. Ex. 25, Jones OHR Probable Cause Finding.

On October 15, 2007, the MPD EEO investigator Debbie Burt took Officer Jones's statement of her complaints of harassment and hostile work environment due to sex and sexual orientation

discrimination.   Ex. 30, Jones IAD Interview, Oct. 15, 2007; Ex. 13, Defendant Interrogatory

Responses, Answer 10.   Officer Weeks also gave a statement regarding the harassment she and

Officer Jones had suffered as a result of disclosing their relationship.  Ex. 38, Weeks IAD Interview,

Oct. 7, 2007.   MPD's EEO office never interviewed any other witnesses.  *Id.*

On November 19, 2007, MPD made a determination not to investigate Plaintiffs' complaints

of sexual orientation discrimination, sexual harassment, and a hostile work environment.  *Id.*  The

District has admitted that it conducted no investigation into these complaints.  *Id.*

       F.     <u>Officer Jones receives lowered performance appraisal after filing EEO complaint</u>

Officer Jones returned to duty on the day-work shift on November 26, 2007.  JSMFD ¶ J087;

DSUF ¶ 56; Ex. 11, Weeks Dep. at 201-02.   On her first day back at work, Sgt. Washington yelled

to Officer Jones on November 26, 2007, "[y]ou can feed the dogs but they will bite you."   Ex. 35,

Washington Dep. at 83-84.   Sgt. Washington admitted to making this comment to Officer Jones as

a way to respond to her EEO "reports" about him while she had been on stress leave.  *Id.* at 83-84.

Shortly thereafter, in December 2007, Officer Jones received notice of her FY2007

performance evaluations for the period October 2006 to September 2007.   Ex. 4, Jones FY2007

Performance Rating.   Sgt. Podorski was the rating official for the evaluation.   Ex. 6, MPD Internal

Memo on Plaintiffs' claims; Ex. 5, Weeks FY2007 Corrected Performance Rating.   After preparing

an initial rating on the "wrong form," Sgt. Podorski told Sgt. Jamison-Logan to complete Officer

Jones's performance evaluation for him, and to rate Officer Jones as "Meets Expectations."   Ex. 7

Jones Dep. at 208; Ex. 6, MPD Internal Memo on Plaintiffs' claims.   Sgt. Podorski never counseled

Officer Jones regarding her lowered performance rating, as required by MPD policy.   Ex. 7, Jones

Dep. at 208.   Officer Jones did not receive a copy of the evaluation by Sgt. Podorski, which

hindered her opportunity to grieve her performance rating and, in turn, become eligible for Detective status. Ex. 6, MPD Internal Memo on Plaintiffs' claims at MPD Jones000139. Sgt. Podorski did not deliver Officer Jones's rating to her in person. Officer Jones asked for a copy of her evaluation from Sgt. Mack, but was unable to get a copy until February 2008. Ex. 7, Jones Dep. at 213. This delay prevented Officer Jones from meeting the deadline within which to grieve her evaluation. *Id.* at 213.

The District conducted a review of Sgt. Podorski's evaluation of Officer Jones in December 2008, in responding to Plaintiffs' OHR charges. Ex. 6, MPD Internal Memo on Plaintiffs' claims. The MPD EEO office concluded that Sgt. Podorski misused his authority when he "devalued [Officer Jones's] work performance" by unjustifiably lowering her FY2007 evaluations. *Id.* at MPD Jones000141.

G.    Officer Jones Files Charge of Discrimination With OHR—March 2008

On March 31, 2008, Officer Jones timely filed a charge of discrimination with the D.C. Office of Human Rights ("OHR"). Officer Jones claimed she was subjected to a continuing hostile work environment based on her sexual orientation (lesbian), naming Sgt. Podorski and Sgt. Washington as harassing officials. Ex. 23, Jones OHR File Excerpts. On December 23, 2008, Officer Jones requested that OHR amend her complaint to include claims of gender discrimination, sexual harassment, and reprisal, and that her claims be cross-filed with the EEOC pursuant to OHR's Worksharing Agreement. *Id.* Officer Jones's amendments were processed by OHR in April 2009. *Id.* Officer Jones's gender discrimination complaint was also cross-filed with the U.S. Equal Employment Opportunity Commission. *Id.*

H.     Officer Jones harassed and retaliated against after filing EEO Complaints

Even after filing EEO complaints with MPD and OHR, Officer Jones continued to suffer harassment and differential treatment by her superiors.  In January 2008, Sgt. Washington made threatening comments to Officer Jones when he yelled, "Ya'll pulled that shit.  You jumped on the bandwagon with Weeks.  I always been straight with you.  That shit is fucked up.  You and your girl fucked up."  Ex. 46, Jones PD-119 report; Ex. 35, Washington Dep. at 84-85.  Sgt. Washington called Officer Jones "a dog" and admitted that these comments were in response to Officer Jones's EEO complaints against him to MPD: "we had always been friends, and then you go ahead and make some false allegations. Why?"  Ex. 35, Washington Dep. at 84-85.  Officer George Yong informed Officer Jones that "Sgt. Washington said he is about to start some shit."  Ex. 46, Jones PD-119 report.

Similarly, after filing her EEO complaints, Sgt. Podorski continued to refuse to sign off on routine paperwork when Officer Jones presented it to him.  For example, on February 19, 2008, Officer Jones asked Sgt. Podorski to sign a complaint.  Ex. 28 Weeks OHR Rebuttal Affidavit, Nov. 10, 2008 at 7; Ex. 23, Jones OHR charge at 5.  Sgt. Podorski refused to sign the form and threw it on the floor.  Ex. 7, Jones Dep. at 52; Ex. 28, Weeks OHR Rebuttal Affidavit, Nov. 10, 2008 at 7; Ex. 23, Jones OHR charge at 5.  Officer Alford Meyer witnessed the incident and commented to Officer Jones, "that was messed up."  Ex. 23, Jones OHR File Excerpts at 19.  On another occasion, on March 11, 2008, Sgt. Podorski again threw Officer Jones's paperwork on the floor while refusing to sign it.  *Id.*  Officer Jones noticed that other officers had no trouble getting forms signed by Sgt. Podorski, who was the check-off sergeant during Roll Call at the time.  *Id.*

In May 2008, Officer Jones complained to Commander Maupin that she had been unfairly separated from Officer Weeks when Maupin placed Officer Jones on the day-work shift, but placed Officer Weeks back on the midnight shift. *Id.* at OHR Charge Amendment. When Officer Jones complained to Commander Maupin about the switch, he retorted, "why do you two have to follow each other around?" and told Officer Jones, "you don't have to follow [Weeks] everywhere she goes." *Id*. at 73-74.

Also in May 2008, supervisors refused to allow Officer Jones to visit Officer Weeks in the hospital when Weeks was severely injured in an on-duty car crash. Ex. 11, Weeks Dep. at 205-211. When Officer Jones heard about the accident, she asked Sgt. LaFranchise if she could go to the hospital to visit her partner. Ex. 23 at OHR Charge Amendment pg. 2, and at Jones OHR Statement ¶15. Instead, he gave Officer Jones a detail and told her to go on duty. *Id.* Once the MPD GLU representatives became involved, Officer Jones obtained permission to visit Officer Weeks in the hospital. *Id.* at ¶15; Ex. 28, Weeks OHR Rebuttal Affidavit, Nov. 10, 2008; Ex. 11, Weeks Dep. at 205-11. MPD supervisors knew that Officer Jones was Officer Weeks's significant other, and that they lived together and shared a home. Ex. 11, Weeks Dep. at 210. Yet, Lt. Jannifer commented "why can't a Sergeant take Kenniss home? Why does Tonia have to take her home?" Ex. 23 at Jones OHR Statement ¶15.

I.   Retaliation and harassment continued during OHR investigation

Beginning in 2010, while the OHR investigation into Officer Jones's discrimination complaint was underway, Sgt. Levenberry, who had previously been friendly with Officer Jones, began harassing Officer Jones and retaliating against her for involving him in her OHR complaint. Sgt. Levenberry harassed Officer Jones about her requests to be assigned, or not be assigned, with

certain male 7D officers.  Ex. 47, Levenberry OHR emails.  Sgt. Levenberry even complained to

OHR about Officer Jones's "propensity to file EEO complaints" and accused her of playing the

"EEO complaint card."  *Id.*; Ex. 25, Jones OHR Probable Cause Finding.

> J.       OHR finds probable cause that Jones was subjected to sex harassment, sexual
>          harassment, sexual orientation harassment, and reprisal

After investigating Plaintiffs' charges of discrimination, on July 16, 2010, OHR issued a

Probable Cause Finding on Officer Jones's complaints of sex discrimination, sexual orientation

discrimination, and reprisal.  Ex. 25, Jones OHR Probable Cause Finding.  OHR found probable

cause that Officer Jones had established a claim of sexual harassment, hostile work environment

based on sexual orientation (lesbian), and reprisal.  *Id.*  After OHR closed Officer Jones's complaint

due to administrative convenience, this civil action ensued.

## II.    ARGUMENT[6]

The evidence establishes a harassing and retaliatory hostile work environment based on

Officer Jones's sex, sexual orientation, and protected EEO opposition and participation activity.  The

record is replete with genuine disputes of material fact and credibility determinations that must be

weighed by a jury.  Finally, the Court should grant Officer Jones an adverse inference as a result of

the District's clear failure to preserve relevant material evidence, for which it has already been

sanctioned.  For these reasons, the Court should deny the District's motion for summary judgment.

---

[6] Officer Jones hereby withdraws her claims of discriminatory non-promotion (Counts II, IV, VI, IX, and X).  Officer Jones continues to assert that the facts surrounding her non-promotion constitute evidence supporting a continued hostile work environment based on her sex, sexual orientation, and reprisal.

