# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| TONIA L. JONES, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 11-215 (RMC) |
| | ) | |
| DISTRICT OF COLUMBIA, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

Tonia Jones and Kenniss Weeks were police officers and squad car partners in the Washington, D.C., Metropolitan Police Department (MPD) in the summer of 2006. Ms. Jones, who was known to her colleagues as a lesbian woman, began an intimate relationship with Ms. Weeks, who at the time was known to her colleagues as a heterosexual woman who had previously been married to a man. The unexpected relationship between the two women created a wave at MPD, and Ms. Jones and Ms. Weeks now allege that the ripples from that wave created a hostile work environment for them, in violation of Title VII and the D.C. Human Rights Act (DCHRA), for which they sue the District of Columbia (the District or D.C.) Both Plaintiffs allege that they were subjected to harassment and hostility on the basis of sexual orientation and sex, as well as retaliation for complaining. Because the claims all emanate from allegations related to Plaintiffs' lesbian relationship, and they have not raised a genuine issue of material fact as to harassment based on sex, the Court will grant D.C.'s motion for summary judgment as to Plaintiffs' sex discrimination claims under Title VII and DCHRA. However, because there are disputes of material fact concerning Plaintiffs' claims of a hostile work

environment due to their sexual orientation and retaliation for protected activities under

DCHRA, the Court will deny summary judgment on those claims.

## I. BACKGROUND

### A. Factual Background

#### 1. Plaintiffs' Romantic Relationship

Ms. Jones and Ms. Weeks are police officers of the D.C. Metropolitan Police

Department. Ms. Weeks has worked for MPD since 2000; she was assigned to the Seventh

District (7D), first as an officer, and later as an investigator and a detective, from September

2000 until December 2009. *See* Def.'s Statement of Undisputed Facts [Dkt. 90-1] ¶¶ 74-75, 153

(Def.'s Undisputed); Pl. Weeks's Statement of Material Facts in Dispute [Dkt. 93-1] ¶¶ W002-03

(Weeks Disputed).[1] Ms. Jones began working for MPD in 2001 and was assigned to 7D at all

relevant times except for a brief assignment in July 2010. *See* Def.'s Undisputed ¶¶ 2-3; Pl.

Jones's Statement of Material Facts in Dispute [Dkt. 96-1] ¶¶ J002-03 (Jones Disputed).

Prior to the fall of 2006, both Ms. Weeks and Ms. Jones were friends with

Sergeant Jonathan Podorski, the day-shift supervisor of Police Service Area (PSA) 703. *See*

Def.'s Undisputed ¶¶ 6, 78; Weeks Disputed ¶ W006; Jones Disputed ¶ J006.[2] Ms. Weeks

considered Sgt. Podorski a close friend; she had socialized at his home, he taught her how to play

---

[1] The Court draws its facts from Plaintiffs' Third Amended Complaint [Dkt. 26], the admissible evidence submitted by the parties, and Plaintiffs' disputed facts where appropriate, inasmuch as Plaintiffs are entitled to the benefit of any inferences to be drawn from the facts. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). By doing so, the Court makes no findings of credibility. Because Plaintiffs have had great difficulty tying their arguments to facts in the record, the Court belabors the citations for its findings.

[2] MPD divides the District of Columbia into Police Service Areas, or PSAs, which are defined geographical areas within each MPD District. Each MPD officer is responsible for management and patrol duties within her assigned PSA. *See* Def.'s Undisputed ¶ 17. Patrol officers bid for assignments to PSAs and to one of the shifts that cover each 24-hour period.

the guitar, and they had gone on group vacations together, along with other coworkers. *See* Def.'s Undisputed ¶ 79; Weeks Dep. [Dkt. 93-11] at 13, 22. During this time, Ms. Weeks also believed that Sgt. Podorski had romantic feelings for her. *See* Weeks Disputed ¶ W007. Ms. Jones and Sgt. Podorski also had a friendly relationship; they had socialized on several occasions and Ms. Jones considered Sgt. Podorski to be a "good guy, a friend." *See* Def.'s Undisputed ¶ 6; Jones Dep. [Dkt. 93-7] at 21. Prior to September 2006, people at MPD knew that Ms. Jones identified as a lesbian, but Ms. Weeks was known to her colleagues as a heterosexual woman. *See* Def.'s Undisputed ¶ 13. Ms. Weeks and Ms. Jones were assigned to ride together beginning in early 2006. *See* 3d Am. Compl. [Dkt. 26] ¶ 8.

In July 2006, Ms. Jones and Ms. Weeks began a romantic relationship. *See id.*; Def.'s Undisputed ¶¶ 4, 76. By September 2006, both were assigned to PSA 703, riding together as partners, and reporting to Sgt. Podorski. *See* Jones Dep. at 113. Ms. Jones testified that around that time, while on duty with Sgt. Podorski in an MPD scout car, she told him that she was dating another female officer. *See* Jones Dep. at 28-30. Sgt. Podorski did not react with anger or otherwise negatively at the time, although Ms. Jones says that "at some point he became angry." Jones Dep. at 37. Also in September 2006, both Plaintiffs together told Sgt. Podorski about their relationship. *See* Jones Dep. at 42-43; Weeks Dep. at 20-23. According to Ms. Weeks, Sgt. Podorski responded by telling Ms. Weeks "you let the kid come out and play," which she took to mean that she "let [her] emotions come out." Weeks Dep. at 24. Ms. Jones did not recall Sgt. Podorski's reaction during this joint conversation. *See* Jones Dep. at 43-44.

Ms. Jones and Ms. Weeks assert that Sgt. Podorski's behavior toward them changed after they informed him of their relationship. Shortly afterwards, Sgt. Podorski told Ms. Jones that Ms. Weeks was a "drama queen." Jones Dep. at 109-10; Podorski Dep. [93-2] at 33-

35.  In another conversation, Sgt. Podorski warned Ms. Jones that she "shouldn't mess with" Ms. Weeks, whom he called "poison."  Jones Dep. at 109; Podorski Dep. at 35.  Ms. Weeks alleges that Sgt. Podorski also told her that Ms. Jones was "poison."  Weeks Dep. at 91.

## 2.  Alleged Hostile Actions Related to Work Assignments

On September 24, 2006, Plaintiffs arrived at a domestic violence call where two family members were suspected of hitting and threatening a teenage family member with a knife. *See* Podorski IAD File Narrative Report [Dkt. 94-7] at 2 (Podorski IAD); Jones Dep. 120.[3] Plaintiffs talked with the teenager and determined that she had been attacked for telling her family that she was a lesbian.  *See* Podorski IAD at 5.  Sgt. Podorski ordered Plaintiffs not to arrest the two family members and to bring the teenager to a mental health facility for evaluation. *Id.* at 4-5.  Sgt. Podorski stated that he had prior experience with the teenager and knew she had mental health issues and was a runaway.  *See* Podorski Dep. at 53, 122-24.  Plaintiffs disagreed with his order, and called the MPD Gay and Lesbian Unit (GLU) to complain about it.  *See* Podorski IAD at 5.  Sgt. Brett Parsons of the GLU, along with another MPD officer, came to the scene, interviewed witnesses, and arrested the two family members.  *Id.*  Sgt. Podorski was subsequently referred to the U.S. Attorney's Office for "Failure to Make a Lawful Arrest," and cited by MPD's Internal Affairs Division (IAD) for Neglect of Duty.  *See* Podorski IAD Final Report [Dkt. 94-11] at 3.  Ms. Jones alleges that after these events on September 24, 2006, Sgt. Podorski prevented the Plaintiffs from riding together on a daily basis, even during periods when they were assigned to the same PSA.  *See* Jones Disputed ¶¶ J028-29.

---

[3] The District describes this incident as having taken place in October 2006, *see* Def.'s Undisputed ¶¶ 24, 95, but internal MPD files establish that September 24, 2006 is the correct date.  *See* Podorski IAD at 2.

In November 2006, Plaintiffs participated in the annual "open season" bidding process, in which MPD officers bid on different PSA assignments. *See* Jones OHR Complaint (Apr. 20, 2009), Jones OHR File [Dkt. 94-3] at 3. Both Plaintiffs had planned to bid for PSA 703, but Sgt. Podorski assigned Ms. Jones to be out on duty during bidding, and when she returned to the 7D office, PSA 703 was full. *See id.* As a result, Ms. Weeks bid on and was assigned to PSA 703, Ms. Jones was assigned to PSA 701, and Plaintiffs were unable to ride together as squad-car partners. *See id.* Ms. Jones alleges that Sgt. Podorski intentionally assigned her to be out on patrol during bidding in order to keep her and Ms. Weeks apart. *See id.*; *see also* Weeks OHR Rebuttal Affidavit (Nov. 10, 2008) [Dkt. 94-8] at 1.

Ms. Weeks also alleges that Sgt. Podorski "would call-in" to inquire about Plaintiffs' court appearances, which he would not do with other officers. *Id.* at 6.

In November 2006, Sgt. Podorski gave Ms. Jones a performance evaluation score of 28, representing "exceeds expectations," on her annual performance evaluation. Def.'s Undisputed ¶ 27.

In January 2007 Sgt. Podorski informed Plaintiffs that he believed they were unsafe riding together because they had too many Use of Force Incident Reports (UFIRs). *See* Podorski Dep. at 42-46. At some point that month, Sgt. Podorski posted a notice at 7D, stating that Ms. Jones, Ms. Weeks, and one other officer had too many UFIRs and experienced too many injuries at work. *See* Jones Dep. at 55-56; Weeks Dep. at 85. Plaintiffs allege that this posting was harassing because it was unusual and violated their privacy, and that the record does not support the District's contention that Sgt. Podorski separated Plaintiffs because of their UFIRs.

*See* Jones Opp'n at 33-34;[4] Jones Disputed ¶ J044; *see also* Jones Dep. at 58 (calling the posted notice an invasion of privacy); Weeks Dep. at 85 (asserting that the posting of the notice created a hostile work environment). Sgt. Podorski testified that he told other sergeants in 7D that Plaintiffs were overly aggressive when they worked together, but he did not recall "a specific incident" that "triggered" the notice posting. *See* Podorski Dep. at 45-46.

After the notice on excessive UFIRs was posted, Ms. Weeks told Sgts. Eric Levenberry and Buddy Smallwood that she believed Sgt. Podorski was being unfair. *See* Weeks Dep. at 63. According to Ms. Weeks, Sgt. Levenberry told her she could file a complaint with the District's Equal Employment Opportunity (EEO) Office, but warned her that if she did, Sgt. Podorski might tell people that Ms. Weeks had slept with him. *Id*. Sgt. Levenberry recalled the conversation but not how he advised Ms. Weeks. *See* Levenberry Dep. [Dkt. 94-12] at 19. Ms. Jones testified that, also in January 2007, she and Ms. Weeks together complained to Lt. Derek Larsen about Sgt. Podorski, telling Lt. Larsen that they did not want to work with Sgt. Podorski anymore because of the way he had been treating them. *See* Jones Dep. at 69, 72-79. There was apparently no immediate response; Lt. Larsen testified that he advised Plaintiffs several months later, in October 2007, that if they were having a problem with Sgt. Podorski they could file an EEO complaint. *See* Larsen Dep. [Dkt. 94-1] at 42-43. In February 2007, Plaintiffs also talked with Lt. Ashley Rosenthal, a former EEO counselor for 7D and trainer at the Police Academy, about Sgt. Podorski's allegedly harassing behavior; Plaintiffs allege that Lt. Rosenthal advised them to document their complaints but did not take further steps to address their concerns. *See* Weeks Dep. at 333; Rosenthal Dep. [Dkt. 97-9] at 59-62.