A.    Officer Jones's gender claims under Title VII and DCHRA are timely (Counts I, III, and V)

The District argues that Officer Jones's Title VII and DCHRA gender claims regarding her 2007 performance evaluation are time-barred because she did not file a discrimination claim based on gender until after April 2009, eighteen months after the performance evaluation.  This is incorrect.  First, Officer Jones did not receive a copy of her evaluation until February 2008.  Ex. 7, Jones Dep. at 212-213.  Officer Jones then sought to amend her OHR complaint to include gender in December 2008.  Ex. 23, Jones OHR File Excerpts at 3-6.  While OHR did not process the amendment until April 2009, Officer Jones timely amended her OHR complaint and cross-filed with the EEOC less than 12 months after receiving the evaluation, well within the statute of limitations period.[7]

Additionally, the District misses the mark in characterizing Officer Jones's disparate treatment claims based on gender as "discrete acts."  One avenue of relief available to Officer Jones would be for her to allege disparate treatment for discrete acts.  However, that is not the case here.  As the Supreme Court held in *National Railroad Passenger Corporation (AMTRAK) v. Morgan,* 536 U.S. 101, 120-21 (2002), in a hostile work environment complaint, such as in this case, where the allegation is one of an ongoing pattern of discrimination comprised of both discrete and non-discrete acts, acts that are otherwise time-barred can qualify as part of a hostile work environment claim if

---

[7]In December 2008, Officer Jones requested that her claims be cross-filed with the EEOC to include gender as a basis.  Given that the incidents comprising a hostile work environment are part of one unlawful employment practice, the employer may be liable for all acts that are part of this single claim. In order for the charge to be timely, the employee need only file a charge within 300 days of any act that is part of the hostile work environment.  *AMTRAK v. Morgan*, 536 U.S. 101, 118 (2002).  Three hundred days before December 2008 is February 2008, thus Officer Jones made various claims of sex-based discrimination and harassment within that 300-day timeframe.  Therefore, her Title VII claims are also timely.

they involve the same type of employment actions, occur relatively frequently, and are perpetrated

by the same managers.  *See also*, EEOC Compliance Manual, §2-IV.C (rev. July 2005).  Officer

Jones has alleged from the inception of her complaints that Sgt. Podorski and Sgt. Washington

subjected her (and Officer Weeks) to unwelcome and harassing treatment, unwelcome comments,

and tangible employment actions, including but not limited to a lowered performance rating, on the

basis of her sexual orientation and sex.   Ex. 23, Jones OHR File Excerpts at Charge of

Discrimination and Amendment.

   B. <u>Officer Jones was subjected to unwelcome harassment because she is female and was in a same-sex relationship</u>

   Officer Jones raises facts that establish *prima facie* cases of hostile work environment and

discrimination, because of sex (under Title VII and the DC Human Rights Act) and because of

sexual orientation (under the DC Human Rights Act).  The District argues that Officer Jones fails

to meet the standard for a hostile work environment either based on sex or sexual orientation

because the complained-of harassing behaviors were infrequent, merely uncivil, and otherwise

Officer Jones fails to show a workplace permeated with discriminatory intimidation, ridicule, and

insult that was severe or pervasive.  The District also argues that the personnel decisions of which

Officer Jones complains were legitimate and cannot stand as discrete acts of discrimination.  In

making this argument, the District attempts to artificially separate Officer Jones's allegations into

discrete claims, which is inappropriate in the context of a hostile work environment complaint.

*AMTRAK v. Morgan*, 536 U.S. 101, 120-21 (2002); *see also Lester v. Natsios*, 290 F. Supp. 2d 11,

33 (D.D.C. 2003) ("Discrete acts constituting discrimination or retaliation claims . . . are different

in kind from a hostile work environment claim that must be based on severe and pervasive

discriminatory intimidation or insult.").

To establish a *prima facie* case of a hostile work environment based on sex under Title VII, a plaintiff must demonstrate the following:

> (1) the employee was a member of a protected class; (2) the employee was subjected to unwelcome[] sexual harassment . . . ; (3) the harassment complained of was based upon sex; (4) the charged sexual harassment had the effect of unreasonably interfering with the plaintiff's work performance and creating an intimidating, hostile, or offensive working environment . . . ; and (5) the existence of *December 5, 2016 superior* liability.

*Davis v. Coastal Int'l Sec., Inc.*, 275 F.3d 1119, 1122-1123 (D.C. Cir. 2002) (quoting *Yeary v. Goodwill Indus.-Knoxville, Inc.*, 107 F.3d 443, 445 (6th Cir. 1997)).   The District Court has routinely acknowledged that hostile work environment claims under the D.C. Human Rights Act mirror those under Title VII.  *See, e.g., Title Lively v. Flexible Packaging Ass'n*, 830 A.2d 874, 887 (D.C. 2003); *Campbell-Crane & Assocs. v. Stamenkovic*, 44 A.3d 924, 933 (D.C. 2010) (defining hostile work environment under the DCHRA as "harassment . . . severe and pervasive enough to affect a term, condition, or privilege of employment.").

A plaintiff must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems*, 510 U.S. 17, 21 (1992) (citations omitted).  The issue of whether a work environment is hostile or abusive "can be determined only by looking at <u>all the circumstances</u>," including:

> the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.  The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive.  But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required.

*Harris v. Forklift Systems*, 510 U.S. 17, 23 (1992); *see also Faragher v. Boca Raton*, 524 U.S. 775, 787-88 (1998).  The severity of any particular incidents can counterbalance a lower degree of pervasiveness.  *Baloch v. Norton*, 355 F. Supp. 2d 246, 260 (D.D.C. 2005).  Very rarely will such fact-based determinations be appropriate for resolution on summary judgment.  *Armstrong v. Reno*, 172 F. Supp. 2d 11, 23-24 (D.D.C. 2001).  The District's argument is predicated on contending that individual factual instances raised by Officer Jones could not support discrete act claims, ignoring the nature of a totality of the circumstances analysis.

As argued below, Officer Jones was subjected to a pervasive discriminatory and harassing work environment on the basis of her sex—including her non-conformity with sex-stereotypes and sex harassment—her sexual orientation, and for her reporting the harassment.[8]  Often the harassment was of a very severe nature, including a supervisor shouting at Officer Jones and her partner, "do you want to fuck?" in front of many of her co-workers.  The severity and duration of the District's actions led to humiliation, a lowered performance rating, physical stress reactions requiring medical treatment and a loss of leave, and permanent dissolution of Officer Jones's relationship with Officer Weeks.

1.   The District subjected Officer Jones to severe and pervasive harassment because of her sex

Officer Jones is a member of a protected class under Title VII and DCHRA as she is female. The prohibition against discrimination based on sex under Title VII includes discrimination based

---

[8]In the context of race and color discrimination, the EEOC has long recognized that "[m]ultiple protected bases of discrimination can be raised by the same set of facts, both because negative stereotypes and biases may be directed at more than one protected basis at a time, and because certain protected bases overlap considerably."  EEOC Compliance Manual, Section 15: Race & Color Discrimination.  While this tenet is often addressed in the context of race claims that also raise related claims of color, ethnicity, or national origin discrimination, the same analysis applies to sex and sexual orientation claims, which, as discussed in detail below, are also overlapping.

on non-conformity with typical gender stereotypes. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989). When Congress said, "in forbidding employers to discriminate against individuals because of their sex," it "intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes." *Id.* (quoting *Los Angeles Dept. of Water and Power v. Manhart*, 435 U.S. 702, 707, n. 13 (1978)). While comments alone do not automatically prove that gender played a role in an employment decision, when those people giving input in employment decisions are the same people making the sex-based comments, the evidence of impermissible discrimination is stronger. *Id.* at 251-52.

Courts in this Circuit and across the country have recognized claims by lesbian and/or gay plaintiffs alleging gender discrimination under Title VII. Recently, in *Terveer v. Billington*, the District Court for the District of Columbia denied a motion to dismiss a complaint that alleged the defendant denied a gay employee promotions and created a hostile work environment because his "status as a homosexual male did not conform to the Defendant's gender stereotypes associated with men." 34 F. Supp. 3d 100, 116 (D.D.C. 2014) (Kollar-Kotelly, J.). The District Court for the District of Columbia also held in *Schroer v. Billington* that the Library of Congress's refusal to hire a woman because her appearance and background did not comport with the decision maker's sex stereotypes about how men and women should act and appear violated Title VII's prohibition on sex discrimination. 577 F. Supp. 2d 293, 308 (D.D.C. 2008) (Robertson, J.).

Several other district courts have reached similar conclusions. In *Boutillier v. Hartford Pub. Sch.*, the District Court allowed the claim of a lesbian teacher to go forward where the only evidence of gender non-conformity was the fact that she was openly married to a woman because "[c]onstrued most broadly, she has set forth a plausible claim she was discriminated against based on her

nonconforming gender behavior." No. 3:13cv1303, 2014 U.S. Dist. LEXIS 134919, at *4 (D. Conn.

Sep. 25, 2014). The District Court for the District of Massachusetts held as follows:

> Conceivably, a plaintiff who is perceived by his harassers as stereotypically masculine in every way except for his actual or perceived sexual orientation could maintain a Title VII cause of action alleging sexual harassment because of his sex due to his failure to conform with sexual stereotypes about what 'real' men do or don't do.