---

[4] Throughout this Opinion, citations to the parties' briefs refer to the page number provided by the Electronic Case Filing System, identified at the top of each page, and not to the page number at the bottom.

In March 2007, Ms. Jones began her new assignment in PSA 701. During this time, Sgt. Podorski was responsible for Roll Call assignments to scout cars, and Ms. Jones alleges that Sgt. Podorski routinely refused to assign her and Ms. Weeks to the same scout car, even though he would routinely assign other officers in heterosexual relationships to ride together. *See* Statement of Officer Tonia L. Jones, Jones OHR File at 68-74.[5] Also during March 2007, Plaintiffs met with Joel Maupin, Commander of 7D, to complain about Sgt. Podorski and to request that they both be transferred to the midnight shift to avoid his supervision. *See* Weeks Dep. at 137. CDR Maupin informed Plaintiffs that they could file an EEO complaint, but that he had a policy between open bids of agreeing to reassignments only with a "body-for-body" replacement; that is, a transferring officer had to find another officer to take her place. *See id.* at 136-37, 142; Jones Dep. at 127-28. CDR Maupin testified that the "body-for-body" requirement is standard procedure because of staffing limitations, *see* Maupin Dep. [Dkt. 93-12] at 31, while Plaintiffs contend that the "body-for-body" policy was not an official policy and was selectively enforced in a discriminatory way. *See* Weeks Dep. at 130-32 (Ms. Weeks describing her understanding that one other officer had been permitted to change her shift without a "body-for-body" replacement). Both Ms. Weeks and Ms. Jones were reassigned to the midnight shift later in 2007, in August and September, respectively, when each had found a replacement with whom to switch. *See* Weeks Dep. at 125-26.

---

[5] In only one of the curlicues in Plaintiffs' arguments, they complain that Sgt. Podorski contributed to a hostile work environment by preventing Ms. Jones from bidding on PSA 703 and thereby preventing Plaintiffs from riding together, *and*, after her assignment to PSA 701, by not permitting Plaintiffs to cross PSA boundaries to ride together.

### 3. Alleged Hostile Actions at Myrtle Beach Bike Week

Sgt. Yurell Washington was the supervisor in 7D on the midnight shift to whose supervision each Plaintiff voluntarily transferred in late summer 2007. *See* Weeks Disputed ¶ W010; Def.'s Undisputed ¶ 80. Before those transfers, in May 2007, Plaintiffs had traveled with Sgt. Washington and his girlfriend to Myrtle Beach, South Carolina, for an annual motorcycle rally (Bike Week). *See* Def.'s Undisputed ¶ 82; Weeks Disputed ¶ W012. During the several-hours-long drive, during which the travelers talked and, at various times, Plaintiffs openly kissed in the back seat, Sgt. Washington asked Ms. Weeks why she "switched to being with women," which Ms. Weeks alleges was invasive and harassing. Weeks Opp'n at 14; *see* Washington Dep. [Dkt. 94-15] at 77-79, 116-17. Sgt. Washington contends that the question came up naturally in conversation and that he had no hidden motive in asking it. *See* Washington Dep. at 77-78.

A number of MPD officers traveled to Myrtle Beach for "Bike Week" and during the vacation Plaintiffs stayed at a rental house with other officers including Sgts. Podorski and Washington. Jones Dep. at 102; *see also* Washington Dep. at 113. During a party one night at a different house, a clearly drunk Sgt. Podorski walked out onto the porch and yelled, "Do you want to f—k?" in front of a large group that included Plaintiffs. Jones Dep. at 46. That Sgt. Podorski asked this question is undisputed; there is a dispute as to whether he was seriously propositioning Ms. Weeks or both Plaintiffs, *see, e.g.*, Weeks Dep. at 118 ("I took it as him being serious."), or if the outburst was directed at no one in particular, *see* Def.'s Undisputed ¶ 118; Podorski Dep. at 66 ("I don't know if I was yelling at them or someone else in the house."). Ms. Jones testified that other officers at the party expressed their indignation to her about the Sergeant's conduct, although apparently none presented evidence in discovery. *See* Jones Dep.

at 106.  Ms. Jones also testified that she helped to restrain other officers from attacking Sgt.

Podorski.  *See id.* ("I was trying to stop other people from assaulting [Sgt. Podorski].").

Plaintiffs argue that their recollections of other officers' reactions after Sgt. Podorski's outburst

corroborates Ms. Jones's testimony that the outburst was directed at either Ms. Weeks or both

women.

### 4.   Alleged Hostile Actions by Sgt. Washington and Other Officers

After Ms. Weeks transferred to the midnight shift in August 2007, Sgt.

Washington suggested a couple of times that they ride their motorcycles to work together.

Weeks Dep. at 124 (recalling that Sgt. Washington invited her to ride their bikes "a couple

times"); Washington Dep. at 55 (recalling that he asked her once, in a casual, friendly manner).

Ms. Weeks now complains that she felt harassed by Sgt. Washington's offers to ride their

motorcycles to work together.

By mid-September 2007, Plaintiffs were both assigned to the midnight shift and

were again patrolling together.  During a patrol prior to September 19, Plaintiffs stopped an

automobile that had been reported stolen.  *See* Def.'s Undisputed ¶ 119; Washington Dep. at 53.

A woman who was a known prostitute was driving the car; after talking with her, Plaintiffs

accepted her word that the owner of the car (who had reported it stolen) had given her

permission to drive it.  *See* Def.'s Undisputed ¶ 120; Weeks Dep. at 151-53.  Plaintiffs reported

the encounter to Sgt. Washington, who ordered them to arrest the woman as a suspected car

thief.  Plaintiffs refused.  *See* Def.'s Undisputed ¶¶ 120-21; Washington Dep. at 53.  Sgt.

Washington became angry because Plaintiffs defied his direct orders, although he ultimately

agreed not to insist that they lock up the suspect.  *See* Weeks Dep. at 157.  Sgt. Washington

testified that Plaintiffs' insubordination during this incident, particularly Ms. Weeks's vocal

resistance to his orders, was "the last straw," and he determined to separate them. Washington Dep. at 54; *see also id.* at 55 (stating that Ms. Weeks resisted his orders vocally, while Ms. Jones was largely silent throughout the incident).[6]

Sgt. Washington separated Plaintiffs by assigning Ms. Weeks to the so-called "Marjorie Court detail," a temporary fixed-post assignment to provide protection to a fellow officer at his home, on September 19, 2007. *See* Def.'s Undisputed ¶ 124; Washington Dep. at 55, 80-81. During such a stint on October 5, 2007, Ms. Weeks arrested a suspect on an unrelated matter, but Sgt. Washington ordered her to return to her detail and assigned the arrest to another officer to process at the lock-up. Ms. Weeks charges that in doing so Sgt. Washington was treating her unfairly. *See* Weeks Internal Affairs Division Interview at 9-11 (Oct. 7, 2007) [Dkt. 94-18] (Weeks IAD Interview). Plaintiffs believe that Sgt. Washington assigned Ms. Weeks to the detail in order to separate Plaintiffs, and that his intent was punitive. Ms. Weeks alleges that another officer asked for the detail but Sgt. Washington refused because he was "saving" it for Ms. Weeks. Weeks OHR Complaint (Apr. 20, 2009), Weeks OHR File at 3 [Dkt. 94-4]; Weeks Dep. at 128; *see also* Washington Dep. at 60 (testifying that he did not recall telling anyone that he was "saving" the detail for Ms. Weeks).

Plaintiffs further allege that Sgt. Washington inappropriately referred to their sexual orientation. According to Ms. Weeks's testimony, Sgt. Washington's girlfriend told Ms. Weeks that he had described the women as "the butch one" (Ms. Jones) and "the femme one" (Ms. Weeks), which Ms. Weeks considered derogatory, harassing, and evidence of Sgt.

---

[6] Plaintiffs also argue that Sgt. Washington had a history of "bias against females." *See* Weeks Disputed ¶ W080; Washington Dep. at 88-89. Finding that the incidents cited by Plaintiffs had no connection to the workplace and are largely unproved, the Court finds the allegations irrelevant and inadmissible.

Washington's inappropriate focus on their sexual orientation. *See* Weeks Dep. at 95-97. Sgt. Washington testified that he did not recall using those terms, but that it was "a known impression" in 7D that Ms. Jones was "butch" and Ms. Weeks was "femme." Washington Dep. at 79. Plaintiffs also allege that Sgt. Washington frequently initiated frank discussions with Plaintiffs about his sexual attraction to other women, which Plaintiffs assert was unprofessional and which they believe Sgt. Washington would not have done with heterosexual female colleagues. *See* Weeks Disputed ¶ W097; Washington Dep. at 131-32.

Further, Plaintiffs complain that other MPD employees harassed them because of their sexual orientation. They allege that, in September 2007, they were standing together when Officer Stephen Pristoop, a colleague, offered $5,000 to Ms. Weeks to watch the couple have sex; Plaintiffs rejected the offer. *See* Def.'s Undisputed ¶ 135; Jones Dep. at 264-66. Officer Pristoop was later fired by MPD, due to unrelated inappropriate actions. *See* Def.'s Undisputed ¶ 138; Washington Dep. at 59-60. Ms. Jones alleges that Sgt. Buddy Smallwood asked her if he "could have a kiss," adding that Ms. Weeks would not find out. *See* Jones Dep. at 262. Ms. Weeks alleges that Officer William Chapman would frequently tell her that she should "go back" to men. 3d Am. Compl. [Dkt. 26] ¶ 18. There is no allegation that either Plaintiff reported any of these encounters to MPD at the time. *See, e.g.*, Weeks Dep. at 266 ("I can't remember if I told someone [about Officer Pristoop].").

### 5. Investigations of Ms. Weeks for Neglect of Duty and Absence

In September and October of 2007, Ms. Weeks was investigated, on Sgt. Washington's orders, for two separate incidents involving MPD's absence and leave policies. First, on September 26, 2007, Ms. Weeks was investigated for "neglect of duty" after allegedly leaving a squad car partner (not Ms. Jones) behind and neglecting to follow MPD procedures

after doing so. *See* Def.'s Undisputed ¶¶ 126-28; Washington Dep. at 626-3. Ms. Weeks disputes that she ever left a partner behind and contends that the charge was baseless. *See* Weeks Dep. at 176-78. She was never formally reprimanded for the alleged violation, and she does not know if anything came of it, but she argues that being written up contributed to a hostile work environment. She also states that the investigation remains in her 7D employment file as an "adverse action." *See id.*; Weeks Disputed ¶¶ W087-88.

Second, on October 3, 2007, Ms. Weeks called in sick but failed to check in with MPD's medical clinic upon returning to work as required by official policy; as a result, Sgt. Washington initiated an investigation into Ms. Weeks for being absent without leave (AWOL). *See* Weeks AWOL Investigation Memorandum (Feb. 27, 2008) [Dkt. 90-9]. Ms. Weeks admits that she failed to comply with existing policy (and was officially AWOL) but complains that Sgt. Washington checked in repeatedly with medical staff to ask if Ms. Weeks had reported to them, which Ms. Weeks contends was atypical and harassing. *See, e.g.*, Weeks Dep. at 192-93, 195. Ms. Weeks also contends that the AWOL investigation was untimely as it was not commenced until four days after the incident, and that she herself was not told about the AWOL charge for a year. *See* Weeks Disputed ¶ W091.

**6. Plaintiffs' Stress Leave**

On October 7, 2007, Ms. Weeks and Ms. Jones attended the wedding of two fellow officers. *See* Def.'s Undisputed ¶ 139; Weeks Disputed ¶ W102. Plaintiffs each requested one hour of leave, although MPD policy provided for short periods of personal leave in the form of two- or four-hour blocks. *See* Def.'s Undisputed ¶ 140; Weeks Disputed ¶ W102.