*Centola v. Potter*, 183 F. Supp. 2d 403, 410 (D. Mass. 2002). Other district courts that have held

similarly are growing in number. *See, e.g.*, *United States EEOC v. Scott Med. Health Ctr.*, No. 16-

225, 2016 U.S. Dist. LEXIS 153744, at *21 (W.D. Pa. Nov. 4, 2016) (holding that discrimination

on the basis of sexual orientation is subset of sexual stereotyping and thus covered by Title VII's

prohibitions on discrimination "because of sex."); *Videckis v. Pepperdine Univ.*, 150 F. Supp. 3d

1151, 1160 (C.D. Cal. Dec. 15, 2015) (holding "that sexual orientation discrimination is a form of

sex or gender discrimination . . . It is impossible to categorically separate 'sexual orientation

discrimination' from discrimination on the basis of sex or from gender stereotypes . . . Simply put,

to allege discrimination on the basis of sexuality is to state a Title IX claim on the basis of sex or

gender."); *Isaacs v. Felder*, 2015 WL 6560655 (M.D. Ala. Oct. 29, 2015) (explicitly rejecting

arguments that sexual orientation discrimination cannot be challenged under Title VII); *Hall v.

BNSF Ry. Co.*, 2014 WL 4719007 (W.D. Wash. Sept. 22, 2014) (denying employer's motion to

dismiss Title VII sex discrimination claim challenging employer's policy of providing health

insurance coverage for employees' married opposite-sex spouses but not same-sex spouses, finding

allegations were sufficient to allege discrimination based on sex); *Koren v. Ohio Bell Tel. Co.*, 2012

WL 3484825 (N.D. Ohio Aug. 14, 2012) (denying defendant's motion for summary judgment where

plaintiff alleged his supervisor discriminated against him based on sex stereotypes because he was

married to a man and took his husband's last name, holding "[t]hat is a claim of discrimination because of sex.").

A growing number of the United States Circuit Courts of Appeal are also in accord. *See*, *e.g.*, *Latta v. Otter*, 771 F.3d 456, 486 (9th Cir. Oct. 7, 2014) (Berzon, J., concurring) ("The notion underlying the Supreme Court's anti-stereotyping doctrine in both Fourteenth Amendment and Title VII cases is simple, but compelling: '[n]obody should be forced into a predetermined role on account of sex,' or punished for failing to conform to prescriptive expectations of what behavior is appropriate for one's gender."); *Muhammad v. Caterpillar Inc.*, 767 F.3d 694 (7th Cir. Sept. 9, 2014, *as amended on denial of rehearing*, Oct. 16, 2014) (in denying petition for review, Court removed language that had stated sexual orientation-related discrimination claims are not actionable under Title VII).

Under either Title VII or the DCHRA, Officer Jones has clearly set forth a *prima facie* case of sex discrimination based on sex-stereotyping and sex harassment (both of which are theories of sex-discrimination). After Officer Jones revealed her relationship with Officer Weeks to her superiors in September 2006, male Sergeants in 7D began mistreating her in ways they had not mistreated her previously. The mistreatment included comments by sergeants about how her behavior conflicted with their sex stereotypes about how women should act. This could not be more clear in Sgt. Washington calling Officer Jones "the butch one."

Sgt. Podorski's comments and behavior after he learned of Officer Jones's relationship indicate his disapproval of her non-conformity with his stereotype for how a woman should behave. His actions include his various attempts to break up Plaintiffs' relationship. Officer Jones testified that after learning of the relationship Sgt. Podorski became "upset" and "angry," Ex. 7, Jones Dep.

-26-

at 34-36, 227, and told Officer Jones that Officer Weeks was "a drama queen," a label he never applied to any other officer.  Ex. 2, Podorski Dep. at 35.  Also soon after he learned of their relationship, Sgt. Podorski told Officer Jones that Officer Weeks was "poison" in relationships, and that Officer Jones "shouldn't mess with" Officer Weeks.  Ex. 2, Podorski Dep. at 36-38 ; Ex. 7, Jones Dep. at 109-110.

The District argues that the incident during Bike Week in May 2007, when Sgt. Podorski yelled "do you want to fuck?" at Plaintiffs, should be discounted or considered in a vacuum because it occurred off-duty and in a social setting.  However, a hostile work environment claim need not rest solely on incidents that occurred while the plaintiff was physically at the workplace.  *Greer v. Paulson*, 505 F.3d 1306, 1314 (D.C. Cir. 2007) (joining five other circuits in "rejecting a *per se* rule against considering incidents alleged to have occurred while an employee was physically absent from the workplace").  A plaintiff can demonstrate that her employer's off-duty acts were work-related and collectively gave rise to a hostile environment.  *Peart v. Latham & Watkins LLP*, 985 F. Supp. 2d 72, 83 (D.D.C. 2013).  As Sgt. Branham noted, "[w]hether in South Carolina or in China, he's still [a] supervisor."  Ex. 3, Branham (Willis) Dep. at 94-95.  Sgt. Podorski made this crude proposition at an MPD social event, in front of dozens of Officer Jones's co-workers.  Officer Jones testified that it was "inappropriate," "sexual in nature," and "unprofessional."  Ex. 7, Jones Dep. at 46-48, 107.  Others who overheard him were angered to the extent that they were willing to "take care of" Sgt. Podorski on Plaintiffs' behalf.  *Id.* at 106.  Plaintiffs felt compelled to leave the event.  *Id.* at 105.

In December 2007, Sgt. Podorski evaluated Officer Jones for the period of October 2006 to September 2007.  Ex. 6, Vaughn-Roach memo to Newsham, Aug. 27, 2008.  While in years prior

-27-

Officer Jones was evaluated consistently as "Exceeds Expectations," Sgt. Podorski lowered her performance rating to "Meets Expectations" for FY2007. *Id.* at MPD000141. The District recognized that Sgt. Podorski misused his authority to "devalue" Officer Jones's work performance. *Id.*

These examples of the harassment based on Officer Jones's non-conformity with gender stereotypes establish that she was the subject of discrimination based on her sex. In light of the numerous disputed material facts, the District's motion for summary judgment cannot be granted.

2.      The District subjected Officer Jones to unwelcome harassment based on sexual orientation

Officer Jones is also part of a protected class under the DCHRA due to her sexual orientation and involvement in a same-sex relationship. D.C. Code §§ 2-1401 – 1402, *et seq.* It is unlawful under the D.C. Code for an employer to discriminate against any individual based on their sexual orientation, with respect to her compensation, terms, conditions, or privileges of employment. D.C. Code § 2-1402.11.

The harassment described in the section above was severe and pervasive enough to affect the terms, conditions, and privileges of Officer Jones's employment. Sgt. Podorski and Sgt. Washington made it clear to Officer Jones and other MPD officers that they were treating her differently specifically because she had entered into a same-sex relationship with Officer Weeks, whom they perceived to be a straight woman, and that their intention was to separate Officer Jones from Officer Weeks. As Officer Jones testified:

> I am a woman who's dating a woman who all the guys want to date and who are attracted to. And, yes, they started to retaliate because of that.

Ex. 7, Jones Dep. at 227.  Beyond Sgt. Podorski's comments to each Plaintiff, noted above, that one should end her relationship with the other because she is "poison," Ex. 2, Podorski Dep. at 36-38; Ex. 7, Jones Dep. at 109-110, he "started to separate [Plaintiffs] at work, said he didn't want [them] riding together . . .[and] made comments about the relationship at work that [Plaintiffs] didn't agree with."  Ex. 30, Jones IAD Interview October 2007 at 5.  Sgt. Podorski, and later Sgt. Washington, also accused Officer Jones of "malingering" when she would take leave at the same time as Officer Weeks.  *Id.* at 5-6.

Sgt. Branham also testified at length about how Sgt. Podorski and Sgt. Washington singled out Officer Jones for differential treatment specifically because she was in a lesbian relationship. Ex. 3, Branham (Willis) Dep. 16-17, 26-27, 29.  The District argues that Officer Jones was kept from riding with Officer Weeks as part of a legitimate need to manage employee staffing levels and employee assignments, and that the Plaintiffs did not have a right to ride together.  However, the sergeants made it clear that they refused to let Plaintiffs ride together and conspired to "get them" because "they were gay," and because Officer Weeks had chosen to date Officer Jones.  *Id.* at 26, 29.  Sgt. Branham  overheard either Sgt. Washington or Sgt. Podorski talking about how "they just didn't like . . . [Weeks and Jones] riding together or that they didn't like the fact that Officer Weeks was now in a homosexual relationship."  *Id.* at 16-17.  Sgt. Branham testified that while other sergeants didn't appear to have a problem with Plaintiffs' relationship, "for some reason, these two sergeants [Podorski and Washington] just never put them together."  *Id.* at 27.  Officer Jones does not argue that she had a right to ride with Officer Weeks, but that in this respect she was targeted for treatment different from others based on her sex and sexual orientation.

Other witnesses testified about how the sergeants mistreated Plaintiffs because they were in a lesbian relationship.  Lt. Rosenthal told the Office of Human Rights that during one conversation with Plaintiffs, "[they] informed her that [they were] not allowed to ride together with her partner and that everyone was upset that they were together."  Ex. 25, Jones Probable Cause Finding at 10.  Officer Jones also told OHR that she "and her partner requested to switch shifts because they felt that they were getting differential treatment," indicating supervisory knowledge that Plaintiffs were alleging discrimination by their supervisor.  *Id.*  Plaintiffs had several conversations with Lt. Rosenthal, including one in early 2007 where they told her that Sgt. Podorski was upset that Officers Weeks and Jones were dating and that as a result, Sgt. Podorski and others would not let them ride together or work together.  Ex. 29, Rosenthal Dep. at 41.

In November 2006, Sgt. Podorski succeeded in separating Officer Weeks from her partner by preventing Officer Jones from bidding during open season along with Officer Weeks for PSA 703, Sgt. Podorski's PSA.  Ex. 23, Jones OHR File Excerpts at 3.  Again, the District argues that this was not disparate treatment because Officer Jones does not put forward evidence to that effect.  To the contrary, as noted above, Sgt. Podorski expressed clearly that he intended to separate the Plaintiffs because of their same-sex relationship, and did so by preventing Officer Jones from bidding for the same PSA as Officer Jones.