Upon arriving at work, Plaintiffs saw Sgt. Washington just leaving 7D.[7] They then found that he had marked them out for two hours. They allege that he had not marked other officers out for two hours, even though others may have been gone for as long as or longer than Plaintiffs. *See* Def.'s Undisputed ¶ 141; Weeks Disputed ¶ W105. The record is not clear as to whether Plaintiffs were late arriving on duty by an hour or slightly more, but Plaintiffs contend that clarity is unimportant because Sgt. Washington had already marked them out for two hours before he knew when they actually reported. *See* Weeks Dep. at 176; Jones Dep. at 144. Neither Plaintiff brought the mistake to the attention of Sgt. Washington or requested a correction to her leave records through typical channels, although each described the matter when they filed EEO charges with MPD's Internal Affairs Division later that month. *See* Def.'s Undisputed ¶ 142; Weeks Disputed ¶ W106.

Plaintiffs say that they became too stressed to work after Sgt. Washington marked them out for two hours for the wedding and decided to take stress leave. On October 8, 2007, both Plaintiffs filed formal stress complaints with MPD, alleging that their work environment was stressful because Sgt. Washington was discriminating against them based on "sexual preference." *See* Jones and Weeks PD-42 Documents (Oct. 7, 2007) [Dkt. 94-19] (PD-42 Documents). Both also reported physiological symptoms such as headaches and nausea due to ongoing harassment. *Id.* Plaintiffs immediately took time off due to stress and did not return to work until November 26, 2007. *See* Def.'s Undisputed ¶ 147; Weeks Dep. at 201-02. While on stress leave, both Plaintiffs filed EEO complaints with the Internal Affairs Division (IAD), alleging discrimination on the basis of sexual orientation and retaliation. Ms. Jones complained

---

[7] Because Plaintiffs were working the midnight shift, the Court interprets their allegations as meaning they asked to report for work at 1:00 a.m. after attending the wedding.

of such treatment by Sgt. Podorski, but not Sgt. Washington, and Ms. Weeks complained of such treatment by Sgt. Washington, but not Sgt. Podorski. Each Plaintiff was interviewed by EEO Counselor Debbie Burt. *See* Weeks IAD Interview; Jones IAD Interview (Oct. 15, 2007) [Dkt. 94-10].

Additionally while on stress leave, Plaintiffs took a preplanned, prepaid, one-week vacation to Puerto Vallarta, Mexico. *See* Def.'s Undisputed ¶¶ 145-46. The parties dispute whether Plaintiffs had remaining paid annual leave to cover their vacation or used paid stress leave. Plaintiffs admit that they had both exhausted their sick and annual leave at the time, *see* 3d Am. Compl. ¶ 70, but Ms. Weeks asserts that they both had received approval for the vacation prior to requesting stress leave, and that they used approximately 40 hours of annual leave and not stress leave for the vacation. *See* Weeks Disputed ¶ W113. In addition, Ms. Weeks alleges that MPD categorized her leave time incorrectly. *See id.* ¶ W115.

In November 2007, Sgt. Podorski gave Ms. Jones a performance evaluation rating of 26, or "meets expectations." This 2007 rating was two points lower than his evaluation of her in 2006. *See* Jones Annual Evaluation 2007 [Dkt. 90-11]. Sgt. Podorski initially gave Ms. Weeks a performance rating of 26 as well but that rating was raised to 28 ("exceeds expectations") by another sergeant in PSA 703, Sgt. Robert Hunter. *See* 3d Am. Compl. ¶ 99; Weeks Dep. at 213. Ms. Jones signed her evaluation on December 2, 2007, but was not given a copy. *See* Jones Dep. at 213. Ms. Jones did not grieve her evaluation because, she says, she had not received a copy and the evaluation was not in her personnel folder when she looked. *See id.* at 213-14. Ms. Jones received a copy of her 2006 evaluation on February 8, 2008. *See* Jones Copy, Jones Annual Evaluation 2007 (signed as having been "Received 2-8-08") [Dkt. 96-4].

Plaintiffs returned from stress leave on November 26, 2007. Ms. Jones complains that Sgt. Washington told her "[Y]ou can feed the dogs but they will bite you," which she interpreted as a threat related to her EEO charge. *See* Washington Dep. at 83-84. In January 2008, Sgt. Washington allegedly told Ms. Jones, "Y'all pulled that shit. You jumped on the band wagon with Weeks. I always been straight with you. That shit is f—ked up. You and your girl f—ked up." *See* Jones PD-119 Report (Jan. 22, 2008) [Dkt. 95-6]. After they returned from stress leave in December 2007, both Plaintiffs had been reassigned to PSA 705, where they were supervised by Lt. Rosenthal. *See* Jones Disputed ¶ J026; *see also* Rosenthal Dep. at 27-28 (confirming that she had supervised both Plaintiffs in PSA 705 around this time).

Ms. Jones alleges that Sgt. Podorski escalated his aggressive behavior toward her when, on March 11, 2008, she asked him to sign a routine report, and he threw the papers on the floor in anger and refused to sign. Another sergeant subsequently signed the papers. *See* Jones Dep. at 52-53. In May 2008, when Ms. Weeks was injured in an on-duty car accident, Ms. Jones complains that Sgt. (First Name Unknown) LaFranchise refused to grant Ms. Jones's request to leave work early to pick up Ms. Weeks from the hospital. *See* Jones OHR Complaint at 3 (Apr. 20, 2009); Statement of Officer Tonia L. Jones ¶ 15 (No. 08-206-DC(N)), Jones OHR File at 17. Plaintiffs also contend that during the same month CDR Maupin again split them up by assigning Ms. Weeks to the "midnight shifts," and that he told Ms. Jones she need not "follow" Ms. Weeks "everywhere she [goes]." Jones OHR Complaint (Apr. 20, 2009); *see also* Maupin Dep. at 74 (stating that he did not recall making this comment).

### 7. Detective Applications and Ms. Weeks's Move to 7D Detectives' Office

In the spring of 2008, both Plaintiffs were eligible for, and participated in, MPD's Investigator Qualifications and Selection Process. *See* Def.'s Undisputed ¶ 150. A total of 228

officers, including both Plaintiffs, were found to be eligible for 63 open positions. *Id.* ¶ 151. The candidates were all ranked and the 63 highest-ranking officers were promoted to Investigator, a precursor to becoming a Detective; the other names remained on the list to be awarded promotions as vacancies occurred in the order of the list. *See* Investigator Candidate Ranking List [Dkt. 90-15]. The ranking took into account multiple factors in determining each candidate's overall ranking. These included a written examination (20 percent), an interview with a panel (50 percent), and past performance evaluations (10 percent). *See* Jones Testing Results [Dkt. 90-17]; Weeks Testing Results [Dkt. 90-16]; Def.'s Mot. Summ. J. [Dkt. 90] at 22 (Mot.). At the end of the application process in October 2008, Ms. Weeks was ranked 16th and was selected to become an Investigator. Ms. Jones, however, was ranked 193rd and was not selected, as there were only 63 openings. *See* Investigator Candidate Ranking List. Although Ms. Jones contends that Sgt. Podorski's "meets expectations" performance evaluation in 2006 was the major factor in her ranking, the District maintains that Ms. Jones's overall low score— including her examination results and poor interview—was the determinative factor. *See* Jones Disputed ¶ J099; Def.'s Undisputed ¶ 63. Ms. Jones has withdrawn her allegations that MPD discriminated against her by failing to promote her to Investigator. *See* Jones Opp'n at 22 n.6 [Dkt. 96].

When Ms. Weeks was promoted to Investigator in October 2008, she ceased to work as a patrol officer. Instead, Ms. Weeks began to work in the 7D Detectives' Office as an Investigator. *See* MPD Investigator Selection for Criminal Investigations Division (Oct. 23, 2008) [Dkt. 95-2]. Ms. Weeks alleges that she continued to suffer a hostile work environment despite the change in work location and supervisors. She alleges that she was given less desirable assignments than those assigned to male colleagues, arrest warrants she initiated were

given to male colleagues for closure, and her cases were reassigned to male detectives. *See* Weeks Handwritten Notes [Dkt. 95-3] at 1-2. She complains that a superior asked her if she was "timid" and that she was "ridiculed" once when she requested training. Weeks Dep. at 259, 227. Ms. Weeks also complains that her supervisor, Sgt. Avis King, verbally counseled her for contacting a friend working in MPD's Homicide unit for help on a case and that Sgt. King then sent an email to all 7D detectives to condemn the practice of "going outside of this unit crying about not receiving assistance with cases" without following proper protocol, a practice Sgt. King called "cancerous." Avis King Email (Dec. 9, 2008) [Dkt. 95-4]. Later in December 2008, Ms. Weeks requested an hour of leave to attend a funeral service for a fallen police officer, but was denied leave by Sgt. King because there was a mandatory meeting. *See* Weeks Handwritten Notes at 2. Ms. Weeks complains that another sergeant counseled her for requesting leave. *Id.*

Further, Ms. Weeks alleges that, in February 2009 in the 7D Detectives' Office, she opened one of her desk drawers to find an unwrapped tampon, which she believes had been placed there to harass her. *See* Weeks Dep. at 249-51. Ms. Weeks reported the incident to her supervisors, and she complains that they did not initiate an investigation to identify the person who placed the tampon in the drawer. *See* Weeks Dep. at 249-51. The District maintains that the tampon incident is immaterial because Ms. Weeks fails to link it to "any supervisor action or inaction." *See* Def.'s Undisputed ¶ 155.

Ms. Weeks was promoted to Detective in October 2009 and transferred out of 7D in December 2009. *See* Weeks Transfer Email [Dkt. 95-9].

## B. Procedural Background

### 1. Plaintiffs' MPD and D.C. Administrative Complaints

Under D.C. regulations, an employee is entitled to a final interview with her EEO counselor, at which the employee must be given an "Exit Letter" informing her of the disposition of her EEO charge and of her right to file a complaint with the Director of the D.C. Office of Human Rights (OHR) within 15 days. *See* D.C. MUN. REGS. tit. 4 § 105.5-105.6. At her request, Ms. Weeks received such an Exit Letter on December 14, 2007; the document warned her that she had 15 days to file a complaint with OHR if she wished to pursue her charges. *See* Weeks Exit Letter [Dkt. 64-19]; *see also* Def.'s Undisputed ¶ 158. Despite the warning in the Exit Letter, Ms. Weeks waited until March 31, 2008, to file a complaint of discrimination with OHR alleging discrimination based on sexual orientation. Weeks OHR Complaint (Mar. 31, 2008). Ms. Jones did not ask for an Exit Letter and did not receive one until March 31, 2008. Jones Exit Letter [Dkt. 64-20]. Unlike Ms. Weeks, Ms. Jones promptly filed a sexual orientation-based complaint with OHR on the same day. *See* Jones OHR Complaint (Mar. 31, 2008), Jones OHR File at 1-2.