The harassment related to Officer Jones engaging in a same-sex relationship increased in severity and pervasiveness in January 2007.  Sgt. Podorski began making unwarranted and public accusations that Plaintiffs were "unsafe" to work with.  Ex. 11, Weeks Dep. at 57; Ex. 2, Podorski Dep. at 44-46.  In January 2007, he posted a letter in 7D alleging that Plaintiffs had too many "Use of Force" complaints (UFIRs), were "unsafe" to work with, and had too many injuries.  Ex. 11,

Weeks Dep. at 85; Ex. 7, Jones Dep. at 59-61.  He further stated that he wanted Plaintiffs transferred to another PSA outside of 703.  Ex. 7, Jones Dep. at 61.  Sgt. Podorski admitted in his deposition that he told other sergeants that Plaintiffs were unsafe, including Sergeants Smallwood and Lafranchise.  Ex. 2, Podorski Dep. at 44-46.  He also told Lt. Larsen that Plaintiffs were unsafe and needed to be separated.  Ex. 21, Larsen Dep. at 28-30.

### 3.    Harassment unreasonably interfered with Officer Jones's work

As described above, Officer Jones's supervisors created a work environment pervaded by hostile and offensive comments, and improper personnel actions.  The District argues that the comments of sergeants and officers in 7D, including those by Officer Jones's supervisors Sgt. Podorski and Sgt. Washington, were merely "offhand comments made outside-of-work" or "infrequent uncivil behavior."  Def.'s Br. at 34-35.  The District also argues that the personnel actions taken by the very same supervising sergeants were "legitimate personnel decisions," not motivated by inappropriate discrimination.  Def.'s Br. at 34-35.  In any event, this is an astonishing argument in may respects, not the least of which being that the MPD itself found that Sgt. Podorski's lowering Officer Jones's performance appraisal was unjustified.  Review of the facts detailed above, with inferences resolved in favor of Officer Jones as the non-moving party, *Klock v. Miller & Long Co.*, 763 A.2d 1147, 1150 (D.C. 2000), establish that Officer Jones was subjected to an  abusive work environment that unreasonably interfered with her work.

The instances of abusive and harassing behavior paint a clear picture of a work environment that became pervaded by animus toward Officer Jones after she revealed her relationship with Officer Weeks.  Instead of treating Officer Jones like they had before, after she revealed she was in a relationship with another woman in September 2006, the men around Officer Jones treated her in

ways that unreasonably interfered with her work and created an intimidating, hostile, and offensive working environment. *See Davis v. Coastal Int'l Sec., Inc.*, 275 F.3d 1119, 1122-1123 (D.C. Cir. 2002). Whether based on her sex, or her sexual orientation, the treatment was "so objectively offensive as to alter the conditions of the victim's employment," *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998), to the extent that Officer Jones was forced to take stress leave in October 2007. JSMFD ¶¶ 81-88; DSUF ¶¶ 52-56.

**a.    The District improperly applies a disparate treatment analysis to Officer Jones's hostile work environment allegations**

The District seeks to improperly isolate and separate out the several personnel actions from the abusive comments and behaviors harassment, in an attempt to show that those employment actions do not stand alone as actionable discrete adverse actions. Def.'s Br. at 37-47. Yet, this reflects a serious misunderstanding of Officer Jones's claims. From the beginning, Officer Jones has asserted an ongoing harassing and hostile work environment. Any adverse personnel actions addressed in her claims were offered as evidence of the ongoing hostile work environment, not as discrete acts requiring multiple separate analyses under *McDonnell Douglas*. The *McDonnell Douglas* framework does not apply to hostile work environment claims. *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008) (applying *McDonnell Douglas* standard to substantive Title VII claim but totality of the circumstances standard to hostile work environment claim); *Akonji v. Unity Healthcare, Inc.*, 517 F. Supp. 2d 83, 97 (D.D.C. 2007) (applying *McDonnell Douglas* framework to disparate treatment claim but not to hostile work environment claim). Rather, a "totality of the circumstances" test applies to hostile work environment claims. *Baloch v. Norton*, 355 F. Supp. 2d 246, 259 (D.D.C. 2005) (citing cases suggesting that, on a motion for summary judgment of a hostile work environment claim, courts simply assess the totality of the circumstances).

-32-

In making its inapplicable disparate treatment arguments, the District contends that Officer Jones's DCHRA sexual orientation claims based on discrete incidents that occurred before October 3, 2007 are time-barred; that her DCHRA gender discrimination claims based on discrete incidents occurring before October 3, 2008 are time-barred; and that her Title VII gender discrimination claims based on discrete incidents occurring before June 5, 2008 are time-barred.  The District isolates individual facts that evince the hostile work environment, in an attempt to show that standing alone they do not support Officer Jones's claims.  Of course, these arguments ignore the fact that a hostile work environment claim is a continuing violation.  As noted in *AMTRAK v. Morgan*, if a single event that contributes to the hostile work environment occurs within the limitations period, the entire claim is timely.  536 U.S. 101, 117 (2002) ("Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.").

As noted by the Supreme Court in *Morgan*, discrete acts claims are different in kind from a hostile work environment claim that is based on severe and pervasive discriminatory intimidation or insult.  *AMTRAK v. Morgan*, 536 U.S. 101, 115-16 (2002).  The District relies on the analyses of discrete adverse actions in *Bryant v. Brownlee*, 265 F. Supp. 2d 52 (D.D.C. 2003), and *Lester v. Natsios*, 290 F. Supp. 2d 11, 27-30 (D.D.C. 2003), to address Officer Jones's allegations that several personnel actions were part of the hostile work environment.  The way in which the District relies on *Bryant* and *Lester* betrays its attempt to conflate the analyses of discrete acts of discrimination with the analysis of a hostile work environment claim, the latter of which the Court should conduct in this case.

The section of *Bryant* from which the District derives its argument is an analysis of alleged discrete acts of discrimination, not a hostile work environment claim.  The District asserts that the *Bryant* Court "found that these hostile work environment claims could not survive summary judgment, because the alleged adverse actions 'did not involve the type of objectively tangible harm that is necessary to constitute an adverse employment action.'" Dist. Mot. at 36, citing *Bryant*, 265 F. Supp. 2d at 60.  This quotes is actually from the opinion's analysis of discrete personnel actions and whether they could stand alone as claims of Title VII disparate treatment.  *Bryant*, 265 F. Supp. 2d at 59-62.  Notably, the *Bryant* Court evaluated the hostile work environment claim in a separate section.  *Id.* at 62.  While arriving at the conclusion that the defendant was entitled to summary judgment on the hostile work environment claim, the court conducted a different analysis.  The *Bryant* Court focused on the fact that only two isolated incidents among all of the allegations gave rise to an inference of Title VII discrimination, which is plainly not the case in the facts alleged by Officer Jones.

The District relies on *Lester* to further conflate the proper hostile work environment analysis with the improper discrete adverse employment action analysis.  *E.g.*, Def. Br. at 38, 39, 41.  Again, the District wholly misappropriates a quotation from *Lester* to support its claim that Officer Jones "had not 'carried her burden with respect to these miscellaneous alleged incidents of showing adverse employment actions for purposes of a *prima facie*' case of hostile work environment."  Def.'s Br. at 36.  The quoted material is, again, not from the court's analysis of Lester's hostile work environment claim, but instead from its discrete actions analysis.  *Lester*, 290 F. Supp. 2d at 30.

The proper analysis for this Court to conduct is to evaluate whether, when taken as a whole, the various personnel actions and the harassing comments and actions described in the sections

-34-

above unreasonably interfered with Officer Jones's work and created an intimidating, hostile, and offensive working environment based on her sex and/or sexual orientation. An analysis of the kind the District proposes—to evaluate each individual factual assertion for whether it could stand alone as a discrete disparate treatment claim—is inappropriate for a hostile work environment claim given that the facts should be all evaluated as part of the same employment practice. *Morgan*, 536 U.S. at 120.

> **b.      The District's actions were not legitimate but were pretext for illegal discrimination**

Notwithstanding that a disparate treatment analysis is inappropriate in this case, the District attempts to legitimize the discriminatory actions it took against Officer Jones. These reasons were neither legitimate nor does the evidence support the District's asserted "non-discriminatory" actions. Instead, the District's purported legitimate reasons reveal material disputes of fact that must be resolved by a jury.

First, the District argues that with regard to Officer Jones's allegations about her leave, that she exhausted her leave and that her supervisors were warranted in checking to ensure that she was not abusing leave policies. With regard to shift changes, details, and keeping Officer Jones from riding with Officer Weeks, the District asserts that non-discriminatory personnel management policies, such as "a body for a body," dictated such changes. The District also argues that it had legitimate reasons for the lowered performance evaluation Officer Jones received after she filed her EEO complaint. The evidence shows that the reasons offered by the District were not supported by legitimate policies or practices and were motivated by discrimination. Instead, MPD applied policies unevenly and selectively enforced them to harass Officer Jones and her partner.