On December 23, 2008, Plaintiffs' counsel sent letters to MPD stating that both Plaintiffs wanted to amend their initial OHR Complaints to include gender discrimination, sexual harassment, and reprisal, but the letters did not include any sworn statements or charges from Plaintiffs themselves, and were, therefore, ineffective for the purpose. *See* Jones OHR File at 20; Weeks OHR File at 20. On April 1, 2009, Plaintiffs' counsel sent an email to OHR, attaching statements from Ms. Jones and Ms. Weeks in which they alleged discrimination on the basis of gender in addition to their earlier claims. *See* Juliette Niehuss Email (Apr. 1, 2009) [Dkt. 90-22]. The date on the signature line of each of Plaintiffs' amended OHR complaints is April 20, 2009,

*see* Weeks OHR Complaint (Apr. 20, 2009), Weeks OHR File at 4; Jones OHR Complaint (Apr. 20, 2009), Jones OHR File at 12, and the District concedes that April 1, 2009, the date of the email with Plaintiffs' statements attached, is the formal filing date of the amendments. *See, e.g.*, Mot. at 27 ("Plaintiff [Jones] did not file her EEOC complaint until April 1, 2009."); *see also id.* (citing the April 1, 2009 email as the record citation for Ms. Jones's filing of her amended OHR complaint). The complaints were cross-filed with the Washington Field Office of the Equal Employment Opportunity Commission (EEOC) as charges of sex discrimination under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*

Ms. Jones alleges that, several months later, Sgt. Levenberry emailed OHR investigators to tell them that Ms. Jones threatened EEO complaints whenever she did not get her way; Ms. Jones argues that Sgt. Levenberry sent these emails in retaliation for Ms. Jones having mentioned him in her OHR complaint. *See* Levenberry OHR Emails [Dkt. 95-7]. Sgt. Levenberry has testified that he was merely answering questions from OHR investigators concerning an EEO charge filed by Ms. Jones against him. *See* Levenberry Dep. at 52.

## 2.  Procedural History of the Present Action[8]

Plaintiffs filed this lawsuit on January 25, 2011. Complaint [Dkt. 1]. Their Third Amended Complaint, filed December 28, 2012, included thirteen counts. *See* 3d Am. Compl. [Dkt. 26]. This Court dismissed Plaintiffs' constitutional claims, Counts XI, XII, and XIII, on July 25, 2012. *See* 7/25/2012 Order [Dkt. 16].[9] The Court dismissed Counts VIII and X,

---

[8] The Court has previously considered its jurisdiction over all claims in this case, and found that the Court has jurisdiction. *See* 7/25/2012 Mem. Op. at 9 n.4 [Dkt. 15]; 5/19/2014 Mem. Op. at 6 [Dkt. 56].

[9] Plaintiffs repeated these already dismissed counts in their Third Amended Complaint in order to preserve their appeal rights. *See* 3d Am. Compl. at 1 n.1.

alleging retaliation in violation of Title VII, on June 30, 2016. 6/30/2016 Order [Dkt. 89]. In her

Opposition to Defendant's Second Motion for Summary Judgment, Ms. Jones withdrew her

claims based upon discriminatory non-promotion, Counts II, IV, VI, IX, and X. *See* Jones Opp'n

at 22 n.6.[10] Both Plaintiffs now advance a case of an alleged hostile work environment due to

their sexual preference and a retaliatory hostile work environment due to their protected

activities. They also allege a hostile work environment due to their sex. Remaining for decision

are: Count I, which alleges a hostile work environment in violation of DCHRA due to Plaintiffs'

sexual orientation; Count III, which alleges a hostile work environment in violation of DCHRA

on the basis of Plaintiffs' sex; Count V, which alleges a hostile work environment in violation of

Title VII on the basis of Plaintiffs' sex; and Count VII, which alleges a retaliatory hostile work

environment in violation of DCHRA due to Plaintiffs' protected activities. *See* 3d Am. Compl.

at 25-31.[11]

_____

[10] The Court interprets Ms. Jones's withdrawal of Counts II, IV, VI, and IX as notice of
voluntarily dismissal, and accordingly these claims will be dismissed with prejudice. As noted
previously, the Court had already dismissed Count X. *See* 6/30/2016 Order.

[11] Plaintiffs also argue that they are entitled to an adverse evidentiary inference—precluding
summary judgment—with regard to relevant evidence that the District failed to maintain,
namely, Patrol System (PSS) log books and relevant emails sent prior to July 2009. To warrant
an adverse inference, three elements must be satisfied: (1) the party having control over the
evidence must have had an obligation to preserve it at the time the evidence was destroyed or
altered; (2) the destruction or loss must have been accompanied by a "culpable state of mind";
and (3) the evidence that was destroyed or altered must have been "relevant" to, *i.e.*, supportive
of, the claims of the party that sought the discovery of the spoliated evidence. *Bolger v. D.C.*,
608 F. Supp. 2d 10, 30 (D.D.C. 2009). Plaintiffs argue that the PSS log books could have
supported their claims by providing evidence that officers in heterosexual relationships were
permitted to ride together while Plaintiffs were separated. The District counters that this
additional evidence would not be material or relevant to the claims at issue, notably because the
District concedes that other couples were not separated, while Plaintiffs were separated, albeit
for legitimate, non-discriminatory reasons. *See* Mot. 62-63. In light of the District's concession,
the Court finds that the missing log books would not be material to Plaintiff's claims and that
Plaintiffs have failed to show a "culpable state of mind." Plaintiffs further contend that the
District improperly destroyed MPD emails that were sent or received before July 2009. They
raise vague suggestions that the deleted emails might have provided additional evidence related

The Court advised the parties at a status conference on June 30, 2016, that supplemental briefing was required due to internal inconsistencies, lack of clarity, and the lack of record citations in Plantiffs' briefs. *See* 6/30/2016 Minute Entry; Tr. of Status Conference (June 30, 2016) [Dkt. 91]; 6/30/2016 Order (ordering supplemental briefing). The parties subsequently filed supplemental briefs, which are ripe for decision. The District filed a renewed motion for summary judgment. *See* Mot. Ms. Weeks and Ms. Jones filed separate briefs in opposition. *See* Weeks Opp'n to Def.'s 2d Mot. for Summ. J. [Dkt. 93] (Weeks Opp'n); Jones Opp'n to Def.'s 2d Mot. for Summ. J. [Dkt. 96] (Jones Opp'n). The District replied. Reply to Opp'n to 2d Mot. for Summ. J. [Dkt. 99] (Reply).

## II. LEGAL STANDARDS

### A. Motion for Summary Judgment

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it is capable of affecting the substantive outcome of the litigation. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if there is sufficient admissible evidence such that a reasonable jury could return a verdict for the non-moving party. *See Scott v. Harris*, 550 U.S. 372, 380 (2007).

The party moving for summary judgment bears the initial responsibility of identifying portions of the record which demonstrate the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); Fed. R. Civ. P.

---

to their claims. The District explains that its policy was to reuse tapes that stored old emails after one year, and that the emails were destroyed according to this established retention policy and not in bad faith. The Court concludes that Plaintiffs have failed to show a "culpable state of mind" or that the lost materials would have supported their case. The Court declines to make a finding of spoliation.

56(c)(1)(A) (providing that the movant may cite to "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials").  In response, the non-moving party must similarly designate specific facts in the record that reveal a genuine issue for trial.  *See Celotex*, 477 U.S. at 324.  On a motion for summary judgment, a court must analyze all facts and inferences in the light most favorable to the non-moving party.  *See Anderson*, 477 U.S. at 255.  However, to the extent the non-moving party relies on conclusory assertions offered without evidentiary support, such assertions do not establish a genuine issue for trial.  *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

**B.  Hostile Work Environment Under Title VII and DCHRA**

Title VII of the Civil Rights Act of 1964, as amended by the Equal Employment Opportunity Act of 1972 (Title VII), prohibits status-based discrimination in federal and D.C. workplaces.  42 U.S.C. § 2000e-16.  Title VII generally prohibits an employer, including specifically the District, from taking any "personnel action[]" based on an employee's race, color, religion, sex, or national origin.  *See* 42 U.S.C. § 2000e-16(a).  Title VII protects employees not only from discrete discriminatory acts, but also from a hostile work environment, that is, a workplace permeated by discriminatory harassment based on an employee's protected status.  To establish a hostile work environment, the employee must allege facts sufficient to demonstrate that the harassment is "sufficiently severe or pervasive to alter the conditions of the victim's employment":

> A plaintiff pleading a hostile work environment claim must show that he was exposed to "'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  To assess a claim of hostile work environment, the court considers "the frequency of the discriminatory conduct; its

severity; whether it is physically threatening or humiliating, or a
mere offensive utterance; and whether it unreasonably interferes
with an employee's work performance."

*Durant v. D.C. Gov't*, 875 F.3d 685, 700 (D.C. Cir. 2017) (quoting *Harris v. Forklift Sys., Inc.*,

510 U.S. 17, 21 (1993) 510 U.S. 17, 21, 23 (1993), and *Meritor Sav. Bank, FSB v. Vinson*, 477

U.S. 57, 65, 67 (1986)) (internal citations omitted).  There is no bright-line test for a hostile work

environment, and a plaintiff need not show psychological harm or any specific adverse

employment outcome.  *See Harris*, 510 U.S. at 23.  To make a prima facie Title VII hostile work

environment claim based on sex, the plaintiff employee must show:

(1) the employee was a member of a protected class; (2) the
employee was subjected to unwelcome[] sexual harassment []; (3)
the harassment complained of was based upon sex; (4) the charged
sexual harassment had the effect of unreasonably interfering with
the plaintiff's work performance and creating an intimidating,
hostile, or offensive working environment []; and (5) the existence
of respondeat superior liability.

*Davis v. Coastal Int'l Sec., Inc.*, 275 F.3d 1119, 1122-23 (D.C. Cir. 2002) (quoting *Yeary v.*

*Goodwill Indus.-Knoxville, Inc.*, 107 F.3d 443, 445 (6th Cir. 1997)).

Almost all of the legal tenets developed under Title VII are applied by D.C. courts

when applying the D.C. Human Rights Act.  *See Attakora v. D.C.*, 943 F. Supp. 2d 152, 157

(D.D.C. 2013) (citing *Am. Univ. v. D.C. Comm'n on Human Rights*, 598 A.2d 416, 422 (D.C.

1991) ("In deciding cases brought under [DCHRA], we follow the allocations of burdens and

order of proof prescribed for cases brought under Title VII of the Civil Rights Act of 1964.")).

In addition to sex, DCHRA establishes sexual orientation as a protected class.  *See* D.C. CODE

§ 2-1401.01 (stating the intent of DCHRA is to end "discrimination for any reason other than

that of individual merit, including, but not limited to . . . sexual orientation [or] gender identity or

expression").

DCHRA defines "sexual harassment" as a type of discrimination that encompasses hostile work environment claims. The D.C. Municipal Regulations define sexual harassment fairly broadly:

> Sexual harassment -- unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when the following occurs:
>
> (a) Submission to such conduct is made either explicitly or implicitly a term or condition of employment;
>
> (b) Submission to or rejection of such conduct by an employee is used as the basis for employment decisions affecting the employee; or
>
> (c) The conduct has the purpose or effect of unreasonably interfering with an employee's work performance or creating an intimidating, hostile, or offensive working environment.
>
> Sexual harassment may include, but is not limited to, verbal harassment or abuse, subtle pressure for sexual activity, patting or pinching, brushing against another employee's body, and demands for sexual favors.

D.C. MUN. REGS. tit. 4, § 199.1 (2010); *see also* D.C. Mayor's Order 2004-171 (Oct. 20, 2004) (summarizing the definition of sexual harassment under D.C. law and including as examples of sexual harassment that may contribute to a hostile work environment "sexually offensive comments or off-color language . . . belittling or demeaning to an individual or a group's sexuality or gender").[12]

A hostile work environment charge under DCHRA is subject to the same test as complaints of a hostile work environment under Title VII. *See Campbell-Crane & Assoc., Inc. v.*

---

[12] Mayor Anthony Williams issued the District's regulation on sexual harassment on October 20, 2004 (Mayor's Order 2004-171). Evidently it was re-adopted and re-posted by the Mayor's Office on October 7, 2011 and remains outstanding. *See* http://ohr.dc.gov/publication/dc-sexual-harassment-policy (last visited June 1, 2018).