> i.   *Officer Jones brings evidence of pretext concerning her leave allegations*

The District claims that Officer Jones has not proffered any evidence "that leave was denied or delayed for discriminatory reasons," and that as a result, she cannot support her claims of a hostile work environment based on facts related to her leave. This reflects the District's continued misunderstanding of Officer Jones's hostile work environment claims. First, Officer Jones has not alleged that she was denied leave by her supervisors. Rather, she has alleged that her leave, and that of her partner, was excessively scrutinized by her supervisors who were motivated by discriminatory intent. Officer Jones has also alleged that the harassment she and Officer Weeks suffered resulted in their taking "stress leave," known as Performance of Duty or "POD" leave, which was not properly credited to her. Additionally, Officer Jones alleges that on October 7, 2007, after attending a co-worker's wedding along with Officer Weeks and other MPD officers, Sgt. Washington improperly docked Officer Jones and her partner for an hour of leave that she did not request or use, despite the fact that she was not late, and despite the fact that heterosexual officers who returned to the station after Officer Jones were not charged leave. Officer Jones has put forth evidence that all of the incidents were characterized by discriminatory animus against her and her partner because of their same-sex relationship.

For example, Officers Jones and Weeks have both alleged as evidence of the illegal harassment that Sgts. Podorski and Washington routinely accused them of "malingering" when they took sick leave together. Ex. 30, Jones IAD Interview October 2007 at 5-6.; Ex. 38, Weeks IAD interview at 14. Sgt. Washington confirmed his belief that Plaintiffs were not really sick but were "malingering," making up a ridiculous story that they took a "lesbian cruise" with Rosie O'Donnell (a prominent gay celebrity) while on sick leave. Ex. 35, Washington Dep. at 125-27. This story

was, of course, false.  Ex. 11, Weeks Dep. at 202-204.[9]  The District wrongly asserts that alleging

supervisory scrutiny "does not constitute an adverse employment action" and therefore cannot

support Officer Jones's harassment claims.  Dist. Mot. at 38.  Officer Jones has not alleged that

excessive supervisory scrutiny of her leave constituted an "adverse employment action."  Rather,

she has alleged that those facts provide supporting evidence which, taken as part of the totality of

the circumstances with all other facts, support her claim of illegal harassment.  *See Baloch v.*

*Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008) (applying *McDonnell Douglas* standard to

substantive Title VII claim but totality of the circumstances standard to hostile work environment

claim).

      With respect to the non-POD determination, the District has already conceded that Officer

Jones's lost leave while on "stress leave"—approximately 265 hours—should have been restored

to her, and her LWOP status reversed.  Ex. 6, MPD Internal Memo on Plaintiffs' claims at

MPD000141.  This was because MPD's EEO office found that "the fact that Officer Weeks 265

hours have been restored (although as non POD) also supports management misconduct." *Id.*  Thus,

the District's argument at this stage that Officer Jones should not be entitled to a restoration of her

lost leave contradicts its own admission.  If anything, the District has created additional disputes of

material fact by challenging the conclusions of its own witnesses, and those disputes must be

decided by a jury.

———————————————

[9] Plaintiffs requested and received approved annual leave to take a vacation in 2007, prior to filing
their harassment complaints and requesting sick leave.  There is no dispute that Plaintiffs were
approved to take annual leave, and did take annual leave, for that period of time. Plaintiffs have
never asserted that they should have been granted any other kind of leave.  Notably, the trip did not
involve Rosie O'Donnell or a "lesbian cruise."

Finally, Officer Jones has offered proof of both differential treatment and pretext relating to the leave Sgt. Washington charged to Officer Jones and her partner.  Officer Jones proffered the names of two other officers—Andre Kimvalkani and Robin Simms—who arrived to work *after* Officers Jones and Weeks but were not docked *any* leave by Sgt. Washington.  Ex. 11, Weeks Dep. at 161-162; Ex. 40, Roll Call Sheets for Oct. 7, 2007.  Upon arriving at 7D, officers told Officers Jones and Weeks that before they had arrived, Sgt. Washington had left the tour for the day, yet he still docked them two hours of leave, even though they had only used one hour of leave and were not late to their shift.  They also learned from other officers that Sgt. Washington had been saying "he was going to get them" and that "he had something for them."  Ex. 39, PD-42 forms; Ex. 7, Jones Dep. at 186; Ex. 25, Jones OHR Probable Cause finding at 3.  The District has never offered any evidence to rebut these claims, and testimony from other managers corroborated that supervisors including Washington specifically targeted Officer Jones and Weeks because of their relationship.  Ex. 3, Branham (Willis) Dep. at 20, 26, 31-32, 37; Ex. 37, Branham OHR Statement; Ex. 25, Jones OHR Probable Cause Finding at 10 (citing to a female sergeant's testimony to OHR investigators).  Again, this incident, taken as part of the totality of the circumstances and other facts in the record, support Officer Jones's claims that she was subjected to illegal harassment on the basis of her sex and sexual orientation.

> ii.    *Officer Jones brings evidence of pretext concerning her shift changes*

The District argues that Plaintiffs' desire to ride in the same car together did not supersede its legitimate need to manage employee staffing levels and employee assignments.  Again, the District misunderstands the nature of Officer Jones's claims and ignores crucial evidence developed throughout the record.

While the District relies on the testimony of Commander Maupin and Sgt. Washington concerning alleged manpower limits and the need for a "body for body" policy, DSUF ¶ 19, the District ignores evidence in the record that these policies were selectively enforced against Plaintiffs. First, the "body for a body" policy is not an official MPD policy, and was not in the General Orders at the time. Ex. 11, Weeks Dep. at 128. In fact, prior to requesting shift changes to escape Sgt. Podorski's harassment, Officer Weeks and Officer Jones had never heard of such a policy. It was not until Plaintiffs were separated by Sgt. Podorski and they informed Commander Maupin that they wanted to switch shifts that they were told they could not do so without finding a "body for a body" to switch with them. For example, after Sgt. Podorski prevented Officer Jones from bidding on PSA 703, Officer Jones found another officer, Officer Courtney Flash, to switch PSAs with her. Ex. 23, Jones OHR File Excerpts at 13. However, Commander Maupin refused to allow Jones to switch PSAs, indicating that his "body for a body" policy was not the real reason for the denial. *Id.* Similarly, Officer Weeks testified that while Commander Maupin refused to allow Plaintiffs to switch shifts away from Sgt. Podorski in early 2007, another heterosexual officer, Tameka Moore, was permitted to switch her shifts without finding a "body for a body," again showing selective enforcement of this so-called policy. Ex. 11, Weeks Dep at 131-32. More importantly, an MPD practice on "manpower" limits does not override the District's separate obligations under Title VII and the DCHRA to promptly respond to, remedy and prevent complaints of harassment. Thus, despite the "body for a body" policy, MPD had independent obligations to remove Officer Jones from under Sgt. Podorski's supervision, or alternatively to grant Plaintiffs' requests for a shift change to remove them from the hostile work environment.

-39-

Additionally, with respect to Plaintiffs' supervisors refusing to allow them to ride in the same car together, as discussed at length above, Plaintiffs offered un-rebutted proof that many other heterosexual couples, and officers from different PSAs, were routinely allowed to ride in the same car together despite management's claim that Plaintiffs could not ride together. Again, if the District is now disputing this evidence, that is a question for the jury; such material disputes of fact involving similarly situated employees cannot be resolved on summary judgment.

> iii. *The District has long conceded that Sgt. Podorski lowering Jones's 2007 Performance Evaluation was unjustified misconduct*

Finally, the District claims it had legitimate reasons for Officer Jones's lowered FY2007 performance evaluations and her non-selection for the 2008 Detectives' Class. However, the District cannot make such claims in light of its own admission conceding that Sgt. Podorski lowering of Officer Jones's performance appraisals was due to "abuse of his position" and unjustified "management misconduct." Ex. 6, MPD Internal Memo on Plaintiffs' claims. In 2008, MPD's own EEO office examined Officer Jones's allegations and found, in part, that Sgt. Podorski misused his authority when he "devalued [Officer Jones's] work performance" by unjustifiably lowering her FY2007 evaluation. *Id.* at MPD Jones 000141. The District also found the fact that Sgt. Hunter changed Officer Weeks' rating indicated that the ratings were unjustified and referred to Sgt. Podorski's actions as "management misconduct." *Id.*[10] This constitutes a party admission. Fed. R. Evid. 801(d)(2). The District now ignores or denies this evidence that creates genuine disputes of

_____

[10]Notably, this was not the first time Sgt. Podorski was found to have engaged in supervisory misconduct with respect to Plaintiffs. In 2006, after an IAD investigation into Sgt. Podorski's unlawful order to Plaintiffs concerning the arrest of a gay teenage victim of abuse, Sgt. Podorski was suspended. Ex. 30, Transcript of Jones EEO interview, Oct. 15, 2007 at 6 (note, transcription of "Blue Unit" should read "GLU" unit); Ex. 31, Podorski IAD Discipline Final Investigative Report.

material fact concerning the legitimacy of Sgt. Podorski's conduct or misconduct, which must be decided by a jury.

Similarly, while Officer Jones has withdrawn her non-promotion claim for non-promotion to the 2008 Detectives' Class insofar as it asserts a discrete adverse action claim,[11] the facts surrounding Officer Jones's non-selection still provide evidence of pretext stemming from Sgt. Podorski's "management misconduct" in lowering her performance appraisal.  For example, Officer Jones testified that after learning of her low score on the 2008 Detectives' Exam, she spoke with an MPD official who told her "my evaluation had a lot to do with placement on the list.  That exceeds expectations goes higher than meet expectations." Ex. 7, Jones Dep. at 211.  The record concerning the 2008 Detective's exam and selection process indicates that Officer Jones's lowered performance appraisal was worth at least 10% of the overall weighted examination score. Dist. Ex. 13 (Dkt. 90-14), February 22, 2008 Circular (CIR-08-01)).  Thus, the November 2007 lowered performance rating—which the District conceded in 2008 was unjustified—was part of the 2008 Detective's selection process, and affected Officer Jones's ability to fairly compete in that process.  While Officer Jones is no longer asserting a discrete claim of non-selection regarding this process, the circumstances surrounding her non-selection serve as evidence that Sgt. Podorski's ongoing harassment of Officer Jones because of her relationship with Officer Weeks led to tangible employment actions.