*Stamenkovic*, 44 A.3d 924, 933 (D.C. 2012) ("The law is clear that to establish a claim of discrimination based on a hostile work environment under the DCHRA, a plaintiff must show: '(1) that he is a member of a protected class, (2) that he has been subjected to unwelcome harassment, (3) that the harassment was based on membership in a protected class, and (4) that the harassment is severe and pervasive enough to affect a term, condition, or privilege of employment.'") (emphasis omitted) (quoting *Daka, Inc. v. Breiner*, 711 A.2d 86, 92 (D.C. 1998)).

### C. Retaliation Under DCHRA

DCHRA specifies that it is an "unlawful discriminatory practice" to retaliate against an employee for having "exercised or enjoyed, or . . . aided or encouraged any other person in the exercise or enjoyment of any right granted or protected under [DCHRA]," or "because that person has opposed any [discriminatory] practice . . . or because that person has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing authorized under [DCHRA]." D.C. CODE § 2-1402.61(a)-(b).

To establish a prima facie case of retaliation under DCHRA, a plaintiff must demonstrate that: (1) she was engaged in protected activity; (2) the employer took a materially adverse employment action; and (3) there is a causal connection between the protected activity and the materially adverse action. *See Taylor v. D.C. Water & Sewer Auth.*, 957 A.2d 45, 54 (D.C. 2008); *see also Bryant v. D.C.*, 102 A.3d 264, 268 (D.C. 2014) (noting that the analysis for DCHRA retaliation is the same as for Title VII). In order for a factfinder to infer a causal connection between an employee's protected activity and an adverse action, there must be evidence that the employer was aware of the employee's protected activity. *See McFarland v. George Washington Univ.*, 935 A.2d 337, 357-58 (D.C. 2007).

The D.C. Circuit has recognized that a hostile work environment can be retaliatory, as Plaintiffs complain. *See, e.g.*, *Hussain v. Nicholson*, 435 F.3d 359, 366 (D.C. Cir. 2006) ("In this circuit, a hostile work environment can amount to retaliation under Title VII."); *see also Hammel v. Marsh USA Inc.*, 206 F. Supp. 3d 219, 240 (D.D.C. 2016) (denying summary judgment on alleged retaliatory hostile work environment under DCHRA).  To prevail on such a claim, the plaintiff must show that she was subjected to "discriminatory intimidation, ridicule, and insult' of such 'sever[ity] or pervasive[ness] [as] to alter the conditions of [her] employment and create an abusive working environment.'"  *Hussain* 435 F.3d at 366 (quoting *Harris*, 510 U.S. at 21-22).

### D.  Timeliness

Hostile work environment claims involve repeated, ongoing conduct that need not fully manifest in any single instance or on any particular day:  the facts alleged in support of the claim may be cumulative and may take place over an extended period of time.  A hostile work environment charge is timely so long as one of the acts contributing to the hostile work environment occurred within the applicable statute of limitations.  Moreover, additional hostile acts occurring later may be considered:

> Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.
>
> That act need not, however, be the last act. As long as the employer has engaged in enough activity to make out an actionable hostile environment claim, an unlawful employment practice has "occurred," even if it is still occurring.  Subsequent events, however, may still be part of the one hostile work environment claim and a charge may be filed at a later date and still encompass the whole.
>
> . . . . The statute does not separate individual acts that are part of the hostile environment claim from the whole for the purposes of timely filing and liability.  And the statute does not contain a requirement

> that the employee file a charge prior to 180 or 300 days "after" the
> single unlawful practice "occurred." Given, therefore, that the
> incidents constituting a hostile work environment are part of one
> unlawful employment practice, the employer may be liable for all
> acts that are part of this single claim.

*Nat'l Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 117-18 (2002) (footnotes omitted).

Any prior related conduct must, however, be "sufficiently related" to the activity that is not time-barred to be part of the same alleged hostile work environment practice. *McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 77 (2d Cir. 2010) (discussing *Morgan* and describing the assessment as "fact-specific and sensitive").

Title VII requires an employee to file an EEOC charge with that agency within 180 days from a discrete discriminatory act or within 300 days if the employee first files with a state or local agency tasked with handling Title VII violations, as happened here. *See* 42 U.S.C.A. § 2000e-5(e)(1); *see also Morgan*, 536 U.S. at 101-02 (applying Title VII's time-limitation provision to a hostile work environment claim). As this applies to a charge of a hostile work environment, at least one of the alleged acts constituting hostility must have occurred within the relevant timeframe.

Charges brought under DCHRA must be filed with OHR "within one year of the occurrence or discovery of the alleged act." D.C. CODE § 2-1403.16(a) (2001). In most instances, a D.C. employee must first "consult an EEO counselor within one hundred-eighty (180) days of the occurrence of the alleged unlawful discriminatory practice." D.C. MUN. REGS. tit. 4, § 105.1. The EEO counselor must seek a solution on an informal basis and, within 30 days, conduct a final interview with the complainant. *Id.* §§ 105.3(c), 105.4. Following the final interview, the EEO counselor must issue an Exit Letter constituting written notice that an employee must file a formal complaint with OHR within 15 days in order to pursue her charge

with OHR.  *Id.* §§ 105.5-105.6.  However, "a complaint of sexual harassment may be filed directly with OHR"—*i.e.*, an employee alleging a hostile work environment may bypass the internal EEO counseling and Exit Letter process.  *See id.* § 105.1.  Under D.C. law, a claim of a hostile work environment may be brought directly to OHR within one year of a timely alleged incident.  *See id.*

To bring an EEO lawsuit under DCHRA, a District employee must file "within one year of the unlawful discriminatory act, or the discovery thereof," which deadline is tolled for as long as a timely complaint is pending with OHR.  *See* D.C. CODE § 2-1403.16(a) ("The timely filing of a complaint with the Office, or under the administrative procedures established by the Mayor pursuant to § 2-1403.03, shall toll the running of the statute of limitations while the complaint is pending.").

## II.    ANALYSIS

### A.  Hostile Work Environment Based on Sexual Orientation

At the heart of this case are Plaintiffs' allegations that they were subjected to a hostile work environment on the basis of sexual orientation in violation of DCHRA.[13]  To the detriment of their allegations, Plaintiffs have adopted an "everything but the kitchen sink" litigation strategy, by which every perceived impropriety, trivial slight, or unwelcome management decision is alleged to have contributed to a hostile work environment.  The Court has spent an inordinate amount of time scrutinizing Plaintiffs' facts and attempting to impose

---

[13] Mses. Jones and Weeks have filed separate Statements of Material Facts in Dispute.  Weeks Disputed [Dkt. 93-1]; Jones Disputed [Dkt. 96-1].  Given the lengthy discovery process and a history of inaccuracies in this case, the Court relies on underlying documents in the record in assessing the allegations on summary judgment.

order on the parties' arguments with regard to which claims find support in the facts of record. *See* Tr. of Status Conference (June 30, 2016) at 2-3.

However, on summary judgment it is the moving party—the District—that bears the burden of demonstrating that no genuine issue of material fact exists as to each remaining Count. In this analysis, Plaintiffs are given the benefit of all reasonable inferences that may be derived from the facts and the Court assesses the totality of the circumstances to determine whether a claim is supported. *See, e.g.*, *Brooks v. Grundmann*, 748 F.3d 1273, 1276 (D.C. Cir. 2014) (noting that the strength of a plaintiff's hostile work environment claim is determined by the "totality of the circumstances") (quoting *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008)). Having considered all of the circumstances, the Court concludes that Plaintiffs' allegations are sufficient to raise a genuine issue of material fact as to their claim of a hostile work environment on the basis of sexual orientation. *Anderson*, 477 U.S. at 249-50.

### 1. Timeliness

Ms. Weeks filed her first OHR complaint on March 31, 2008; in it, she alleged harassment on the basis of sexual orientation in violation of DCHRA, including the following allegations in her written statement:

> DISPARATE TREATMENT
> In early 2007, I began a relationship with another officer (lesbian). From March 2007 thru present, when my Sergeant (SGT) was informed of our relationship, my partner and I was [*sic*] not allowed to ride together as other officers (heterosexual) who were involved in relationships were allowed to. The department tried to say that we could not ride together because we were assigned to different Patrol Service Area (PSA); however other officers (heterosexual) who were also assigned to different PSA's [*sic*] were allowed to ride together.
>
> HARASSMENT
> From early 2007 thru present, two SGTs (heterosexual) have made remarks about my partner and me, in regards to our relationship

> (lesbian), and also threatened me with disciplinary write ups. My SGT (heterosexual) made comments regarding my relationship with other officers and officials.
>
> Since I began working for the Department, I have always received "Exceeds Expectations" ratings for my performance evaluation. However, in February 2008, I received an "Average" rating on my evaluation, which was performed by a SGT (heterosexual) who was not my direct supervisor.

Weeks OHR Complaint (Mar. 31, 2008).[14] The Court interprets Ms. Weeks's complaint of harassment to raise a claim of hostile work environment. Because DCHRA provides that such complaints may be brought within one year of the latest alleged behavior, Ms. Weeks's OHR complaint was timely if any of the alleged harassing incidents of which she complains occurred on or after March 30, 2007. *See* D.C. MUN. REGS. tit. 4, § 105.1. Ms. Weeks alleged that her sergeant (presumably Sgt. Podorski, who was her sergeant until August 2007) did not allow her and Ms. Jones to ride together "[f]rom March 2007 thru present," even though "other officers (heterosexual) who were involved in relationships were allowed to" ride together, including some who were "assigned to different PSA's [*sic*]." Weeks OHR Complaint (Mar. 31, 2008). Ms. Weeks also alleged that, [f]rom early 2007 thru present, two SGTs," presumably Sgts. Podorski and Washington, "have made remarks about my partner and me, in regards to our relationship (lesbian), and also threatened me with disciplinary write ups." *Id.* Ms. Weeks also mentioned her lowered November 2007 performance rating, which she claimed to have received

---

[14] The parties' briefs and record documents confirm that Ms. Weeks's OHR complaint misstated the date of her performance evaluation, which occurred in November 2007.

in February 2008, and which she alleged was an harassing incident motivated by Sgt. Podorski's disapproval of Plaintiffs' relationship. *See id.*

The District challenges the timeliness of Ms. Weeks's OHR complaint. The District argues that "[a]ny sexual orientation claims based on discrete incidents occurring before October 3, 2007 are time-barred," because that date is 180 days before March 31, 2008, when Ms. Weeks filed her OHR complaint. *See* Mot. at 55-56. This argument is based on the D.C. Code requirement that a claim of discrimination under DCHRA is timely only if the claimant first consults with an EEO counselor within 180 days of a discriminating incident. *Id.* Ms. Weeks counters that, as to her hostile environment complaint, the statute of limitations is one year, not 180 days, *see* D.C. MUN. REGS. tit. 4 § 105.1, and because her complaint is based on a theory of a hostile work environment, *i.e.*, "HARASSMENT," she need only have alleged one incident contributing to ongoing illegal hostility within the relevant time period.