    4.    <u>Officer Jones establishes vicarious liability</u>

As discussed, the evidence establishes a work environment of ongoing sex-based comments, including overt solicitations for sex from fellow officers including Officer Jones's own supervisor,

---

[11]See note 6, *supra*.

that began to define her work experience.  The record also reveals differential treatment with regard to performance appraisals, car assignments, shift assignments, and detail assignments.  Most importantly the evidence shows that it was Officer Jones's supervisors, Sgt. Podorski and Sgt. Washington, who took these employment actions that make the District vicariously liable.  An employer may be held vicariously liable for harassment by an employee who supervises a complainant.  *Vance v. Ball State*, No. 11-556,  570 U.S. ___ (2013), slip. op. at 6-7 (citing *Faragher v. Boca Raton*, 524 U. S. 775 (1998)).

Sgts. Podorski and Washington, Officer Jones's supervisors in 7D, took several actions for which the District can be held vicariously liable.  Most egregious was Sgt. Podorski unjustifiably lowering Officer Jones's FY2007 performance appraisal after learning of her same-sex relationship and her reports to management about his inappropriate behavior.  Ex. 6, Vaughn-Roach memo to Newsham Aug. 27, 2008.  The District acknowledged internally that Sgt. Podorski misused his authority in doing so.  *Id.* at MPD 141.  This is the kind of employment action that establishes vicarious liability.  The Supreme Court has found that such adverse actions could constitute "tangible employment actions," which open the employer to vicarious (and strict) liability for the supervisors' harassment.  *Vance*, slip. op. at 6-7 (actions causing "a significant change in benefits").  *See also* EEOC Enforcement Guidance on Recent Developments in Disparate Treatment Theory (July 14, 1992) (noting that evidence "that an adverse action was taken on the basis of stereotyped attitudes about the charging party's class would also constitute direct evidence of discrimination.")

Even without evidence of tangible employment actions, Officer Jones can still establish liability because the District cannot show that it took prompt remedial action to correct the harassment.  MPD's EEO policies are clear that sexual harassment is not to be tolerated.  Ex. 10,

General Order PER-201.09, Equal Employment Opportunity.  Officer Weeks testified that she told Sgt. Podorski to stop treating her in a harassing manner, but he did not.  Ex. 11, Weeks Dep. at 88.  When he refused, she and Officer Jones reported his behavior to Sgt. Levenberry and Sgt. Smallwood.  *Id.*  They, too, did nothing to protect Plaintiffs from the offensive and unlawful conduct, but advised Plaintiffs of their option to file an EEO complaint.  The Sergeants never reported the matter to their superiors, as is required by MPD's EEO policy, nor did they initiate an investigation into Sgt. Podorski's misconduct.  Ex. 10, General Order PER-201.09, Equal Employment Opportunity.  Further, when Plaintiffs reported Sgt. Podorski's behavior to Commander Maupin in March 2007, he admitted having done nothing, and assumed that was for the EEO office to handle, despite acknowledging that the General Orders required him and other supervisors to initiate an investigation into potential misconduct and report the matter to EEO upon learning of potential discrimination allegations.  Ex. 12, Maupin Dep. at 21, 23-26.

Orders required Commander Maupin and other supervisors to initiate an investigation into potential misconduct and report the matter to EEO upon learning of potential discrimination allegations.  *Id.* at 23-26.  Because of Commander Maupin's inaction, Plaintiffs were further subjected to overt sexual harassment by Sgt. Podorski,  Sgt. Washington, and others.  Defendants admittedly failed to respond promptly or reasonably to remedy Officer Jones's complaints regarding this ongoing hostile work environment.  In fact, the District was given the explicit opportunity to raise this defense, and chose not to do so.  *See* Nov 14, 2013 Order, Dkt. 43.  Instead the District conceded in open court that it took no action with regard to Plaintiffs' 2007 complaints—no investigation was conducted, no efforts were made to remedy the harassment aside from telling Plaintiffs to file an EEO complaint, and Commander Maupin informed Plaintiffs they would have

Case 1:11-cv-00215-RMC   Document 96   Filed 12/05/16   Page 47 of 61

to find their own way out of the hostile work environment via his "body for a body" policy. Ex. 13,

District's Amended Answers to Plaintiffs' Interrogatories at Response 10; Ex. 7, Jones Dep. at 128;

Ex. 11, Weeks Dep. at 126-128, 142.

C.  Officer Jones establishes a *prima facie* case of retaliatory hostile work environment (Counts VII and VIII)[12]

The District argues that because Officer Jones failed to establish a *prima facie* case of hostile

work environment that she also fails to establish a claim of retaliatory hostile work environment.

Def. Br. § IV.  The District also argues that, in the alternative, Officer Jones's retaliation and reprisal

claims fail because undisputed facts establish legitimate reasons for personnel decisions and there

are not any genuine disputes of material fact as to pretext.  To the contrary, the record shows how

Officer Jones was subjected to a hostile work environment that became even more abusive after she

complained of the treatment to her superiors.  Their comments came nearly immediately after

Officer Jones complained to her superiors, and included specific reference to her having engaged

in protected activity.  Officer Jones establishes a *prima facie* claim of retaliation under Title VII and

the DCHRA, and the District is not entitled to judgment as a matter of law on those claims.

Under Title VII an employer may not discriminate against an employee for opposing an

unlawful employment practice or making a charge or participating in an investigation, proceeding,

or hearing of a Title VII claim.  42 U.S.C. § 2000e-3(a).  Similarly, under the DCHRA, it is an

"unlawful discriminatory practice" to retaliate against a person for having "exercised or enjoyed,

or . . . aided or encouraged any other person in the exercise or enjoyment of any right granted or

---

[12] The Court previously entered judgment in favor of Defendant on Count VIII (Title VII- Reprisal-Hostile Work Environment and Harassment) of the Third Amended Complaint. Dkt. 89.  Because Defendant again argues on that Count in the Second Motion for Summary Judgment, Dkt. 90, Officer Weeks includes responsive argument here.

-44-

protected under [the DCHRA], or "because that person has opposed any [discriminatory] practice . . . or because that person has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing authorized under [the DCHRA]." D.C. Code 2001 §2-1402.61.

To establish a *prima facie* case of illegal retaliation under Title VII, a plaintiff must show that "(1) she engaged in statutorily protected activity; (2) her employer took an adverse personnel action against her; and (3) a causal connection exists between the two." *Carney v. Am. Univ.*, 151 F.3d 1090, 1095 (D.C. Cir. 1998)). The standard for retaliation claims under DCHRA mirrors standard under Title VII. *Id.* at 1095 (citing *Howard Univ. v. Green*, 652 A.2d 41, 45 (D.C. 1994)).

Title VII and the DCHRA have been interpreted to protect formal and informal complaint activities. The District of Columbia Court of Appeals has made clear:

> Protected activity need not take the form of a lawsuit or of a formal complaint to an enforcement agency such as the EEOC or the OHR. On the contrary, the protections of Title VII extend to an employee's informal complaints of discrimination to his or her superiors within the organization.

*Carter-Obayuwana v. Howard Univ.*, 764 A.2d 779, 790-91 (D.C. 2001). Officer Jones began engaging in protected activity in January 2007 when she began complaining to other supervising sergeants in 7D, not just when she filed her EEO complaint in October 2008.

A materially adverse action is one that might well have dissuaded a reasonable worker from making or supporting a charge of discrimination. *Smith v. Office of Human Rights*, 11-CV-1623 (D.C. Oct. 17, 2013) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). The United States Court of Appeals for the District of Columbia Circuit has acknowledged that "[a] threatening verbal statement, standing alone, might well constitute a materially adverse action." *Gaujacq v. EDF, Inc.*, 601 F.3d 565, 578 (D.C. Cir. 2010).

-45-

To establish causal connection a plaintiff may show that the employer had knowledge of the protected activity, and that the adverse personnel action took place shortly thereafter. *Mitchell v. Baldrige*, 759 F.2d 80, 86 (D.C. Cir. 1985). The rule of thumb for inferring causation is that, generally, any amount of time under three months between the protected activity and the adverse action will support an inference of causation on temporal proximity alone. *Hamilton v. Paulson*, 542 F. Supp.2d 37, 58 (D.D.C. 2008). The burden of establishing a *prima facie* case of retaliation is a minimal one. *Holcomb v. Powell*, 433 F.3d 889, 903 (2006). It is only required that the plaintiff present adequate facts to permit an inference of retaliatory motive. *Id.*

Officer Jones first complained to 7D supervising sergeants in January 2007. WSMFD ¶ W050; DSUF ¶ 102. After Officer Weeks told Sgt. Eric Levenberry and Sgt. Buddy Smallwood about Sgt. Podorski harassing her, including that he was not allowing her to ride with Officer Jones, both Plaintiffs complained to their lieutenant, Lt. Derek Larsen, later in January 2007. Ex. 7, Jones Dep. at 74. Officer Jones joined Officer Weeks in telling Lt. Larsen that they did not want to work with Sgt. Podorski anymore because he was treating them differently. *Id.* Plaintiffs requested reassignments away from Sgt. Podorski. *Id.* at 76. Lt. Larsen spoke with Sgt. Podorski about his behavior and indicated that it was unwelcome. Ex. 21, Larsen Dep. at 46. He also told Sgt. Podorski that Plaintiffs could file an EEO complaint given what they alleged. *Id.* at 46. However, Lt. Larsen did not take any further action to remedy the harassment. *Id.* at 30.