The Court finds that Ms. Weeks's March 31, 2008 complaint to OHR raised a timely claim of a hostile work environment based on sexual orientation, sex, and retaliation under DCHRA (Counts I, III and VII). That complaint included a subsection titled "HARASSMENT" in which Ms. Weeks alleged "remarks" by Sgts. Podorski and Washington about her relationship with Ms. Jones and threatening disciplinary write-ups, as well as her temporarily lowered performance rating. *See* Weeks OHR Complaint (Mar. 31, 2008). Harassment based on an employee's protected status—here, sexual orientation, sex, and protected activity under DCHRA—is a descriptor of a hostile work environment which is shown by a series of ongoing events that are sufficiently severe and pervasive to interfere unreasonably with an employee's work performance. A number of Ms. Weeks's allegations occurred within the one-year time frame. *See Brooks*, 748 F.3d at 1278 ("'[A] plaintiff may not combine discrete

acts to form a hostile work environment claim without meeting the required hostile work environment standard,' but a hostile work environment claim is not rendered invalid 'merely because it contains discrete acts that the plaintiff claims (correctly or incorrectly) are actionable on their own.'") (quoting *Baird v. Gotbaum*, 662 F.3d 1246, 1252 (D.C. Cir. 2011)).  Moreover, the District's argument about the timeliness of allegations based on "discrete" acts simply does not apply to the hostile work environment claims at bar.  *See, e.g.*, *Baird*, 662 F.3d at 1251-52 ("[T]he district court erred to the extent that it categorically excluded [plaintiff's] time-barred complaints in considering the hostile work environment claim, thus failing to employ the *Morgan* analysis, including, of course, a determination of which acts exhibit the relationship necessary to be considered 'part of the same actionable hostile environment claim.'") (quoting *Morgan*, 536 U.S. at 103).

The District also argues that Ms. Weeks failed to file her original OHR complaint (March 31, 2008) within 15 days of receiving her Exit Letter (December 14, 2007) so that all of her DCHRA claims should be dismissed.  DCHRA provides that "timely filing of a complaint with [OHR] shall toll the running of the statute of limitations while the complaint is pending." D.C. CODE § 2-1403.16(a).  The District is correct concerning any claims by Ms. Weeks that were not based on an alleged hostile work environment.  As to her allegations of a hostile work environment, due either to her sexual orientation, sex, or in retaliation for her protected activity, her complaint is timely under D.C. law.

Although a closer question, the Court is not persuaded by the District's further argument that Ms. Weeks failed to raise an adequate claim of a hostile work environment.  The District argues that the initial OHR complaint filed by Ms. Weeks "clearly alleged *sexual orientation* discrimination" but not a hostile work environment.  Reply at 3-4.  However, as

stated above, the Court interprets Ms. Weeks's OHR complaint—alleging harassment through "remarks" by Sgts. Podorski and Washington about her relationship with Ms. Jones, threatening discipline, and a lowered evaluation score—as advancing a claim of a hostile work environment. Ongoing harassment due to protected status is exactly what may be sufficiently severe so as to constitute a hostile work environment that intrudes on an employee's ability to work.

Ms. Jones also filed her original OHR complaint on March 31, 2008, describing similar allegedly hostile acts, including the incident in which Sgt. Podorski allegedly refused to sign Ms. Jones's report and threw it on the ground in anger. *See* Jones OHR Complaint (Mar. 31, 2008). As did Ms. Weeks, Ms. Jones included a section entitled "HARASSMENT." Ms. Jones filed her OHR Complaint almost immediately after receiving her Exit Letter, *see* Jones Exit Letter (Mar. 28, 2008). Some of the allegedly ongoing behaviors took place during the one-year period before that filing with OHR. Therefore, Ms. Jones timely complained of a hostile work environment due to her sexual orientation, sex, and/or retaliation for protected activities under DCHRA.

### 2. Merits

At this point in this litigation, Plaintiffs allege that they experienced a hostile work environment on the basis of sexual orientation beginning in September 2006, when they informed Sgt. Podorski that they were in a same-sex relationship. Plaintiffs contend that the news of their relationship led to different treatment throughout the fall of 2006, with increasingly hostile behavior in 2007 and later. They argue that they were subjected to harassing comments in the workplace, with Sgt. Podorski criticizing each woman to the other and making disparaging remarks about the relationship in the fall of 2006. *See, e.g.*, Jones Dep. at 109-10 (recalling that around this time Sgt. Podorski told Ms. Jones that Ms. Weeks was a "drama queen" and

"poison"). They complain that Sgt. Podorski prevented them from bidding on the same PSA in late fall 2006 because he assigned Ms. Jones to be out on duty during bidding. In addition to this central complaint, Plaintiffs allege that Sgt. Podorski frequently targeted Plaintiffs with hostility such as his inappropriately posted notice concerning their UFIRs in January 2007 to embarrass Plaintiffs, *see* Jones Dep. at 55-56; Weeks Dep. at 85; made other staffing decisions to prevent them from riding together during the fall of 2006 and into the spring of 2007, *see, e.g.*, Jones OHR File at 13-14 (alleging that Sgt. Podorski's Roll Call assignments were discriminatory); shouted "Do you want to f—k?" at them during a Bike Week party in May 2007, *see, e.g.*, Podorski Dep. at 66; gave or encouraged others to give both Plaintiffs lower-than-deserved performance evaluation ratings in November 2007, *see* Jones Annual Evaluation 2007; 3d Am. Compl. ¶ 99;[15] and refused to sign a routine report for Ms. Jones in March 2008, *see* Jones Dep. 52-53.

        Plaintiffs also allege hostility on the part of Sgt. Washington: allegedly, he asked Ms. Weeks why she "switched to being with women" while driving together to South Carolina for Bike Week in May 2007, *see* Washington Dep. at 77-79; assigned Ms. Weeks to the Marjorie Court temporary detail in September and October 2007, *see* Washington Dep. at 55; Weeks IAD

---

[15] Ms. Weeks also points to MPD's internal assessment of Plaintiffs' complaints, the Vaughan-Roach Report, in which MPD's internal reviewer concluded that Sgt. Podorski improperly gave Plaintiffs "meets expectations" ratings in November 2007, and that his behavior toward them appeared to have been motivated by personal factors unrelated to job performance. *See* MPD Internal Memo on Plaintiffs' Claims [Dkt. 93-6] (Vaughan-Roach Report). The Vaughan-Roach Report, authored by an MPD employee named Sharon Vaughan-Roach, included a summary of internal mediation related to Plaintiffs' complaints, as well as Ms. Vaughan-Roach's findings regarding the allegations. There is insufficient information in the record regarding Ms. Vaughan-Roach's qualifications or seniority to attribute her findings to MPD; the Court may cite to this and other administrative documents in the record in analyzing the claims at bar to the extent the documents provide evidence of timing.

Interview at 9-11;[16] had Ms. Weeks investigated for "neglect of duty" in October 2007, *see* Weeks Dep. at 176-78, and marked her as AWOL the following month, *see* Weeks AWOL Investigation Memorandum; marked Plaintiffs out for two hours, rather than the one hour they requested, when they attended a wedding in October 2007, *see, e.g.*, Weeks Dep. at 176; and expressed anger toward Plaintiffs when he allegedly told Ms. Jones in November 2007 "you can feed the dogs but they will bite you," and "You and your girl f—ked up." *See* Jones PD-119 Report. Ms. Weeks also testified that Sgt. Washington's girlfriend told Ms. Weeks that he had described Ms. Jones as "the butch one" and Ms. Weeks as "the femme one," which Ms. Weeks considered evidence of Sgt. Washington's inappropriate focus on their sexual orientation. Weeks Dep. at 95-97. Sgt. Washington testified that he did not recall using those terms, but that the description was "a known impression" in 7D. Washington Dep. at 79.

        The District counters that its actions were based on the legitimate needs of the workplace and not motivated by animus based on Plaintiffs' sexual orientation or protected activity. For example, the District argues that Plaintiffs had increased UFIRs when they worked together (a point Plaintiffs do not challenge) and that Ms. Jones had long been known by her colleagues to be a lesbian, so it would not make sense to attribute hostility in the workplace against Ms. Jones due to her relationship with Ms. Weeks. *See* Def.'s Undisputed ¶ 13. Additionally, the District raises non-discriminatory bases for the allegedly hostile behavior of

---

[16] Sgt. Washington testified that he assigned Ms. Weeks to the Marjorie Court detail because Plaintiffs needed to be separated after they refused to obey his direct order to make an arrest based on reports of a stolen car. Plaintiffs do not dispute that they refused to obey Sgt. Washington's order. Instead they cite to hearsay or lay opinion testimony which is inadmissible in federal court, in particular, testimony from Sgts. Branham and Rosenthal giving their *opinions* that Sgt. Washington bore ill will towards Plaintiffs. *See, e.g.*, Branham Dep. at 29; Jones OHR Letter of Determination: Cause Finding at 9-10 (July 16, 2010) (quoting Sgt. Rosenthal) [Dkt 97-5]. Opinion testimony from lay witnesses is generally inadmissible in federal court. *See* Fed. R. Evid. 701.

Sgts. Podorski and Washington. Aside from the danger posed by Plaintiffs' UFIRs when they worked together, the District contends that Sgt. Podorski's alleged hostility toward Plaintiffs is traceable to their refusal to follow his orders in handling the domestic violence call on September 24, 2006. Similarly, Sgt. Washington became frustrated and angry when Plaintiffs outright refused, in September 2007, to arrest a prostitute suspected of stealing a reported stolen car as he ordered.

To determine whether a work environment is hostile, courts look to "'all the circumstances,' including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Vickers v. Powell*, 493 F.3d 186, 197 (D.C. Cir. 2007) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88 (1998)). The alleged hostility must be "severe or pervasive" to support the claim. *Stewart v. Evans*, 275 F.3d 1126, 1133 (D.C. Cir. 2002); *accord Oncale v. Sundowner Offshore Serv., Inc.*, 523 U.S. 75, 78, 81 (1998); *Harris*, 510 U.S. at 21. A court's determination is not based on a single factor but on the totality of the circumstances and "the timeline of events as a whole." *See, e.g.*, *Brooks*, 748 F.3d at 1276.

In this analysis, "not all abusive behavior, even when it is motivated by discriminatory animus, is actionable"; rather, to support a claim of hostile work environment the plaintiff must show that "offensive conduct 'permeate[s] [the workplace] with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment.'" *Stewart*, 275 F.3d at 1133 (quoting *Barbour v. Browner*, 181 F.3d 1342, 1347-48 (D.C. Cir. 1999), and *Oncale*, 523 U.S. at 78). In *Baloch v. Kempthorne*, the D.C. Circuit specifically held that "the totality of circumstances" failed to support a hostile work

environment claim where "none of the comments or actions directed at [the plaintiff] expressly focused on his race, religion, age, or disability"; there was no evidence of "tangible workplace consequences"; and the employer identified "legitimate reasons and constructive criticism" for the letters of reprimand at the center of the plaintiff's claims. *Baloch*, 550 F.3d at 1201. Similarly, in *Brooks*, the D.C. Circuit affirmed summary judgment against a plaintiff who complained of a hostile work environment on the basis of her race and gender and argued that abusive conduct added to an "alleged aura of hostility," but could not point to any explicitly discriminatory comments or actions. *See Brooks*, 748 F.3d at 1276-77.

The District urges the Court to adopt the reasoning of *Bryant v. Brownlee*, 265 F. Supp. 2d 52 (D.D.C. 2003). It tries to frame Plaintiffs' hostile work environment claims as simply an amalgam of the sergeants' alleged improper actions, which may have been uncivil but were separated by gaps of time, rendering them only ordinary workplace trials and tribulations. In *Bryant*, however, the district court granted summary judgment after determining that almost "none of the events described in plaintiff's 21-page complaint [had] *any* racial or age-related overtones." *Bryant*, 265 F. Supp. 2d at 64 (emphasis added). The two alleged incidents in *Bryant* that were not "completely neutral" with regards to any protected status were comments by co-workers, one of whom allegedly called the plaintiff an extremely offensive racial epithet while in a Metro station, and the other of whom allegedly told plaintiff that she believed "black women were at the bottom" of a perceived hierarchy for advancement in government jobs. *Id.* at 64. The *Bryant* case is not, however, the perfect analog that the District wishes it were. Mses. Weeks and Jones allege that Sgt. Podorski explicitly disparaged their relationship and made sexual comments, in the context of other allegedly hostile actions that could be interpreted to have been motivated by hostility based on the relationship; Ms. Jones also alleges that Sgt.