After learning of Officer Jones's complaints to other sergeants in 7D in January 2007, Sgt. Washington intensified his harassing behavior, including making comments that directly referred to her protected activities. He yelled at Officer Jones on November 26, 2007, her first day back at work from stress leave, "[y]ou can feed the dogs but they will bite you." Ex. 35, Washington Dep.

at 83-84.  Sgt. Washington admitted to making this comment and that this was his way of responding to Officer Jones's EEO reports.  *Id.* at 83-84.  In January 2008, Sgt. Washington made further threatening comments to Officer Jones when he yelled to Officer Jones, "Ya'll pulled that shit.  You jumped on the bandwagon with Weeks.  I always been straight with you.  That shit is fucked up.  You and your girl fucked up."  Ex. 46, Jones PD-119 report; Ex. 35, Washington Dep. at 84-85.  Sgt. Washington called Officer Jones "a dog" and admitted that this comment was also in response to her EEO complaints.  Ex. 35, Washington Dep. at 84-85.

In March 2007, Plaintiffs complained directly to Commander Maupin.  Ex. 11, Weeks Dep. at 137.  Plaintiffs had a meeting where they reported Sgt. Podorski's treatment.  *Id.* at 137-141.  They "told him about the ill treatment that Sergeant Podorski was giving [them] on day work," about Sgt. Podorski posting a UFIR letter on the 7D bulletin board, and about him preventing them from riding together.  *Id.* at 137, 139.

Plaintiffs also told Commander Maupin that heterosexual couples were allowed to ride together.  *Id.* at 141-42.  They "conveyed [to] Commander Maupin that Sergeant Podorski was creating a hostile work environment" and that they wanted to switch off day-work.  *Id.* at 142.  Despite these complaints, Commander Maupin told Plaintiffs that they could file an EEO complaint or find "body for a body" replacements but that it was "up to [them]" to resolve the matter.  *Id.* at 126-128, 142; Ex. 7, Jones Dep. at 128.  A "body for a body policy" was not in the General Orders.  Ex. 11, Weeks Dep. at 128.  This was a policy that Commander Maupin created and selectively enforced.  *Id.* at 133.

On October 7, 2007, Plaintiffs requested stress leave and filed PD-42 Injury or Illness forms describing the ongoing harassment.  Ex. 39, Plaintiffs' PD Form 42 Reports.  Commander

Maupin reviewed and signed off on Plaintiffs' harassment reports and their requests for stress leave. *Id.* While on stress leave, Plaintiffs initiated internal MPD EEO complaints. Ex. 41, Plaintiffs' internal MPD EEO complaints. On October 15, 2007, EEO investigator Debbie Burt took Officer Jones's statement of her complaints of harassment and hostile work environment due to sex and sexual orientation discrimination. Ex. 30, Jones IAD Interview, Oct. 15, 2007.

Officer Jones's supervising sergeants targeted her for harassment because of her complaints. Sgt. Podorski lowered Officer Jones's FY2007 performance appraisal without cause. Ex. 6, Vaughn-Roach memo to Newsham Aug. 27, 2008. The District acknowledged internally that Sgt. Podorski misused his authority in doing so, and that Officer Jones's performance evaluation should have been re-done by another official. *Id.* at MPD 141.

Commander Maupin also retaliated against Plaintiffs once he learned of their EEO activities. In May 2008, in the middle of a pay period, Commander Maupin inexplicably placed Officer Weeks on the midnight shift but kept Officer Jones on the day shift. When Plaintiffs complained to Maupin about the switch, he retorted, "why do you two have to follow each other around?" Ex. 23 at OHR Charge Amendment; Ex. 12, Maupin Dep. at 73. He also told Officer Jones, "you don't have to follow [Weeks] everywhere she goes." Ex. 12, Maupin Dep. at 74.

Other supervisors in 7D also retaliated against Officer Jones when they learned that OHR was investigating her charges of discrimination. In 2010, Sgt. Levenberry, who had previously been friendly with Plaintiffs, began retaliating against Officer Jones for involving him in her OHR complaint. Sgt. Levenberry harassed Officer Jones about her requests to be assigned, or not assigned, with certain 7D officers. Ex. 47, Levenberry emails; Ex. 32, Levenberry Dep. at 59. Sgt.

Levenberry revealed his animus towards Officer Jones in a series of emails to OHR investigator

Luisa Portillo, writing as follows:

> I am contacting you based on the questions you asked me relating to your Investigation and the <u>common knowledge that Officer Tonia Jones filed EEO complaints against her two previous supervisors</u>. I am Officer Tonia Jones' current supervisor.  It has been brought to my attention that Officer Jones is readying herself to file an EEO complaint against me.  Based on <u>her past history of filing EEO complaints</u> against her two previous supervisors I believe the assertion to be true and I am seeking guidance regarding this matter. It is my observation that when Officer Jones is given assignments to work with someone other than who she would like to work with <u>she pulls out the EEO complaint card against the supervisor</u>.

Ex. 47, Levenberry emails (emphasis added).  Sgt. Levenberry also complained to OHR about

Officer Jones's "propensity to file EEO complaints on her former supervisors." *Id.*  In reprisal for

involving him as a witness in her OHR complaint, Sgt. Levenberry admitted to OHR that he

documented Officer Jones's assignment requests in her interim performance appraisal, and that he

contacted MPD's Employee Assistance Program (EAP) to make them "aware of what was going on

with Officer Jones in her personal life," namely her recent split with her same-sex partner, Officer

Weeks.  *Id.*  Given the context of his communications to OHR, there could be no other motive but

retaliation for her protected activities.

On August 31, 2010, Officer Jones learned that her take home car was assigned to another

male officer and that Commander Maupin had refused to allow her a take-home car.  Ex. 7, Jones

Dep. at 150-157.  One official told Officer Jones that the Commander did not want her to have a car.

*Id.* at 154-155, 166.  On September 14, 2010, only after complaining about this differential treatment

in the course of proceedings at the D.C. Office of Human Rights ("OHR"), was Officer Jones re-

assigned a take-home car.  *Id.*

The facts of the hostile work environment detailed in the sections above were in part motivated by retaliatory animus for Officer Jones having reported the harassment to superiors. The Office of Human Rights conducted a comprehensive investigation into Plaintiffs' allegations. After considering the Plaintiffs' allegations and the District's response, interviewing witnesses with firsthand knowledge of the events and reviewing the available documentary evidence, OHR made factual findings that the District had engaged in discriminatory and retaliatory treatment of Plaintiffs and created a hostile work environment. Ex. 25, Jones OHR Probable Cause Finding at 15-17.

OHR also made a finding that Plaintiffs had established that they were retaliated against for reporting this harassment and filing both internal and external complaints of discrimination between January 2007 and March 2008. *Id.* at 16. OHR found that the District retaliated unfairly against Officer Jones when determining where to detail her, when the District attempted to separate Plaintiffs from each other, and counseled them unfairly. *Id.*

Officer Jones establishes a *prima facie* case of retaliation having reported harassment to superiors in 7D, then being subjected to a hostile work environment motivated in part by retaliatory animus. The District is not entitled to judgment as a matter of law as a jury could draw an inference on the matter of causation from the facts of the hostile work environment.

D.     The District's spoliation of evidence precludes summary judgment

Officer Jones is entitled to an adverse evidentiary inference with regard to relevant evidence that the District did not maintain, including PSS Log Books for times relevant to this case and relevant emails sent prior to July 2009. The District argues that Officer Jones is unable to meet the standard set forth by Federal Rule of Evidence 37(e), and that this issue has already been litigated. This is simply incorrect.

As a primary matter, contrary to the District's argument, this Court did not make a final

decision on the question of an adverse inference in the Order of October 24, 2014. Dkt. 70. In that

Order, the Court found that the District had violated the Court's discovery orders, and granted

Plaintiffs' motion for sanctions. The Court denied Plaintiffs' motion for an adverse inference (and

for default judgment), but did so *without prejudice*. *Id.* During the Status Conference on October

23, 2014, the Court reasoned as follows, indicating that the question remained open as to whether

Plaintiffs are entitled to an adverse inference based on spoliation:

> Now whether there were e-mails that would have assisted the
> plaintiffs case, the plaintiff hasn't yet actually shown. And perhaps
> commander, whatever his name is, e-mail will indicate that there
> were relevant e-mails and they might have a spoliation argument.
> They don't have it right now. They haven't shown enough.

The question of whether Plaintiffs are entitled to an adverse evidentiary inference remains for the

Court to decide. As discussed below, Officer Jones now brings specific evidence to show that the

District destroyed relevant and material evidence that would have supported her claims.

The Court should grant Officer Jones an adverse evidentiary inference against the District

given that she can show the following three elements: (1) the District had control over the evidence

and had an obligation to preserve it when it was destroyed or altered; (2) the District acted in bad

faith or negligence in not retaining the evidence; and (3) the evidence that was destroyed or altered

was materially relevant to Officer Jones's claims to the extent that a reasonable fact finder could

conclude that the lost evidence would have supported her claims. *See Bolger v. District of*

*Columbia*, 608 F. Supp. 2d 10, 30 (D.D.C. 2009) (citing *Mazloum v. District of Columbia Metro.*

*Police Dep't*, 530 F. Supp. 2d 282, 291 (D.D.C. 2008)).

Regardless of the update to Federal Rule of Evidence 37, the D.C. Circuit has established that, "a district court may impose issue-related sanctions whenever a preponderance of the evidence establishes that a party's misconduct has tainted the evidentiary resolution of the issue." *Shepherd v. ABC*, 62 F.3d 1469, 1478 (D.C. Cir. 1995). As to the requisite culpability, the D.C. Circuit has held that "non-accidental destruction supports a negative evidentiary inference." *See Talavera v. Shah*, 638 F.3d 303, 312 (D.C. Cir. 2011). The District Court for the District of Columbia has recognized that "the adverse inference doctrine embraces negligent (in addition to deliberate) destruction of evidence." *Mazloum*, 530 F. Supp. 2d at 292.