Smallwood, also her superior, asked her if he could "have a kiss." Such allegations of explicit

sexual behavior, or inappropriate comments regarding the same-sex relationship, render the

comparison to *Bryant* inapposite. *See, e.g.*, *Hammel*, 206 F. Supp. 3d at 239 (discussing a

manager's inappropriate reference to plaintiff's and other employees' sexual orientation).

The District also argues that "Plaintiffs' multiple complaints regarding personnel

decisions"—including the claim at the heart of this case, that Sgt. Podorski began to separate

them after learning of their same-sex relationship—do not support a harassment claim. The

District argues that its "legitimate need to manage employee staffing levels and employee

assignments is not trumped by Plaintiffs' desire to ride in the same car." Mot. at 39. Of course,

this is true—so long as the need is legitimate. The problem is that D.C. has discarded the records

that would show officer assignments so that a comparison of Plaintiffs' experience and that of

others could be made. As a result, the nature of MPD's legitimate needs and Plaintiffs'

experiences between fall 2006, when Plaintiffs informed Sgt. Podorski of their same-sex

relationship, and August 2007, when Ms. Weeks transferred to the midnight shift under Sgt.

Washington, must be based on credibility determinations of witness testimony by a fact-finding

jury.[17]

Further to this point, the District argues that Mses. Jones and Weeks had

increased UFIRs when they worked together, which provides a legitimate, nondiscriminatory

reason why Sgt. Podorski separated them. While Plaintiffs complain that Sgt. Podorski

inappropriately posted information about their UFIRs, they do not deny the number of UFIRs

---

[17] The District also contends that because none of these personnel decisions is "actionable" they
do not support the hostile work environment claim. Mot. 37. As applied to the remaining claims
at bar, all of which are based on a hostile work environment theory, this point is incorrect on the
law: individual allegations need not be actionable to support a hostile work environment claim.

they filed.  Ultimately, the written record is insufficient to make this determination and a jury

will have to evaluate witness credibility.[18]

        Further potential evidence of a hostile work environment could be found by a jury

in Sgt. Podorski's drunken shout, "Do you want to f—k?" during a party at Bike Week.  The

District argues that the outburst was an isolated incident and stresses that it occurred outside of

work.  It cites *Bergbauer v. Mabus*, 934 F. Supp. 2d 55 (D.D.C. 2013), in which summary

judgment was granted even though the plaintiff's supervisor had touched her sexually on one

occasion outside of work.  It is true that antidiscrimination statutes do not constitute "a general

civility code."  *Oncale*, 523 U.S. at 81.  It is also true that Sgt. Podorski's outburst occurred in a

social setting, away from the District of Columbia.  However, the party was attended by many

coworkers and supervisors and the offending comment was made by a direct supervisor.  Actions

outside the workplace can contribute to a hostile work environment.  *See, e.g.*, *Greer v. Paulson*,

505 F.3d 1306, 1314 (D.C. Cir. 2007) ("We join our sister circuits in rejecting a *per se* rule

against considering incidents alleged to have occurred while an employee was physically absent

from the workplace.").  While a single offensive utterance outside the workplace does not create

a hostile work environment at work, the Court cannot make that distinction here on the written

---

[18] Sgt. Branham testified that officers in heterosexual relationships were permitted to ride
together, *see* Branham Dep. at 16-17, 26, 29; recalled that she had heard Sgt. Washington saying
he was going to "get" Plaintiffs, *id.* at 20; and stated that Plaintiffs had been separated by Sgt.
Podorski or Sgt. Washington in Roll Call assignments.  *Id.* at 26.  Plaintiffs also cite to other
portions of Sgt. Branham's testimony in which she attributes motives to the alleged behavior of
Sgts. Podorski and Washington.  To the extent that these portions of Sgt. Branham's testimony
are raised to prove the truth of the matter asserted—that is, to assign discriminatory motives to
Sgts. Podorski's and Washington's actions—they are, of course, hearsay and inadmissible and
also lay opinion that is inadmissible.  *See* Fed. R. Evid. 801(c); *see also* Fed. R. Evid. 701
(restricting opinion testimony by lay witnesses to opinions that are "rationally based on the
witness's perception," and "helpful to clearly understanding the witness's testimony or to
determining a fact in issue").

record.  Further, it is uncontested that Sgt. Podorski lowered the annual evaluations of Mses. Jones and Weeks (whose rating was quickly raised by another sergeant) in late fall 2007.

As the District correctly argues, "not everything that makes an employee unhappy is an actionable adverse action," and allegations must objectively contribute to the discrimination alleged in order to be actionable.  *See* Mot. at 39 (quoting *Lester v. Nastios*, 290 F. Supp. 2d 11, 28 (D.D.C. 2003)).  The Court finds that this principle bars Plaintiffs from presenting the entirety of their allegations to a jury.  Some of the incidents of which Plaintiffs complain are mere trivialities that do not support their allegations.  These include Sgt. Washington asking Ms. Weeks "a couple times" to ride their motorcycles to work together in August 2007; Sgt. Podorski throwing a form to the floor in annoyance in March 2008; Sgt. Washington accusing Ms. Weeks of being AWOL in October 2007 when she was admittedly AWOL *and* did not learn of this AWOL until a full year later—*i.e.*, clearly it could not have created a hostile work environment in 2007; and Sgt. Washington marking each Plaintiff absent for two hours, the minimum time for personal leave, when they reported for work late after attending a wedding.  Plaintiffs do not dispute the MPD policy to grant such personal leave in two-or-four hour increments or that Sgt. Washington marked them out before he left 7D, before they arrived at 7D, and before he knew when Plaintiffs actually reported for work.  In addition, Plaintiffs did nothing to correct the record, not speaking with Sgt. Washington or the timekeepers.  This small snafu is merely one of those trivial annoyances any employee might suffer.

The Court also finds that Sgt. Washington's assignment of Ms. Weeks to the temporary Marjorie Court detail in the fall of 2007 was provoked by her refusals to follow his direct orders to arrest the prostitute driving a stolen car.  Ms. Weeks complains she could not ride with Ms. Jones and that Sgt. Washington had "informed other officers who asked for the

Marjorie Court detail that he was 'saving this for my girl.'"  Weeks OHR Complaint (Apr. 20,

2009) at 3; *see also* Washington Dep. at 157 (stating that he did not recall saying he was saving

the Marjorie Court detail for Ms. Weeks but that "[i]t may have happened").  Ms. Weeks does

not deny that she refused to follow Sgt. Washington's direct order, that she argued with him

about it, and that he became angry as a result.  This uncontested insubordinate conduct provides

a legitimate non-discriminatory reason for Sgt. Washington's temporary assignment not

connected by word or inference to Ms. Weeks's sexual preference.[19]

   The Court also finds that the uncontested evidence related to CDR Maupin's

"body-for-body" policy is insufficient to suggest that he targeted Plaintiffs because of their

sexual orientation.  Ms. Weeks identified a single comparator, whom she *thought* may have been

allowed to transfer between bids despite the alleged policy.  *See* Weeks Dep. at 130-32.  That

single possible example does not discount the legitimate business purpose of CDR Maupin in

deciding not to institute the mandatory transfer of a replacement—or work short-handed—to

accommodate a transfer request outside the bid process.  CDR Maupin suggested that Plaintiffs

file an EEO complaint about Sgt. Podorski with IAD if they wanted to do so but they apparently

decided to forego that route.  Notably, Plaintiffs do *not* complain that CDR Maupin failed to

---

[19] Because there is insufficient evidence in the record to support a claim that Sgt. Washington's actions were motivated by hostility based on sexual orientation, his alleged use of loaded terms ("the butch one" and "the femme one") when speaking privately to his girlfriend, a non-employee, cannot support an allegation that his actions were motivated by hostility based on sexual orientation.  As will be explained below, the Court finds that the allegations concerning some of Sgt. Washington's remarks (*e.g.*, "You and your girl f—ked up") and behavior could support Count VII, which alleges a *retaliatory* hostile work environment, but not Count I, which alleges a hostile work environment based on sexual orientation.  Even as alleged, Sgt. Washington's behavior was not "severe" or "pervasive" enough to create a hostile work environment on the basis of sexual orientation.

investigate their report that Sgt. Podorski was treating them inequitably, but only complain about the body-for-body policy, as to which they have no evidence of illegal hostility.

Finally, some of Plaintiffs' allegations of inappropriate sexual comments by co-workers cannot as a matter of law support their claims. Where these allegations concern the offensive behavior of other non-supervisory officers that was not reported, MPD cannot be held liable. *See, e.g.*, *Curry v. D.C.*, 195 F.3d 654, 660 (D.C. Cir. 1999) (holding that an employer may be held liable for harassment by a non-supervisory co-worker only if the employer knew or should have known of harassment and failed to take appropriate remedial action). Thus, Officer Pristoop's alleged offer to pay Plaintiffs to watch them have sex, *see* Jones Dep. at 264-66, and Officer Chapman's allegedly encouraging Ms. Weeks to "go back" to dating men, *see* 3d Am. Compl. ¶ 18, do not support Plaintiffs' claims, because there is no evidence that either Plaintiff told MPD about these incidents.

## B. Hostile Work Environment Based on Sex

### 1. Timeliness

Plaintiffs' charges of gender discrimination under Title VII must have been brought within 300 days of at least one of the acts alleged to have contributed to the hostile work environment or they are time-barred. *See Glenn*, 2006 WL 401816 at \*15. Plaintiffs' amended OHR Complaints, in which Plaintiffs first raised allegations of a hostile work environment based on sex, were signed on April 20, 2009, *see* Weeks OHR Complaint (Apr. 20, 2009); Jones OHR Complaint (Apr. 20, 2009), but because Plaintiffs' counsel emailed Plaintiffs' statements amending their OHR complaints on April 1, 2009, the Court accepts April 1, 2009 as the date the

amended charges were filed.  *See* Juliette Niehuss Email (Apr. 1, 2009).[20]  Given the April 1,

2009 filing date, Plaintiffs must have alleged at least one incident contributing to the alleged

hostile work environment that occurred on or after June 5, 2008 (300 days before April 1, 2009).

Ms. Jones's amended OHR complaint contains no allegations based on incidents

that occurred on or after June 5, 2008.  *See* Jones OHR Complaint (Apr. 20, 2009).  The latest

incidents alleged in Ms. Jones's amended OHR complaint occurred in May 2008.  Ms. Jones's

Title VII claims are therefore time-barred.