As discussed below, Officer Jones now makes a showing that the District did not retain material relevant evidence—the PSS Log Books and emails dated prior to 2009—that it had an obligation to retain those items, and that the District acted negligently in not doing so. Officer Jones is entitled to adverse evidentiary inferences on these issues, which precludes entry of summary judgment.

1.  PSS Log Books

Officer Jones is entitled to an evidentiary adverse inference against the District with regard to missing PSS Log Books. This Court ruled in the Order dated February 20, 2014, Dkt. 49, that the PSS Log Books in question were no longer discoverable, and that Plaintiffs retained the right to raise the issue of spoliation with regard to the log books. There is no dispute that the District had control over the PSS Log Books. This Court has found already that the PSS Log Books no longer exist as hard copies or electronically. *Id.*

The District has offered no reason for why it failed to retain the PSS Log Books or the electronic back-ups. Those books contain the leave usage, duty assignments, car assignments, PSA

assignments, and supervisory assignments for every tour of duty during the relevant time period in this case.  Ex. 22, PSS Log Book samples.  As early as March 2008, the District was on notice that Plaintiffs were bringing claims of discrimination that included claims that related to their assignment to different PSAs and whether they were allowed to ride in the same squad car.  *E.g.*, Ex. 23, Jones OHR Charge of Discrimination (alleging that she was not allowed to ride with Officer Weeks because their same-sex relationship, and that other officers were allowed to ride together despite not being in the same PSA).  As detailed in Plaintiffs' Reply in Support of their Motion for Sanctions, Dkt. 67, the District sent Plaintiffs' counsel on a wild goose chase to review the log books, only for the District to tell counsel that the books, for many of the relevant time frames, were "missing."  So too, the electronic backups of these logs, which the MPD is required to maintain under MPD General Order 201.23, Ex. 20, and which the District's own witnesses testified were created and maintained, were nowhere to be found.  The District's negligence in maintaining those records is sufficient to show the culpable state of mind to support an adverse inference.

The missing Log Books are relevant and material to Officer Jones's claims.  The Log Books for January-March 2007, August 2007-October 2007, January -April 2008 and September-October 2008 are missing and presumed destroyed.  Dkt. 49 (Order finding that log books no longer exist in hard copy or electronically).  Had the District produced these books for those time periods, Officer Jones could have obtained relevant and admissible information regarding their claims.  Specifically, they could have provided documented proof on myriad issues, including: refuting Sgt. Podorski's allegation that Plaintiffs were "unsafe" in January 2007; that Plaintiffs were not permitted to ride in the same car from January-March 2007; Officer Jones was prevented from bidding on PSA 703 in November 2006; car assignments and detail assignments on specific dates between August and

October 2007; other officers in different PSAs, and heterosexual couples, were permitted to ride together in the same car; when Plaintiffs shifted to the midnight tour under Sgt. Washington, as compared to other officers' assignments; when Plaintiffs were docked leave that male officers were not docked by Sgt. Washington on October 7, 2007; their stress and sick leave usage in October 2007, including that they properly used annual leave for a vacation during that time; and Sgt. Podorski and Sgt. Washington remained Plaintiffs' supervisors in 2008 even after they filed their internal EEO complaints of harassment and complained repeatedly to their supervisors.

A reasonable fact finder could easily determine that these were pieces of evidence that would have been crucial in supporting Officer Jones's claims.  For these reasons, Officer Jones is entitled to an adverse evidentiary inference with regard to the contents of the PSS Log Books, and thus the District is not entitled to judgment as a matter of law.

2.     Emails sent prior to July 2009

The District directly conceded that it destroyed emails sent prior to July 2009 in the affidavit it filed in connection with its opposition to Plaintiffs' motion for sanctions.  Specifically, the District asserted:

> Prior to July of 2009 . . . [b]ackup tapes were used to backup all email servers . . . on a [*sic*] daily, weekly and monthly intervals . . . .  These tapes were stored offsite for up to one year at which point they were put back in rotation.  Hence, *new data was written on the tapes which erased old data.*

Dckt. 66-1 at ¶¶ 6-8 (emphasis added).  The incidents at issue in this suit date back to 2006.  At the very latest, in March 2008, the District was on notice that Officer Jones was bringing claims of discrimination that included claims related to her supervisors, giving rise to a duty to retain emails relevant to their supervisory role.  *E.g.*, Ex. 23, Jones OHR Charge of Discrimination (alleging that

-54-

she was not allowed to ride with Officer Weeks because their same-sex relationship, and that other officers were allowed to ride together despite not being in the same PSA).  This Court approved email searches for several District employees reaching back to 2006.  Yet as the District concedes, while those emails would have been backed up and maintained for "up to a year," thereafter the backup tapes were reused and "new data was written on the tapes which erased old data."  Dckt. #66-1 at ¶¶ 6-8.  This negligence implicates the District in spoliating evidence.  *Gerlich v. Department of Justice*, 711 F.3d 161, 170 (D.C. Cir. 2014) ("The fact that the records were destroyed as part of the defendant's 'typical practice' was insufficient to overcome the duty to preserve them.").  The fact that the District destroyed emails sent prior to July 2009 gives rise to an adverse evidentiary inference.

The District destroyed emails that were relevant to the Officer Jones's claims.  As such, the District's spoliation demands the Court make an inference in Officer Jones's favor.  *See Talavera v. U.S. Agency for Int'l Dev.*, 638 F.3d 303, 311 (D.C. Cir. 2011) ("This court has recognized the negative evidentiary inference arising from spoliation of records.").  For example, Detective Weeks testified that when she was first in the Detectives' office in 2008, she "sent out an e-mail" requesting training from her supervisors, and that her supervisor sent an e-mail response ridiculing her. Ex. 11, Weeks Dep. at 227-30.  These emails could not be located in the District's ESI discovery production.  This evidence would have supported Week's claims of a hostile work environment.  Similarly, Officer Jones e-mailed Commander Maupin about her complaints, yet Commander Maupin could find no such emails in his search performed for OHR.  Ex. 14, Groomes email to Maupin re: Request for Documents and Litigation Hold, Dec. 9, 2010.  Sgt. Podorski also admitted that he "may have" sent or received e-mails about Plaintiffs' complaints.  Ex. 2, Podorski Dep. at 100.  Yet of the very

few emails produced for Sgt. Podorski by the District during the OHR investigation, most were from

2010.  Ex. 15, Sample of Podorski emails.  Only one email from March 3, 2008 was found from Sgt.

Podorski, in the District's September 6, 2014 production, referencing Officer Weeks's transfer back

to his PSA 703 in March 2008.  Ex. 16, Podorski email re: Reassignment of Officer Weeks, Mar.

24, 2008.  Of the total ESI production, very few emails were produced from Sgt. Podorski's account.

Ex. 17, Declaration of Jonathan Yu.

Given these circumstances, the District's destruction of evidence entitles Officer Jones to

an adverse evidentiary inference.  A reasonable jury could find, on this basis alone, in favor of

Officer Jones, thus the District is not entitled to judgment as a matter of law.

E.       The OHR Probable Cause Findings are admissible evidence of discrimination and
         reprisal that must go before a jury

Prior to initiating this action, Officer Jones obtained a Probable Cause finding of

discrimination, harassment, and reprisal from the D.C. Office of Human Rights. Ex. 25, Jones OHR

Probable Cause Finding.  OHR conducted a comprehensive investigation into Officer Jones's

allegations and found that the District had created a hostile work environment—derogatory

comments, disparate treatment in taking leave and receiving assignments, sexual advances and

requests for sexual acts, and blatant references to her sexual orientation, her same-sex relationship,

and her gender—and had engaged in discriminatory and retaliatory treatment of Officer Jones.  *Id.*

OHR determined that the harassment was not limited to on-duty treatment, but spilled over into

Department-sponsored social events, and was "frequent, pervasive, and offensive."  *Id.*  OHR's

findings and conclusions should be admitted into evidence, *see Ponce v. Billington*, 679 F.3d 840,

847 (D.C. Cir. 2012) (admissibility of administrative reports in discrimination cases left to discretion

of trial court based on strength of finding), and preclude summary judgment.

**III.     CONCLUSION**

For the foregoing reasons, Defendant's motion for summary judgment should be denied.  A

proposed order is attached.


Respectfully submitted,


_____/s/_____
Michael Kator (D.C. Bar No. 366936)
Juliette Niehuss (D.C. Bar No. 977316)
 KATOR, PARKS, WEISER & HARRIS, P.L.L.C.
1200 18th Street, N.W., Suite 1000
Washington, D.C. 20036
Phone: (202) 898-4800
Fax: (202) 289-1389
December 5, 2016          *Attorneys for Plaintiff Jones*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

TONIA L. JONES, *et al.*

        Plaintiffs,

    v.                                       Civil Action No. 11-00215 (RMC)

DISTRICT OF COLUMBIA,

        Defendant.

**[proposed] ORDER**

Upon consideration of the Defendant's second Motion for Summary Judgment, Plaintiffs'
Oppositions, Defendant's Reply, and the entire record, it is this ____day of _____,
2017, hereby:

ORDERED that Defendant's Motion for Summary Judgment is GRANTED IN PART,
and DENIED IN PART, and it is further

ORDERED that judgment is entered in favor of the District of Columbia on Counts II,
IV, VI, IX and X of the Third Amended Complaint, and it is further

ORDERED that the Defendant's Motion for Summary Judgment is DENIED with regard
to all remaining claims (Counts I, III, V, VII, VIII).

_____
Rosemary Collyer
Judge, United States District Court
for the District of Columbia