The amended OHR complaint filed by Ms. Weeks, in contrast, alleged two

incidents that occurred after June 5, 2008:  (1) she learned in August 2008 (before moving to the

Detectives' Office) that she had received an AWOL charge and had been the subject of an

AWOL investigation in October 2007; and (2) she was not treated as well as her male colleagues

in the 7D Detectives' Office and discovered on February 17, 2009 an open tampon in her desk at

---

[20] The District also concedes April 1, 2009, as the filing date for the Title VII charges.  *See* Mot.
at 57 (acknowledging that Ms. Jones's complaint was amended on April 1, 2009, and citing Ms.
Niehuss's email to OHR for this date); *see also* D.C. Office of Human Rights, How to File a
Complaint, https://ohr.dc.gov/service /file-discrimination-complaint (last visited Mar. 8, 2018)
(noting that "submi[ssion]" to OHR constitutes filing a complaint); U.S. Equal Employment
Opportunity Commission, How to File a Charge of Employment Discrimination,
https://www.eeoc.gov/employees/howtofile.cfm (last visited Mar. 8, 2018) (providing that a state
or local agency that enforces employment-discrimination laws can automatically cross-file a
charge with EEOC.  Plaintiffs' arguments that their amended OHR complaints were filed prior
to April 2009 are unavailing.  On December 23, 2008, Plaintiffs' counsel sent letters notifying
MPD of Plaintiffs' intention to amend their complaints.  *See* Weeks OHR File at 20; Jones OHR
File at 20.  Plaintiffs contend that, for purposes of the Title VII analysis, the 300-day limitations
period should be measured from December 23, 2008.  To the contrary, the statute is clear that the
relevant date is when a charge is actually *filed* under Title VII.  *See* 42 U.S.C.A. § 2000e-5(e)(1)
(providing that "[a] charge under this section shall be filed" within three hundred days of the
alleged unlawful action and separately providing for notice to the employer).

the Detectives' Office.  *See* Weeks OHR Complaint (Apr. 20, 2009).  The other incidents

described in the amended OHR complaint occurred before June 5, 2008.

### 2. Merits

Although her claim is timely, Ms. Weeks fails to make out a case of hostile work

environment based on sex under DCHRA (Count III) or Title VII (Count V).  Both plaintiffs' sex

discrimination arguments rely on the theory that they suffered harassment in 7D because they, as

women in a lesbian relationship, failed to conform to "typical gender stereotypes."  Weeks

Opp'n at 28; Jones Opp'n at 26-27.  Ms. Weeks also alleges that she was subjected to a hostile

work environment due to her sex when she became an Investigator in November 2008 and joined

the Detectives' Office.  Again, she attributes "examples of the harassment" to "[her] non-

conformity with gender stereotypes and perceptions about her sexual orientation," not to her

female sex.  Weeks Opp'n at 34.[21]  This Court disagrees with those courts that have held that

Title VII prohibits discrimination based on sexual orientation; whether it should have then, or

should be amended to do so now, the Court finds no suggestion that the Congress of 1964, or the

Supreme Court cases, intended the language of Title VII to be so broad.  Rather, this Court

agrees with the District that sexual orientation is a separate class of protected individuals and

---

[21]  To support her sex discrimination charge, Ms. Weeks cites a concurrence from the Ninth
Circuit, *Latta v. Otter*, 771 F.3d 456 (9th Cir. 2014) (Berzon, J., concurring), as well as an
amended denial of rehearing from the Seventh Circuit, *Muhammad v. Caterpillar Inc.*, 767 F.3d
694 (7th Cir. Sept. 9, 2014, as amended on denial of rehearing, Oct. 16, 2014).  *See* Weeks
Opp'n at 30 n.11 and accompanying text (arguing that discrimination on the basis of sexual
orientation is illegal under Title VII).  The Court is aware that there has been some expansion of
Title VII in some jurisdictions as Ms. Weeks argues, *see, e.g.*, *Zarda v. Altitude Express, Inc.*,
883 F.3d 100 (2d Cir. 2018) (en banc); however, the Court disagrees with the logic behind these
decisions, and the case law is, at best, unsettled.  Moreover, there is no D.C. Circuit precedent
departing from the established interpretation of federal law that harassment based on sexual
orientation does not support a claim of gender discrimination under Title VII and DCHRA
clearly differentiates the two statuses.

notes that Plaintiffs make such allegations in Count I. A change in federal law awaits congressional action. For this reason, as well as the untimeliness of Ms. Jones's Title VII charge, the lack of merit to Ms. Weeks's Title VII sex-discrimination charge, and the lack of merit to Plaintiffs' DCHRA charge of sex discrimination, this Court will grant summary judgment to the District on Counts III and V.

Even were Ms. Weeks's allegations based on her sex, rather than her sexual orientation, the Court finds that she fails to demonstrate a hostile work environment in the Detectives' Office. Ms. Weeks alleges that her "cases, search warrants, and other job duties" were routinely given to "male investigators or detectives with less experience." Weeks Opp'n at 33.[22] She offers no specifics and, on the question of whether cases were transferred to males when they were ripe for arrest warrants, she provided only vague testimony that this happened one time. While Ms. Weeks argues in brief that she was told "to not be so 'timid,'" *id.*, she testified that she was asked *whether* she was "timid." *See* Weeks Dep. at 259. Ms. Weeks claims that she was "ridiculed" by Sgt. King, her supervisor in the Detectives' Office, when she requested training. Weeks Opp'n at 34. In fact, however, Sgt. King did not express ridicule but annoyance at Ms. Weeks's having sought help outside the unit. *See* Avis King Email (Dec. 9, 2008). This incident had nothing to do with Ms. Weeks's sex; moreover, Sgt. King's email was directed to all officers who reported to Sgt. King and did not name or otherwise identify Ms. Weeks. *See id.* Ms. Weeks also complains that, when she became a detective, she wanted to work in homicide but initially received less desirable assignments; her personal preference does not provide evidence that the assignment was based on her sex. Finally, as to the incident

---

[22] Since Ms. Weeks had just been promoted, it seems implausible that there were other investigators who had less experience than she.

involving an unused tampon, Ms. Weeks interpreted it as an aggressive act against her as a woman and makes a general assertion that the District is responsible for maintaining the workplace. *See* Mot. at 13. While the tampon may have offended Ms. Weeks, it was not threatening or even particularly offensive. It appears to have been, at worst, an anonymous crass joke. These allegations do not raise a genuine issue of material fact as to whether Ms. Weeks suffered severe or pervasive harassment in the Detectives' Office.

Plaintiffs also bring sex-based hostile work environment claims under DCHRA, supported by the same facts as those alleged in support of their Title VII claims. *See* Weeks Opp'n at 28-34; Jones Opp'n at 26-31. For the same reasons discussed in the context of her Title VII claim, summary judgment will also be granted as to Ms. Weeks's sex-based harassment claims under DCHRA.[23]

### C. Hostile Work Environment Based on Retaliation

Finally, Plaintiffs allege that they were subjected to a hostile work environment in retaliation for their complaints about harassment due to their sexual orientation, in violation of DCHRA. *See* D.C. CODE § 2-1402.61(a) (2001) (establishing that retaliation constitutes an "unlawful discriminatory practice" under DHCRA). To prevail on such a claim, a plaintiff must show that she was subjected to "'discriminatory intimidation, ridicule, and insult' of such 'sever[ity] or pervasive[ness] [as] to alter the conditions of [her] employment and create an abusive working environment.'" *Hussain* 435 F.3d at 366 (quoting *Harris*, 510 U.S. at 21-22).

Plaintiffs allege that the workplace hostility "became even more abusive" after they complained, which included their superiors making "specific reference to [their] having

---

[23] Ms. Jones's arguments, which largely mirror Ms. Weeks's, *see* Jones Opp'n at 29-31, would be similarly unavailing if they were timely.

engaged in protected activity." *See, e.g.*, Jones Opp'n at 47. Plaintiffs place their first complaints in January 2007, when they spoke together to Lt. Derek Larsen about Sgt. Podorski, telling Lt. Larsen that they did not want to work with Sgt. Podorski anymore because of the way he had been treating them. *See* Jones Dep. at 69, 72-79. Around the same time, Ms. Weeks also spoke to Sgts. Levenberry and Smallwood about Sgt. Podorski's alleged harassment; she claims that although they informed her of her right to file an EEO complaint, they warned that if she did so, Sgt. Podorski might claim that she had slept with him. *See* Weeks Dep. at 63. In February 2007, Plaintiffs also discussed Sgt. Podorski's allegedly harassing behavior with Lt. Rosenthal. *See* Weeks Dep. at 333; Rosenthal Dep. at 59-62. Several months later, in October 2007, Plaintiffs went out on stress leave, filing forms with MPD that identified Sgts. Podorski and Washington by name and advanced allegations of harassment. Plaintiffs filed their OHR complaints in March 2008 and amended them in April 2009. A reasonable juror could conclude that these complaints support a retaliatory hostile work environment claim.

Plaintiffs allege that Sgt. Washington confronted Ms. Jones in November 2007 and "yelled . . . '[y]ou can feed the dogs but they will bite you,'" which she understood to be a threat related to her complaints of harassment. *See* Jones Disputed ¶ J088; Washington Dep. at 83-84 ("I think I may have said that, yeah."). According to a written statement in one of Ms. Jones's administrative complaints, on January 22, 2008 Sgt. Washington said to her, "Y'all pulled that shit. You jumped on the band wagon with Weeks. I always been straight with you. That shit is f—ked up. You and your girl f—ked up." Jones PD-119 Report (Jan. 22, 2008).

Both Plaintiffs also believe that their lowered performance ratings of "meets expectations" by Sgt. Podorski in November 2007 were motivated by retaliatory animus.[24]

The District counters that Plaintiffs' retaliation claims fail, primarily because the claims are based on the same facts as the hostile work environment claims, which the District argues have not been established. As stated above, the Court disagrees with the premise of this argument.

The District also argues that Plaintiffs' allegations are insufficiently severe or pervasive to alter the conditions of their employment, but, again, the Court disagrees. Plaintiffs' allegations suggest that, in the wake of their taking concrete steps to raise their claims of discrimination and harassment based on sexual orientation in fall 2007, Sgt. Podorski and, later, Sgt. Washington became increasingly hostile toward them. In particular, Plaintiffs attribute Sgt. Podorski's lowered performance evaluations in 2007 as well as increased anger and hostility from Sgts. Podorski and Washington in late 2007 and January 2008 to retaliatory motives. From the written record, the Court cannot make the credibility determinations needed to decide the facts, *i.e.*, whether the alleged harassment was sufficiently severe or pervasive to interfere with Plaintiffs' abilities to perform their jobs, and whether it was provoked by disdain for their sexual orientation or in retaliation for their complaints.

---

[24] Plaintiffs point to other incidents in support of their retaliatory hostile work environment claims, but many of these allegations are too attenuated in time and insufficiently extreme or suggestive of retaliatory animus to have contributed to a severe or pervasive hostile work environment. For this reason, the Court finds that, as a matter of law, neither CDR Maupin's reassignment of Ms. Weeks to the midnight shift in May 2008, nor his allegedly telling Ms. Jones she need not "follow" Ms. Weeks "everywhere she [goes]," can support the retaliatory hostile work environment claim. *See* Jones OHR Complaint (Apr. 20, 2009). Nor can Ms. Jones's contention that she was prevented from leaving work early to visit Ms. Weeks in the hospital after Ms. Weeks was in a car accident, also in May 2008. *Id.* These appear to have been discrete incidents and the record cannot support an assumption that they were motivated by animus stemming from the OHR complaints.

The District's motion for summary judgment will be denied as to Count VII.

### III.    CONCLUSION

For the foregoing reasons, the District's Motion for Summary Judgment [Dkt. 90] will be granted in part and denied in part. The motion will be granted as to Counts III and V in Plaintiffs' Third Amended Complaint [Dkt. 26]; Counts II, IV, VI, and IX, which Ms. Jones has withdrawn, will be dismissed with prejudice. The District's motion will be denied as to Counts I and VII.

Plaintiffs also have moved for attorney fees and costs. *See* Motion for Attorney Fees and Costs [Dkt. 78]. This motion will be denied without prejudice as premature. The Court will consider any motions for attorney fees and costs after the completion of this case.

A memorializing Order accompanies this Opinion.


Date:  June 4, 2018                        _____/s/_____
                                           ROSEMARY M. COLLYER
                                           United States District Court